```
 1                       UNITED STATES DISTRICT COURT
                         WESTERN DISTRICT OF KENTUCKY
 2                          LOUISVILLE DIVISION

 3
       UNITED STATES OF AMERICA,      )    Case No. 3:22-CR-00033-BJB
 4                                    )
               Plaintiff,             )
 5                                    )
       v.                             )
 6                                    )
       QUINTEZ O. BROWN,              )
 7                                    )    April 15, 2022
               Defendant.             )    Louisville, Kentucky
 8

 9                              *  *  *  *  *

10                     TRANSCRIPT OF DETENTION HEARING
                       BEFORE HONORABLE COLIN H. LINDSAY
11                      UNITED STATES MAGISTRATE JUDGE

12                              *  *  *  *  *

13     APPEARANCES:

14     For United States:        Amanda E. Gregory
                                  U.S. Attorney's Office
15                                717 West Broadway
                                  Louisville, KY 40202
16
                                  Jolee Porter
17                                Department of Justice
                                  Public Integrity Section
18                                1301 New York Avenue NW
                                  Washington, DC 20530
19
       [Defendant present.]
20

21
                           Dena Legg, RDR, CRR, CCR-KY
22                          Official Court Reporter
                             232 U.S. Courthouse
23                          Louisville, KY 40202
                               (502) 625-3778
24
       Proceedings recorded by certified stenographer, transcript
25     produced by computer.
```

```
 1    APPEARANCES (CONTINUED):

 2    For Defendant:          Rob Eggert
                              Tricia F. Lister
 3                            600 West Main Street, Suite 200
                              Louisville, KY 40202
 4
                              Tricia F. Lister
 5                            600 West Main Street, Suite 100
                              Louisville, KY 40202
 6
                              Patrick J. Renn
 7                            Smith & Helman
                              600 West Main Street, Suite 100
 8                            Louisville, KY 40202

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1        (Begin proceedings in open court at 1:11 p.m.)

2            DEPUTY CLERK:  3:22-CR-33, United States of America

3    versus Quintez Brown for a detention hearing.

4            THE COURT:  All right.  Attorney appearances, please.

5            MS. GREGORY:  Amanda Gregory for the United States.

6            MS. PORTER:  Jolee Porter with the United States from

7    the Public Integrity Section, Your Honor.

8            THE COURT:  All right.  And for the defendant?

9            MR. EGGERT:  Good afternoon, Your Honor.  Rob Eggert

10   and Patrick Renn and Ms. Lister, and we're here for Quintez

11   Brown.

12           MR. RENN:  Good afternoon, Your Honor.

13           THE COURT:  All right.  And this is Mr. Brown here

14   with us?

15           MR. EGGERT:  Yes.

16           THE COURT:  All right.  So let me say essentially what

17   I did before the last hearing.  We're all in here kind of side

18   by side, shoulder to shoulder.  For those of you who are --

19   well, whether you're concerned about COVID or not, just some

20   general rules.

21       No one has to wear a mask.  Anyone can wear a mask.  If

22   there is someone that you either know who is, for example, on

23   the prosecution team or on the defense team, if there's someone

24   with you that you know is comfortable talking to you in

25   proximity without a mask, that's fine.  I'm not going to impose

1   any rule on you.  If there is anyone about whom you're not sure

2   or if you know would prefer to not have -- not be in proximity

3   with you without a mask, then please respect those wishes.

4       So that is a complicated way of saying, with respect to

5   masks and distancing, do your own thing but be respectful of the

6   rights of others to do their own things as well.

7       All right.  So, Ms. Gregory, with respect to detention,

8   which is what we're here for today, by my review there is a

9   rebuttable presumption under 3142(e)(3) and perhaps other

10  sections as well.  Do you agree with that?

11              MS. GREGORY:  Yes, Your Honor.

12              THE COURT:  All right.  Mr. Eggert or Mr. Renn, do

13  you-all agree?

14              MR. EGGERT:  Yes, Your Honor.

15              THE COURT:  Okay.  So in that instance, I'd like to

16  hear any witnesses that either of you intend to call and then

17  arguments from each of you.

18      And given the application of that rebuttable presumption,

19  Mr. Eggert, I'll hear from you-all first.  And I'm gonna just

20  call on you out of habit so I'm calling on one of you instead of

21  three of you.  Any of the lawyers on your team -- you-all split

22  things up the way that you have decided to do so.  So,

23  Mr. Eggert, any witnesses?

24              MR. EGGERT:  Yes, Your Honor.  The first witness would

25  be Ricky Jones.

Jones - Direct

```
1        (DR. RICKY L. JONES, called by the defendant, sworn.)
2             THE COURT:  Mr. Eggert, Mr. Jones -- is it mister or
3   doctor?
4             THE WITNESS:  Doctor.
5             THE COURT:  Dr. Jones, could you make sure that you
6   use that microphone.  You can either move closer to it or move
7   it closer to you.
8             THE WITNESS:  Yes, sir.
9             THE COURT:  Just make sure you're speaking into it so
10  I can hear you, please.
11            THE WITNESS:  That's fine.  Is that good?
12            THE COURT:  Yes.  Thank you.
13                        DIRECT EXAMINATION
14  MR. EGGERT:
15  Q.  Could you state your name for the record.
16  A.  Dr. Ricky L. Jones.
17  Q.  And what's your job?
18  A.  I'm a professor at the University of Louisville.  I'm the
19  chair of the Pan-African Studies Department.
20  Q.  How long have you been at U of L in that capacity?
21  A.  Twenty-six years come August of this year.
22  Q.  All right.  And do you also write for the *Courier-Journal* at
23  times?
24  A.  I do.  I have a biweekly column in the *Courier-Journal* and
25  the USA Today Network.
```

Jones - Direct

1   Q.   Do you know Quintez Brown?

2   A.   I do.

3   Q.   How do you know him?

4   A.   I know him as a student.  I met Quintez when he was a high

5   school student, and then he came to the University of

6   Louisville.  I taught him several classes.  He joined my

7   fraternity.  I spent a lot of time with him, both in the

8   classroom, in my office, and outside.

9   Q.   Do you know him well?

10   A.   I would say so as far as students go, yes.

11   Q.   All right.  And what kind of person -- in your interaction,

12   what kind of a person was and is Quintez Brown?

13   A.   One of the most brilliant kids I've ever met, sharp mind,

14   incredibly analytical, very respectful, great writer, advanced

15   on a level that I envied, you know.  I told him if I could write

16   as well as him at his age, I might have made something of

17   myself.  Good-looking, charismatic, well-liked, incredibly

18   respectful.

19       And to see him today, I really wonder what happened to him,

20   because he -- if I had -- I only have a daughter.  If I had a

21   son, I would have wanted it to be that kid.  Love him to death.

22   Q.   Obviously, do you believe, in light of the Quintez Brown you

23   knew, that he has had mental health struggles?

24   A.   You know, when he went missing -- at the time he went

25   missing, I was away.  I was home in Atlanta.  Another one of my

Jones - Direct

1    old students gave me a call and said he was missing.  I was
2    really worried about that.  It was odd.  And, you know, he -- I
3    feared that he was dead.  I really did.
4        And, you know, when he was found, I like others wanted to
5    respect, you know, whatever he was going through.  You know, I'm
6    not a mental health professional, but my mother and sister both
7    suffer bipolar disorder and depression.  So I've seen it, but I
8    thought that Quintez could level off, and I looked forward to
9    seeing him back on campus.  We traded texts and said, "Hey, man,
10   you good?"
11       "Yeah, Doc, I'm good.  I was like, "All right.  Come see me
12   when you're ready."
13       And I don't know what happened to him, but I believe to my
14   heart, to my soul that something happened to him.  And the
15   reason I'm here today, quite honestly -- you know, I didn't grow
16   up in privileged circumstances -- fifteen-year old mother,
17   didn't meet my father until I was 35 years old, grew up in the
18   housing projects of Atlanta, very violent environment where it's
19   easy to throw people away.
20       And I know the people who really embraced that kid when he
21   was a star at the University and, you know, wanted to prop him
22   up as, you know, this token achiever, token black achiever
23   certainly there, and then things happened to him and people
24   abandon him, as they abandon many people.  I don't have that in
25   me because I believe that something happened to him.  And I

1   don't know what, but I'm hoping that people find out because

2   that's not, you know, the kid that I know and -- so one of the

3   best kids I've met not just in my time at the University of

4   Louisville but in my life.

5   Q.   Okay.  Do you support his release?

6   A.   I've seen -- short answer, yes, because I've seen a lot of

7   situations where if something like this happens and people need

8   mental attention and -- they don't need to been incarcerated.

9   They may not need to be walking around on their own, but they

10   need to be somewhere where they can get the proper help.  And I

11   don't want to see him broken by simply being detained somewhere

12   in a jail or a prison because I don't think that's proper.

13   Q.   Now, we talked before and when we did -- and I gather you

14   have strong feelings supporting his release; is that correct?

15   A.   Yes.

16   Q.   In fact, did you even offer that he could live at your

17   house?

18   A.   I'll do whatever I have to do for him.

19   Q.   We're not proposing that, but you would even do that; is

20   that correct?

21   A.   He could walk out of here today and go home with me if

22   that's what somebody asked.  So if it's an issue -- I don't --

23   I'm not a lawyer.  I don't know why this is a federal case.  You

24   know, I live in a city where people begged for the federal

25   government to intervene when a young lady was killed by police

1    in her home in the city and they wouldn't.  So I don't know why

2    this is a federal case.  I'm not sure.

3        But what I do know is I love that boy so much, and I'm so

4    committed to not having his life destroyed from this point

5    forward before he can even see 22 or 23 years old that I'll do

6    whatever.  I have a 14-year-old daughter.  If he needs to come

7    home with me, he can go home with me, and he can stay there as

8    long as he needs me -- needs to.

9    Q.  And, finally, if -- let's say, if he was released to his

10   grandmother's house, would you visit him?  Would you be willing

11   to visit him?

12   A.   If his grandmother wanted me there, I would move in with

13   her.  I would do whatever needs to be done to help him; and, you

14   know, I'm not saying that lightly.  And let me say -- I'll keep

15   that simple.  Yes, I would visit him.  I would live with her.

16   They could live with me.  It wouldn't matter.

17               MR. EGGERT:  Thank you, sir.

18               THE COURT:  All right.  Any cross-examination?

19                          CROSS-EXAMINATION

20   BY MS. GREGORY:

21   Q.  Good afternoon, Dr. Jones.

22   A.   Good afternoon.

23   Q.  You said you've known Quintez Brown for a while; correct?

24   A.   Yes, ma'am.

25   Q.  And you obviously have a high opinion about him?

Jones - Cross

```
1    A.  Yes, ma'am.

2    Q.  You really care about him?

3    A.  Yes, ma'am.

4    Q.  And you don't want to see him go to jail?

5    A.  Ma'am?

6    Q.  You don't want to see him go to jail?

7    A.  I don't think that's the proper place for him.

8    Q.  You said you don't understand the charges in the case, but

9    you understand the general conduct at issue; correct?

10   A.  Yes.

11   Q.  You understand that he tried to assassinate a political

12   candidate?

13          MR. EGGERT:  Judge, we'd object to that.  She can say

14   tried to shoot.  "Assassinate," I'd object to that word.

15          THE WITNESS:  Martin Luther King was assassinated.

16          THE COURT:  Hang on.  Hang on, Dr. Jones.

17      What is the objection again?

18          MR. EGGERT:  The word assassinate.

19          THE COURT:  I don't know that that's part of the

20   charge.  Can't say I have the legal definition of assassination

21   on the tip of my tongue, but it's certainly not in the

22   indictment.  So I'll sustain the objection but give you an

23   opportunity to rephrase it.

24   BY MS. GREGORY:

25   Q.  You understand that he is charged with attempting to kill by
```

1    shooting a political candidate for a political motivation?

2    A.  No, I don't know that.  I know that that's the opinion of

3    somebody, that he tried to shoot somebody and it was politically

4    motivated.  I've heard opinions saying that, you know, he's an

5    anti-Semite.  I've heard all kinds of stuff, but I don't -- I

6    don't know how much credibility should be given to those

7    opinions.  And let me say this --

8             THE COURT:  All right.  Hang on.  Dr. Jones, I need

9    you to answer the question.

10            THE WITNESS:  Okay.

11            THE COURT:  If there are other questions that

12   Mr. Eggert wants to ask you, he can have the opportunity in a

13   minute.

14            THE WITNESS:  Very well.

15            THE COURT:  The question is --

16            THE WITNESS:  I know he's charged with shooting

17   someone, yes.

18            THE COURT:  Dr. Jones --

19            THE WITNESS:  Yes, sir.

20            THE COURT:  Don't interrupt me, please.

21            THE WITNESS:  Oh, yes, sir.

22            THE COURT:  All right.  The question was do you know

23   that that's what he is charged with.

24            THE WITNESS:  Yes, sir.

25            THE COURT:  Not whether you agree.

Jones - Cross

1      THE WITNESS:  Yes, sir.

2      THE COURT:  All right.

3   BY MS. GREGORY:

4   Q.  And do you know how long he was plotting to do the shooting?

5   A.  No, I do not.

6   Q.  Do you know who he was spending time with in January and

7   February of 2022?

8   A.  I do not.

9   Q.  You wrote an article for the *Courier-Journal* about the

10  defendant; correct?

11  A.  Yes.

12  Q.  And in that you said, at the time of the writing at least,

13  that you hadn't seen him since his disappearance?

14  A.  Yes, ma'am, that's correct.

15  Q.  Other than today in court, have you seen him since --

16  A.  No.

17  Q.  -- the writing of that article?

18  A.  No, ma'am.

19  Q.  So you generally don't know what was going on with his life?

20  A.  Ma'am?

21  Q.  So you don't generally know what was going on in his life

22  since --

23  A.  No, ma'am.

24  Q.  -- around June 2021?

25  A.  No, ma'am.

Jones - Cross

1  Q.  And when was the last time you had seen him before that

2  disappearance, before June 2021?

3  A.  I saw him on campus right when COVID started, I think, or

4  right before that.

5  Q.  So around spring 2020?

6  A.  Yes, ma'am.

7  Q.  You said he was a great writer.  Did you read a lot of his

8  writing?

9  A.  Most of it, yes, ma'am.

10  Q.  Did you read an article he published on Medium.com called "A

11  Revolutionary Love Letter" in January 2022?

12  A.  I don't think I've read that one, no, ma'am.

13        MS. GREGORY:  Okay.  May I approach the witness, Your

14  Honor?

15        THE COURT:  Yes.

16        MR. EGGERT:  Judge, I don't know what she's handing

17  the witness.

18        THE COURT:  Can you show Mr. Eggert what you're giving

19  the witness.

20     There's a little slot right there.  Thank you.

21  BY MS. GREGORY:

22  Q.  Can you read over this while you're up there just silently.

23  Are you finished?

24  A.  Yes.

25  Q.  What I gave you is Government Exhibit B, "A Revolutionary

Jones - Cross

1   Love Letter."  So is that the first time that you've read that?

2   A.  Yes, ma'am.

3   Q.  You talked about being familiar with the defendant's quality

4   of writing.  Is that consistent with the general quality of

5   writing that you know that he produces?

6   A.  Yes, ma'am, well-written.

7   Q.  Is there anything that seems unusual about this writing in

8   terms of being something that was written by the defendant to

9   you?

10  A.  In what way?  I don't understand.

11  Q.  Is it consistent with his other writing?

12  A.  He's written on a variety of subjects so --

13  Q.  Is it consistent with what you know of his political views?

14  A.  It's consistent with what I know of the quality of his

15  writing.

16  Q.  Okay.  Well, do you know anything about his political views?

17  A.  This -- I don't see this as a political piece of writing.  I

18  see it as a philosophical piece of writing.

19  Q.  Okay.  Do you think it's consistent with his philosophical

20  views that you know of?

21  A.  I think he explores a lot of things as he has as a student.

22  I wouldn't pigeonhole him into saying that this is the only

23  point of view that he's held.

24  Q.  Reading it, is it a shock to you that the defendant wrote

25  it?

Jones - Cross

1    A.   No.  It's something that I would have written as well.

2    Q.   And let's talk about some lines in here.  Did you -- did you

3    know that the defendant felt that our situation is one of

4    political warfare?

5    A.   I would say this:  Politics being defined by our last will

6    as the process that decides who gets what, when, where, how and

7    at looking at the suffering of black people in the country from

8    infant mortality to undereducation to unemployment to violence

9    subjected upon them by the state, then many would say it is

10   political warfare; and political warfare is not necessarily

11   violent.  That's a misnomer.  So I -- I would share that belief.

12       He cites Huey Newton in that.  So the question is how do you

13   set up a situation where black people can function with some

14   level of justice, freedom, decency, and humanity in the country?

15   That's -- it's just that simple.  So I think it could be

16   misinterpreted as some type of violent philosophical stance, and

17   I would disagree.

18   Q.   Is shooting someone a violent act?

19   A.   That's --

20            MR. EGGERT:   Judge, is that an argument or a question?

21   I'd object.

22            THE COURT:   Overruled.  You can go ahead and answer

23   the question.

24   A.   Yes, shooting someone is a violent act, but that's not in

25   the spirit of what you were asking me about this piece of

Jones - Cross

1   writing.

2   Q.   Well, what I asked you was were you aware that the defendant

3   thought that our situation is one of political warfare, that he

4   held this view?

5   A.   I think many black people who suffer think we're in a

6   situation of political warfare.  So it would not shock me that

7   he as a very intelligent young man who cares about the

8   well-being of black people would think so as well.

9   Q.   Did you know that he thought the struggle against the

10  negative forces of genocide and fascism will not end at the

11  ballot box of the ruling class?

12  A.   Your question is am I surprised by that thought?

13  Q.   Or did you know that that was something that he thought?  Is

14  that something that you --

15  A.   I did not know that this was his thinking, but I'm not

16  surprised that that's his thinking, since I know he has a deep

17  sense of history.  He actually reads.

18  Q.   Did you know that he thought voting and petitioning will not

19  be sufficient for our liberation?

20  A.   Any thinking person would know that when you look at the

21  situation of black people.  We have no serious political power

22  in either party, neither the Democrats or Republicans.  So

23  historical evidence says that voting doesn't get people to the

24  point where they need to be.

25  Q.   Were you aware that the defendant held that belief?

Jones - Cross

1   A.  No, I wasn't aware that he had it, but I'm not surprised

2   that he has it.  It's a reasonable belief, again, for a person

3   who reads.

4   Q.  Would you characterize it as an anti-democratic belief?

5   A.  No.  I think America is anti-democratic where the well-being

6   of black people are concerned.

7   Q.  Are you aware that two days after the defendant wrote this

8   he bought a pistol?

9   A.  No, but he has a Second Amendment right to do that.

10  Q.  Are you aware that a couple weeks after that he went to

11  practice shooting at a range?

12  A.  No, but I went through the U.S. Naval Academy.  So Americans

13  have a right to be well armed and trained.

14          THE COURT:  Dr. Brown, just answer the questions,

15  please.

16          THE WITNESS:  Yes, sir.

17  BY MS. GREGORY:

18  Q.  Are you aware that on February 8th, 2022, he told others,

19  "All hands against Greenberg on November 8th"?

20  A.  No, ma'am.

21  Q.  Do you know that on February 10th, 2022, he started a search

22  for information about the victim in this case's location?

23  A.  No, ma'am.

24  Q.  Do you know that the night before he attempted to shoot the

25  defendant -- or the victim in this case at his campaign office,

Jones - Cross

```
 1    that the defendant went -- attempted to go to the victim's home?
 2    A.  No, ma'am.
 3    Q.  Did you know that he had a gun at the time that he went to
 4    the home on February 13th, 2022?
 5    A.  No, ma'am.
 6    Q.  Do you know that that gun jammed on February 13th, 2022?
 7    A.  No, ma'am.
 8    Q.  You were talking about mental health issues.  What knowledge
 9    do you have of the defendant's mental health?
10    A.  I have no knowledge of his mental health; but, again, seeing
11    him now, that's not the young man that I know.  And the young
12    man that I knew would not have done the act that was committed.
13    So my belief is that something happened with him.  I have no
14    quantitative empirical evidence of that.
15    Q.  What do you believe happened?
16    A.  I believe that something has happened with Quintez mentally,
17    that's what I believe.  I'm not denying that he committed this
18    act.  I do not know.  And let me say Craig Greenberg is a friend
19    of mine.  So I'm not endorsing that at all, but I'm trying to
20    figure out what happened to this young man leading up to that
21    point.  I'm not denying that it happened.
22    Q.  So you think something happened mentally that caused him to
23    shoot someone?
24    A.  I think something happened mentally to cause him to shoot at
25    someone.  He never actually shot anybody.
```

Jones - Cross

1   Q.  Would you agree that grazing someone's clothing is shooting

2   them?

3   A.  Ma'am?

4   Q.  Would you agree -- question withdrawn.  So you believe

5   something happened to him mentally that caused him to shoot at

6   someone.  So does the thing that you think happened to him

7   mentally, would that make him more dangerous?

8   A.  No, ma'am, I don't think it'd make him more dangerous with

9   proper love and care and attention.

10  Q.  But you're not a --

11  A.  No, ma'am.  If I thought it made him more dangerous, I

12  wouldn't invite him into my home with my daughter.

13  Q.  So why would whatever happened to him mentally cause him to

14  be more dangerous in terms of shooting at the victim in this

15  case but not more dangerous in terms of what's going on at your

16  home?

17  A.  I simply wouldn't use the word dangerous.  I think that he's

18  in a situation where he needs help.  He needs attention.  I

19  don't think he's a dangerous person.  I think something happened

20  that led him to make a bad decision.

21  Q.  But you're not a mental health expert?

22  A.  I am not.

23  Q.  And you don't -- you're unaware of any specific diagnosis

24  the defendant has?

25  A.  No, ma'am, I'm not aware of any specific diagnosis with him.

Jones - Redirect

```
 1   Q.  And you can't say that if released he wouldn't try to shoot
 2   the defendant again?
 3   A.  No, ma'am.  I can't predict the future.
 4           MS. GREGORY:  No further questions.
 5           THE WITNESS:  Sorry for interrupting you, Judge.
 6           THE COURT:  That's all right.  Thank you.  Testifying
 7   is a different sort of experience.
 8           THE WITNESS:  Yes, sir.  I didn't know you were
 9   finished.
10                       REDIRECT EXAMINATION
11   BY MR. EGGERT:
12   Q.  You were given a writing; and, obviously, people have
13   different views and so forth, but this letter in no way shocks
14   you; correct?
15   A.  No, sir.
16   Q.  In fact, it's fair to say some of these views you would
17   share?
18   A.  Yes, sir.  I've taught Huey Newton in my classes.
19   Q.  All right.  I want to second ask you about -- well, you
20   don't know what will happen in the future.  None of us can
21   predict or see the future; correct?
22   A.  I would assume so, sir, yes.
23   Q.  Right.  But one thing that might help us see the future is
24   how he's done on home incarceration in the past.  You'll agree
25   with that; correct?
```

Jones - Redirect

1   A.  Yes, sir, yes, sir.

2   Q.  All right.  You talk about you don't -- you're not a mental

3   health professional, but what you want to have him get and

4   receive is mental health treatment; is that correct?

5   A.  Yes, sir.  I believe that something happened with him

6   mentally, and if a mental health professional agrees, then he

7   needs mental help.  I think that's the case for anyone, yes,

8   sir.

9   Q.  All right.  And, finally, the things they've talked about,

10  did you know this and did you know that, does that change your

11  view at all?  Do you still support his release?

12  A.  Even more so, yes, sir.

13  Q.  And would you still take him home with you?

14  A.  In a New York minute, yes, sir.

15          MR. EGGERT:  Thank you.

16          THE COURT:  Ms. Gregory, anything further?

17          MS. GREGORY:  No further questions.

18          THE COURT:  All right.  Doctor, you can step down.

19  Thank you.

20          THE WITNESS:  Judge, should I leave this?

21          THE COURT:  You can just leave it up there on the

22  ledge, please, or hand it to Steve.

23      All right.  Mr. Eggert.

24          MR. EGGERT:  We'd call Kevin Lamkin.

25      (KEVIN LAMKIN, called by the defendant, sworn.)

1          THE COURT:  What is your last name, please, sir?

2          THE WITNESS:  Lamkin, L-A-M-K-I-N.

3          THE COURT:  Thank you.

4     All right.  So make sure you use that microphone, please.

5     Sit up close to it or move it around if you need to.

6     Mr. Eggert.

7                    DIRECT EXAMINATION

8     BY MR. EGGERT:

9     Q.   Could you state your name for the record.

10    A.   Kevin Lamkin.

11    Q.   And what's your job?

12    A.   Louisville Metro Department of Corrections, court liaison

13    officer.

14    Q.   How long have you worked at the Department of Corrections?

15    A.   Thirteen years.

16    Q.   Okay.  And what are some of the jobs you've had while you've

17    been there?

18    A.   I'm sorry?

19    Q.   What are some of the duties you've had while you've been at

20    Corrections?

21    A.   In regards to courts?

22    Q.   Or any -- any duties.

23    A.   In my current position, I do a lot of testimony in court.  I

24    go to a lot of PC hearings.  I do a lot of revocation hearings

25    and overall just represent the department and the officers in

1    court.

2    Q.  And the Department of Corrections colloquially is known as

3    the jail; is that correct?

4    A.  That's correct.

5    Q.  All right.  Now, did I ask you -- are you familiar with the

6    HIP, home incarceration, records of the defendant, Quintez

7    Brown?

8    A.  I am.

9    Q.  All right.  And the records show, I think, that he was

10   arraigned on February 15th in connection with the -- this case,

11   February 15th, 2022, and he was released on home incarceration.

12   What date was he released?

13   A.  I have him released on February 16th, 2022 --

14   Q.  All right.

15   A.  -- to HIP.

16   Q.  To HIP.  Now, what are the rules of HIP?

17   A.  A lot of the rules are dictated by the court.  It depends on

18   what they have a court order for.  If they have no releases

19   whatsoever, then they're not allowed to leave their house.  Most

20   would have at minimum court release -- excuse me -- but for the

21   most part they're not allowed to leave their house.  They are

22   GPS monitored.  However, there are other releases that they can

23   get besides court release.  They can get work release, doctor

24   appointment releases, things like that.

25   Q.  Okay.  In Mr. Brown's case -- well, any case, are drugs --

Lamkin - Direct

1    are any drugs permitted in the home?

2    A.   No.

3    Q.   Any alcohol permitted in the home?

4    A.   No, sir.

5    Q.   Are home visits conducted?

6    A.   Yes.

7    Q.   And mentioned GPS monitoring.  How is that set up?

8    A.   When they go to the HIP program, they are equipped on their

9    ankle a GPS monitoring device, and that tracks their location at

10   all times.

11   Q.   If they are -- well, let's say even on the porch or out of

12   the house according to GPS without any authority, what will --

13   is that a violation?

14   A.   That would be a violation, yes.

15   Q.   And are they then returned to the jail?

16   A.   Yes.

17   Q.   How do they get back?  If they're revoked and sent back to

18   jail, how does the prisoner or the defendant get back out to

19   HIP?

20   A.   Through a judge's order.

21   Q.   So you won't -- HIP won't take him back until a judge orders

22   him returned; is that correct?

23   A.   That is correct.

24   Q.   All right.  Now, you mentioned that he was released on -- to

25   HIP on February 16th, and he was arrested on this case April

1    6th.  Did he have any violations of HIP?

2    A.   No.

3    Q.   Was there any issue with Quintez Brown while he was held on

4    home incarceration with you-all monitoring him?

5    A.   No, none.

6    Q.   All right.  Then I want to take you -- bring your attention

7    to February, specifically, I think, February 26th.  Was he

8    granted a release?

9    A.   Yes, he was.

10   Q.   And what was that release to do?

11   A.   To be taken to OLOP, Our Lady of Peace.

12   Q.   And was that for a mental health evaluation?

13   A.   Yes, sir.

14   Q.   All right.  And, in fact, did his family take him to Our

15   Lady of Peace?

16   A.   I'm unsure of who took him to OLOP, but it was not

17   Corrections.

18   Q.   It was not Corrections.  So he was taken to Our Lady of

19   Peace, and was he admitted there?

20   A.   Yes.

21   Q.   All right.  And then did he stay at Our Lady of Peace till,

22   I think, March 7th, 2022?

23   A.   Yes, he was discharged from Our Lady of Peace March 7th,

24   2022.

25   Q.   So he was inpatient hospitalized for that period of time

Lamkin - Direct

1    from the 26th to -- February 26 to March 7th?

2    A.   That is correct.

3    Q.   All right.  Now, at that time was he picked up by HIP at Our

4    Lady of Peace, or did he return to HIP through family or by

5    himself?

6    A.   I checked his GPS mon -- or his GPS tracks.  He went

7    straight to OLOP, and then when he was discharged, he went

8    straight back to his home.

9    Q.   Which is what -- exactly what he was supposed to do; is that

10   correct?

11   A.   That is correct.

12   Q.   And then you-all continued to monitor him with GPS from that

13   date, March 7th, to when he was arrested on April 6th; is that

14   correct?

15   A.   That is correct.

16   Q.   All right.  And were home visits conducted?

17   A.   I have on record three home visits.

18   Q.   And when he -- when home visits were conducted, was he home?

19   A.   Yes.

20   Q.   And between the -- except for the release to OLOP, did he

21   ever leave the house?

22   A.   The anklet never left his house.

23   Q.   In short, in the period of time that he was monitored by

24   home incarceration, he was 100 percent in conformance with the

25   rules; is that correct?

1   A.   That is correct.

2   Q.   And you're testifying today as a representative of the

3   Department of Corrections; correct?

4   A.   That is correct.

5          MR. EGGERT:   Nothing further.

6          THE COURT:   All right.  Ms. Gregory.

7                    CROSS-EXAMINATION

8   BY MS. GREGORY:

9   Q.   Good afternoon, Mr. Lamkin.  Has anyone on HIP ever cut off

10  their ankle device?

11  A.   All the time.

12  Q.   Okay.  Has anyone on HIP ever committed an additional crime

13  while on HIP?

14  A.   Yes.

15  Q.   The defendant has an ankle monitor, but he's not physically

16  locked into the house, is he?

17  A.   No.

18  Q.   There are, you know, doors that lock from the inside such

19  that he would be able to unlock and get out of the house;

20  correct?

21  A.   Right.

22  Q.   He has visitors to the house; correct?

23  A.   Yes, I'm -- that's an assumption.

24  Q.   Okay.  Well, he's permitted to have visitors in the house;

25  correct?

1   A.   Yes.

2   Q.   And does anyone check on the visitors?

3   A.   What do you mean by that?

4   Q.   Well, does anyone from Corrections screen the visitors?

5   A.   No.

6   Q.   Does anyone from Corrections go through their packages?

7   A.   No.

8   Q.   Does anyone from Corrections watch all the interactions that

9   he has with visitors?

10  A.   No.

11  Q.   So visitors could bring things to the defendant?

12  A.   Yes.

13  Q.   The Home Incarceration Program form, that includes certain

14  provisions that the person that the person on HIP is staying

15  with has to comply with; correct?

16  A.   That is correct.

17  Q.   One of the conditions is that for the individual to

18  participate in the program, the participant must have a

19  telephone, cell phone, or landlines are acceptable, in working

20  order so the program can contact the participant 24 hours a day;

21  is that correct?

22  A.   That is correct.

23  Q.   And, additionally, participants and household members must

24  limit their telephone conversations on the main contact number

25  to durations of less than five minutes so that HIP can reach the

1   participant in case of emergency; is that correct?

2   A.   I believe so.

3   Q.   Is failure to maintain a working contact number or being

4   unavailable or failure respond to calls grounds for a violation

5   from the program?

6   A.   Yes.

7   Q.   Do you have with you the number that's associated with the

8   defendant in this case?

9   A.   I probably do in this case file, yeah.

10  Q.   Could you look through and find it for me?

11  A.   Sure.

12  Q.   Thanks.

13       THE COURT:  Ms. Gregory, I assume you want him to just

14  find it so you can ask him questions about it --

15       MS. GREGORY:  Yes.

16       THE COURT -- as opposed to having him read the number.

17       MS. GREGORY:  I would like him to read the number,

18  Your Honor, I guess.  Do you want that under seal?

19       THE COURT:  Well, let's take that -- just take it one

20  step at a time so I know when that's coming.  We'll talk about

21  whether that needs to be under seal or not.

22       MS. GREGORY:  Okay.

23       THE WITNESS:  I have the number.

24       MS. GREGORY:  All right.

25       THE COURT:  All right.  Let me ask you, Ms. Gregory --

1    and I'm not trying to direct where you go with it.  I just want

2    to know what I should do next.  Do you want to ask him other

3    questions about the number or about whether it was maintained

4    correctly, whether there was excessive use, those sorts of

5    things, or for whatever reason do you want to just ask him what

6    the number is?

7             MS. GREGORY:  I just need the number for other things

8    that may be relevant.

9             THE COURT:  In that case, I think you-all ought to

10   approach.  We ought to do this on the -- under seal in some way.

11            MS. GREGORY:  That's fine.

12            THE COURT:  I don't think that contact number ought to

13   be a matter of public record.  I think it's appropriate for

14   sealing.

15            MS. GREGORY:  Okay.

16            THE COURT:  So, Mr. Eggert -- well, another thing that

17   occurs to me, if it's literally just getting the number, I don't

18   have any problem with just someone writing it down and showing

19   it to the both of the two of you.

20            MS. GREGORY:  That's fine with the United States.

21            THE COURT:  As opposed to approaching and figuring out

22   a way for the witness to approach and whispering it into the

23   microphone.

24        So could you just write the number down, Mr. Lamkin.

25            THE WITNESS:  Yes, sir.

Lamkin - Redirect

1          THE COURT:  All right.

2       (Sealed Cumulative Exhibit 1 admitted in evidence.)

3          MS. GREGORY:  No further questions, Your Honor.

4          THE COURT:  All right.  Thank you.

5       Any redirect, Mr. Eggert?

6                    REDIRECT EXAMINATION

7    BY MR. EGGERT:

8    Q.  Very briefly.  You were asked about, I guess, phone numbers,

9    but obviously the defendant was living at someone else's house

10   -- actually, his grandmother's house -- but HIP monitored this

11   man; correct?

12   A.  That is correct.

13   Q.  And, second, regarding packages, does HIP have a right to

14   conduct searches?

15   A.  That is correct.

16   Q.  All right.  So as part of HIP, HIP can come in any time and

17   search the residence; is that correct?

18   A.  Yes.

19          MR. EGGERT:  Nothing further.

20          THE COURT:  Ms. Gregory.

21          MS. GREGORY:  Nothing further, Your Honor.

22          THE COURT:  All right.  Thank you.

23       You can step down.  Thank you.

24          THE WITNESS:  Thank you, Your Honor.

25          THE COURT:  All right.  Mr. Eggert, any other

1    witnesses?

2            MR. EGGERT:  Yes, Judge.  Judge, at this time, just to

3    give the court a timeline of what happened here, the arrest on

4    this case, which is an identical case in state court, was as I

5    said, February -- he was arrested -- he appeared in court

6    February 15th, released on bail.  It was a bond posted by the

7    Community Bail Fund and as a condition HIP, and he was there

8    from February 16th to February 26th.

9        At that time, Your Honor -- and I would place this order as

10   Defense Exhibit 1.  At that time, by court order in the case of

11   Commonwealth versus Quintez Brown -- and I'll read it into the

12   record -- "Mr. Brown's treating psychiatrist" -- he was already

13   under treatment -- "having recommended inpatient

14   hospitalization, and the parties being concerned about the

15   welfare and safety of Mr. Brown, it is hereby ordered that the

16   defendant is permitted to travel from his residence to Our Lady

17   of Peace Hospital for an evaluation to determine whether he

18   should be admitted for treatment.  If admission is recommended,

19   he shall remain at the hospital for the duration of his

20   treatment.  Upon discharge, he shall return immediately to his

21   residence."

22       And, Judge, I'd like to place that, if I can, as Defense

23   Exhibit Number 1 and proffer to the court that his family took

24   him to Our Lady of Peace on that February 26th date.  He was

25   admitted to Our Lady of Peace for inpatient psychiatric

1   treatment, hospitalized there until March 6th or 7th -- I'm

2   sorry -- and then returned home by his family taking him home,

3   and I would move to admit that.

4       And this order is reflected -- and it's signed by myself, an

5   agreed order signed by the county attorney too, Assistant County

6   Attorney Ann Dyke, and signed by the judge, William Ryan, and

7   we'd like to enter that into evidence.

8           THE COURT:  All right.  Is that what you gave to

9   Ms. Gregory a moment ago?

10          MR. EGGERT:  Yes.

11          THE COURT:  All right.  Could I have it, please?

12          MR. EGGERT:  Yes.

13          THE COURT:  Just slide it through there.  Thank you.

14          MR. EGGERT:  Then, Your Honor --

15          THE COURT:  Give me just a moment, please, Mr. Eggert.

16          MR. EGGERT:  I'm sorry.

17          THE COURT:  All right.  Pardon me.  So the date of

18  this is 2-26-22.  Was that the date on which he was actually

19  released to Our Lady of Peace, or did that happen the next day?

20          MR. EGGERT:  Judge, what happened was he was released

21  on the -- it was signed on the 26th.  He was taken to Our Lady

22  of Peace.  They may not have formally admitted him because it

23  was -- I think lasted over midnight, you know, and they look at

24  you and so forth on the 27th, but that order was the 26th.

25          THE COURT:  All right.  When do you think he actually

 1    arrived at Our Lady of Peace?

 2            MR. EGGERT:  February 26th.

 3            THE COURT:  Okay.

 4            MR. EGGERT:  All right.  He arrived there upon that

 5    order.

 6            THE COURT:  Right.  And was released from there on the

 7    7th?

 8            MR. EGGERT:  Yes, he gets back to HIP on March 7th.

 9            THE COURT:  All right.  Any objection to the exhibit,

10    Ms. Gregory?

11            MS. GREGORY:  No, Your Honor.

12            THE COURT:  All right.  So that's as Exhibit Number 1.

13        (Defendant Exhibit 1 admitted in evidence.)

14            THE COURT:  And I don't know if you technically

15    offered it or not, but any objection to Exhibit B, United States

16    Exhibit B, Mr. Eggert?

17            MR. EGGERT:  No.

18            THE COURT:  All right.  So that's admitted as well.

19        (Government Exhibit B admitted in evidence.)

20            THE COURT:  Am I missing an A, Ms. Gregory, or did it

21    just come out of order?

22            MS. GREGORY:  We'll get to those later, Your Honor.

23            THE COURT:  All right.  Okay.  Mr. Eggert.

24            MR. EGGERT:  Yes, Judge, we would also move to admit

25    Defense Exhibit Number 2.  Judge, he was on HIP, and while on

 1   HIP, he was indicted.  And I'll just show a copy of the state

 2   court indictment here for this same charge.

 3       And he then appeared in court after being indicted, and

 4   Judge Cunningham maintained the bond, maintained his release on

 5   home incarceration, and that's where he was on home

 6   incarceration at his grandmother's house when police and -- FBI,

 7   I mean, and the helicopters arrived on April 6th.

 8       And this is the indictment which alleges the same conduct as

 9   in this federal case, and it reflects that indictment.  And I

10   can proffer to the court that Judge Cunningham arraigned the

11   defendant, released the defendant, and ordered him to continue

12   to obey the rules of home incarceration.  That'd be -- our

13   Defense Exhibit 2 would be the indictment, and I would move to

14   introduce that.

15           THE COURT:  All right.  Could I see that, please.

16   Thank you.

17           MR. EGGERT:  Third, Judge --

18           THE COURT:  Hang on for just a second, please,

19   Mr. Eggert.

20           MR. EGGERT:  I'm sorry.

21           THE COURT:  That's all right.

22       Ms. Gregory, any objection?

23           MS. GREGORY:  No, Your Honor.

24           THE COURT:  All right.  So that's admitted as well.

25       (Defendant Exhibit 2 admitted in evidence.)

1          THE COURT:  Mr. Eggert.

2          MR. EGGERT:  Yes, Judge.  I would proffer as follows:

3     We are asking that he be released to a third party custodian,

4     and that custodian would be Tanya Hyde, if she could just stand.

5     She is present.  She is the defendant's grandmother.  She lives

6     at 17th and Hill in a house.  She's lived here all her life.

7     She's lived in Louisville all her life.

8          She is retired now from a place that actually helped

9     disabled people and mentally challenged people.  She does not

10    work.  She is home all day.  She does -- she may leave for

11    groceries, but she is home.  No one else lives in the house.

12    There's no guns in the house.  There's no drugs in the house.

13    She doesn't drink.  She smokes cigarettes.  She would be his

14    third party custodian.

15         We asked pretrial to check.  They checked.  Tanya Hyde has

16    no criminal record at all.  She's 62.  That's her residence.

17    That's where she lives, and that's where he's been until --

18    except for Our Lady of Peace and when the FBI arrested him on

19    April 6th.  And she would be his third party custodian, and she

20    is present and she is his blood grandmother.

21         THE COURT:  All right.  Thank you.

22         MR. EGGERT:  Judge, at this time too, I would call --

23    as part of this third party custody arrangement, Judge, that

24    we're proposing where he continue to live where he already lived

25    with Ms. Hyde, his grandmother, we have witnesses we want to

1   call who have also formulated an additional plan.  And if I

2   could, I'd like to call Tamara Russell.

3       (TAMARA RUSSELL, called by the defendant, sworn.)

4                        DIRECT EXAMINATION

5   BY MR. EGGERT:

6   Q.  Could you state your name for the record.

7   A.  Yes, sir.  Tamara Russell.

8   Q.  Okay.  Ms. Russell, what is your job?

9   A.  As of April 4th, I work at JCTC, but prior to March 25th, I

10  worked at the University of Louisville coordinating the MLK

11  Scholars program.

12  Q.  Okay.  And if you could just slow down a little bit.  You're

13  probably nervous.

14  A.  Sorry.

15  Q.  Also, my mind doesn't work as rapidly as --

16  A.  Got you.

17  Q.  All right.  So start again.  Where do you work now?

18  A.  Sure.  Currently I work at Jefferson -- JCTC.

19  Q.  What's your job there?

20  A.  I'm the assistant vice president for inclusion, diversity,

21  and community engagement.

22  Q.  Now, before that where did you work?

23  A.  At the University of Louisville.

24  Q.  And what was your job there?

25  A.  I coordinated the MLK Scholars program.

1    Q.   And's that the Martin Luther King Scholars program?

2    A.   Correct.

3    Q.   All right.  And what is that program?

4    A.   It is one of five mentored scholarship programs.  What that

5    means is it's the highest level of scholarships that are offered

6    at the University.  These scholarships are what are considered

7    full rides, and what that means is you get full tuition, plus

8    you get coverage for your housing, for your meal plan.  Other

9    educational expenses are covered as well.  This particular

10   program serves black and brown students that are geared towards

11   social justice and community engagement.

12   Q.   Do you know Quintez Brown?

13   A.   Yes, sir.

14   Q.   How do you know him?

15   A.   He was one of the students that I recruited into my very

16   first cohort in 2018 for the MLK Scholar program.

17   Q.   Where did he go to high school?

18   A.   DuPont Manual High School.

19   Q.   Okay.  And did you meet him after he went to college, or did

20   you meet him at Manual?

21   A.   I met him at a recruiting event prior to being admitted to

22   U of L.

23   Q.   And then did you get to -- was he accepted, and did he

24   become a Martin Luther King Scholar?

25   A.   Yes, sir.

Russell - Direct

1  Q.  And did you get to know him?

2  A.  Yes, sir.

3  Q.  All right.  And is that a select group?

4  A.  Very select, sir.

5  Q.  All right.  And so you got to know him, and did you get to

6  know him -- did you have a lot of contact with him?

7  A.  Yes, sir.  Part of the program being mentored is that you're

8  advised not only academically but in other others, professional

9  development and so forth.  It's supposed to be extremely

10  supportive in a way that ensures your success and completion of

11  your degree.

12  Q.  All right.  What kind of a person was Quintez Brown?

13  A.  It's hard to describe.  He's -- I'll say this:  When we read

14  his application to be a MLK Scholar, meeting him at recruiting

15  events, you could feel the brilliance.  He has such a positive

16  radiance.  He's very objective, very mature.  He's very

17  community centered.

18     I was just telling someone that in the small group

19  interviews that they have to go through to possibly be selected

20  for the scholarship, you know, you have an array of

21  personalities.  You have extroverts and then folks like me who

22  are introverts, and Quintez was very cognizant of those

23  different personality types and made sure that he took up enough

24  space to make his points, but he also helped his peers kind of

25  fall back to allow for the folks like me to have enough room to

Russell - Direct

1    speak.

2    Q.   Did he appear to care about other people?

3    A.   Absolutely.

4    Q.   Did he care about the community?

5    A.   Absolutely.

6    Q.   And you've heard testimony about Craig Greenberg and guns

7    and so forth.  Honestly, do you believe that this man has had a

8    mental breakdown?

9    A.   Yes.

10   Q.   In fact, do you believe he had a mental breakdown when he

11   left for New York back in July?

12   A.   Yes.

13   Q.   Now, did you look for him back in July of '21?

14   A.   I assisted the folks at U of L around those efforts, yes.

15   Q.   Trying to find him?

16   A.   Yes, sir.

17   Q.   All right.  And before this mental illness, was there any

18   hint of violence or anything like that?

19   A.   Not violence, no, sir.

20   Q.   In fact, was it the opposite?

21   A.   The opposite, absolutely.

22   Q.   All right.  I want to ask you this, ask this question

23   before -- do you support his release?

24   A.   Yes, sir.

25   Q.   In fact, have you gone to his grandmother's home?

1   A.   Yes, sir.

2   Q.   This is after his release on home incarceration?

3   A.   Yes, sir.

4   Q.   You went to 17th and Hill?

5   A.   Absolutely, yes, sir.

6   Q.   This is after he's released in state court, all right, and

7   after he was in the -- after he was in the mental hospital?

8   A.   Yes, sir.

9   Q.   Okay.  And you saw him there?

10   A.   Yes, sir.

11   Q.   Was he obeying the rules?

12   A.   Absolutely.

13   Q.   Did you communicate to him, talk to him?

14   A.   Yes, sir.

15   Q.   Were you there to support him?

16   A.   Absolutely.

17   Q.   I want to ask, if the court released him to his

18   grandmother's, are you willing to visit him?

19   A.   Absolutely.

20   Q.   Okay.  In fact, even if a court ordered, would you -- would

21   you do it if a court ordered or didn't order, how's that?

22   A.   I would go either way.  Unless you tell me I can't, I'll be

23   there.

24   Q.   And will you be there to support him?

25   A.   Yes, sir.

Russell - Cross

1   Q.  All right.  And when you saw him at his grandmother's --

2   this is after, after he went to Our Lady of Peace -- did he seem

3   like the old -- or a little bit like the old Quintez Brown?

4   A.  He seemed a little bit like the old Quintez Brown, but

5   there's a shift that I've noticed in -- that he's receiving the

6   treatment that he needs and so there's this calm kind of peace

7   about him that I haven't seen before.

8   Q.  He's on medication?

9   A.  Yes, sir.

10  Q.  And receiving, I guess, psychotherapy therapy; is that

11  right?

12  A.  Yes, sir.

13  Q.  And he was doing all those things when he was arrested on

14  April 6th; is that right?

15  A.  Yes, sir.

16          MR. EGGERT:  Nothing further.

17                        CROSS-EXAMINATION

18  BY MS. PORTER:

19  Q.  Good afternoon, Ms. Russell.

20  A.  Good afternoon.

21  Q.  You're close with Quintez Brown; right?

22  A.  Yes, ma'am.

23  Q.  You've known him, did you say, since 2018?

24  A.  Yes, ma'am.

25  Q.  So about four years?

Russell - Cross

1    A.   Yes, ma'am.

2    Q.   And you don't want him to go to jail in this case, do you?

3    A.   No, ma'am.

4    Q.   Okay.  Are you aware -- and we've talked about this some

5    today -- with what he's charged with in this case?

6    A.   I am aware.

7    Q.   You're aware that he's been charged with attempted murder of

8    a political candidate for political reasons?

9    A.   I'm aware of that.

10   Q.   To your knowledge and through your interactions with

11   Mr. Brown, were you aware that he was interested in politics?

12   A.   I was aware.

13   Q.   Prior to February 14th, prior to the shooting in this case,

14   when's the last time that you saw him in person?

15   A.   I saw him in April of 2021 -- actually, I'm sorry.  I need

16   to retract that.  I saw him August 25th of 2021.  That was the

17   first day that our program had our return to campus event, and

18   he came in person.

19   Q.   Okay.  So in 2022, this year, you hadn't seen Mr. Brown at

20   all; is that correct?

21   A.   That's correct.

22   Q.   Were you aware of who he was spending time with in that

23   time?

24   A.   I'm not.

25   Q.   Were you aware of what he was doing with his free time in

1   that time?

2   A.   No, not his free time.

3   Q.   Did you read his writings from 2022?

4   A.   I have not.

5   Q.   So you didn't read his January 2022 "Revolutionary Love

6   Letter"?

7   A.   I did not.

8   Q.   Did you know that he wrote "Our situation is one of

9   political warfare"?

10  A.   Just because of what has been previously discussed.

11  Q.   All right.  And were you aware, prior to the discussion

12  today, of Mr. Brown's views that voting was ineffective?

13  A.   Those are discussions we've had in an academic setting, yes.

14  Q.   Okay.  So Mr. Brown has told you about his views that he

15  feels that voting is ineffective?

16  A.   It has been about -- in an academic setting those are things

17  that have come up, yes.

18  Q.   When you say "come up," did they come up by Mr. Brown

19  specifically or a different student in the class?

20  A.   There's been different students that brought that up, and he

21  has joined in with the conversation, yes.

22  Q.   And did you -- were you aware that two days after Mr. Brown

23  published that "Revolutionary Love Letter" he went and bought a

24  gun?

25  A.   I was not aware.

Russell - Cross

1    Q.  Were you aware that after he bought that gun he started

2    practicing shooting at the shooting range?

3    A.  I was not aware.

4    Q.  Did you -- you mentioned that you knew Mr. Brown was

5    interested in politics.  Did you -- were you aware of his views

6    on the mayoral primary campaign?

7    A.  I was not.

8    Q.  Do you know that he made negative social media posts about

9    his victim in this case in January and February 2022?

10   A.  I was not.

11   Q.  Do you follow him on social media?

12   A.  I tend to not follow students because I don't want to

13   intrude into their personal lives.  I only -- that's one of the

14   boundaries that I set.

15   Q.  Do you know that Mr. Brown told others in February of this

16   year, "All hands against Greenberg"?

17   A.  I was not aware.

18   Q.  Did you know that on February 10th of this year Mr. Brown

19   started searching online for his victim's home address?

20   A.  I was not aware.

21   Q.  And you mentioned before you didn't spend any time with him

22   in February; correct?

23   A.  That's correct.

24   Q.  So you didn't spend time with him the 10th through the 14th?

25   A.  I was not there, no.

Russell - Cross

1    Q.  And did you know, on the 13th, he went to his victim's home?

2    A.  I was not aware.

3    Q.  Do you know that -- did you know that while he was at the

4    victim's home he was searching online to try to figure out how

5    his gun that he bought in January, how he could unjam that gun?

6    A.  I was not aware.

7    Q.  That he searched about loading a bullet accidentally

8    backwards in that gun?

9    A.  I was not aware.

10   Q.  And during those searches, he was near and at the victim's

11   home?

12   A.  I wasn't aware.

13   Q.  Do you know that the next morning he went to a pawn shop and

14   bought a second gun?

15   A.  I wasn't aware.

16   Q.  And about an hour later, did you know that he took that gun

17   to his victim's campaign office?

18   A.  Not until the press released statements.

19   Q.  Did you know that he used that gun that he bought that

20   morning to shoot at his victim six times?

21   A.  Only read what was presented from the press.

22   Q.  Okay.  You mentioned that you believe that Mr. Brown had a

23   mental health breakdown.  Am I characterizing that correctly?

24   A.  That's correct.

25   Q.  Are you a mental health expert?

Russell - Cross

1   A.   I'm not -- I wouldn't say an expert, but I do have a degree

2   in social work, which you have to spend significant time diving

3   into that part of social work.

4   Q.   So with your degree in social work, have you run any tests

5   on Mr. Brown?

6   A.   I have not.  I'm not his practitioner.  I'm not assigned to

7   him in that way.

8   Q.   You mentioned that you spoke with him at his home on

9   February -- after the shooting on February 14th?

10  A.   Since he's been on home incarceration, yes.

11  Q.   Do you recall the date that you spoke with him?

12  A.   Unfortunately, I don't recall.

13  Q.   Okay.  Was it in the month of February?

14  A.   It was in the month of March.

15  Q.   Okay.  And when you met with him, you said you spoke with

16  him.  Was he speaking coherently?

17  A.   He was.

18  Q.   And were you able to have an intelligent conversation with

19  him?

20  A.   Absolutely.

21           MS. PORTER:  Okay.  One moment.

22           THE WITNESS:  Sure.

23           MS. PORTER:  Your Honor, no further questions.

24           THE COURT:  All right.  Thank you.

25       Any redirect, Mr. Eggert?

Russell - Redirect

1              MR. EGGERT:  Your Honor, I'll take this up later, not

2    now, but I do have two letters from psychiatrists that I wish to

3    file under seal, since they keep asking about his mental health;

4    and I'll file them under seal because I don't want them to argue

5    that I've waived any privilege.  All right?

6              THE COURT:  All right.

7                        REDIRECT EXAMINATION

8    BY MR. EGGERT:

9    Q.  All right.  Ma'am, you were asked a lot of questions -- were

10   you aware of this and that and so forth.  I want to ask you

11   this:  Do you still support his release?

12   A.  Absolutely.

13   Q.  All right.  Second, you've heard questions, "Are you aware

14   that he had a gun?  Are you aware he fired a bullet?"  Ma'am,

15   are you aware that people are not just shot at or missed but are

16   killed in this city almost every day?

17   A.  Absolutely.  It happens in my neighborhood.

18   Q.  Right.  And are you aware that most of those people happen

19   to be African-Americans who are killed?

20   A.  Absolutely.

21   Q.  And do -- has the federal prosecutor --

22             MS. GREGORY:  Objection.  Relevance.

23             THE COURT:  Nature of the objection, please.

24             MS. GREGORY:  Relevance.

25             THE COURT:  Mr. Eggert, any response?

Russell - Redirect

1              MR. EGGERT:  Yes.  I think it's highly relevant.

2    We're talking about something that is a very serious case, but

3    nobody was even injured.  And the idea that this -- that we got

4    a federal prosecutor from Washington asking her questions, down

5    from Washington -- they have two prosecutors -- and you're gonna

6    have more killings and dead bodies in this city this week, this

7    weekend -- tonight, tomorrow, and Saturday -- and nobody from

8    the federal government's gonna be there, locals, federal,

9    nowhere.

10             THE COURT:  All right.  Well, that's -- lives or dies

11   on its own merits, and I won't have any comment on that, but

12   it's well beyond the issues that we're talking about today.  So

13   I'll sustain the objection.

14             MR. EGGERT:  Thank you.

15   BY MR. EGGERT:

16   Q.  I'll ask it this way.  Do you know -- even know people who

17   have been killed?

18   A.  Yes.

19             MS. GREGORY:  Objection, same objection.

20             MR. EGGERT:  I know.  I'm going --

21             THE COURT:  Sustained.

22   BY MR. EGGERT:

23   Q.  Will you still visit Quintez Brown if he's released?

24   A.  Absolutely.

25             MR. EGGERT:  Thank you.

Russell - Redirect

1          THE COURT:  Any further questions?

2          MS. PORTER:  Your Honor, no further questions.  The

3    government will just note for the record that filing

4    psychological records under seal doesn't preserve the privilege,

5    and by putting those records and bringing up mental health as a

6    defense in the case can put mental health at issue and can

7    constitute waiver under the case law.  Your Honor, we're not

8    asking the court to decide that today, but we want to note it

9    for the record so that defense counsel knows that under the law

10   waiver exists when you put those records at issue.

11         THE COURT:  Well, I think -- let me ask you this --

12   and I guess it's for both of you -- Ms. Porter, if what you're

13   really doing is just kind of putting Mr. Eggert -- and let me be

14   somewhat more precise.  You're putting the defense on notice

15   that you may take the position that they've waived the

16   privilege, and I don't think that's something that we need to

17   wrestle to the ground right this minute.

18         MS. PORTER:  Yes, Your Honor.

19         THE COURT:  I'm not agreeing or disagreeing with you.

20   I haven't looked at that lately.  I will -- you're giving me the

21   opportunity, though, to expand on something I said a moment ago.

22   Mr. Eggert said he was going to file the records under seal, and

23   I believe the entirety of my response was "Okay."  And I did not

24   mean by that okay I accept them under seal.  It means okay,

25   we'll deal with that.  And so there are other bridges to be

Russell - Redirect

1    crossed on that front.

2        Mr. Eggert, anything that needs to be said on that point

3    now?

4            MR. EGGERT:  Yes, Judge.  They've already violated the

5    privilege.  I know we're not gonna argue it now.  They've gotten

6    all his mental health records, his psychiatric records, his

7    therapy records with subpoenas that told the providers, "Don't

8    tell anyone that you've been subpoenaed."  So this idea of

9    waiver -- they have them all already.

10           THE COURT:  Okay.  Well, there are a couple of issues

11   here, only one of which I think I need to deal with today.  One

12   is the waiver -- and call it one-and-a-half issues -- the waiver

13   and this issue of whether by subpoenaing the records any wrong

14   was done.

15       The other issue, though, and one that I will have to decide

16   at some point as I hear this is how is the evidence going to be

17   treated?  Is it going to be filed under seal?  There's a test

18   for that, and we'll have to talk about that.  We may or may not

19   have to have a closed session, depending on what the proponent

20   of the evidence and the United States each say about that, but

21   I'm pretty confident I'm not going to address the larger point

22   that you make today.

23       All right.

24           MS. PORTER:  Your Honor, may I just clarify one thing

25   for the record that has been omitted?

1          THE COURT:  Sure.

2          MS. PORTER:  Defense counsel is well aware that there

3   is a taint team in place on this case, so a filter team.  The

4   prosecution doesn't have access to the psychological records in

5   this case.  We have specifically asked defense counsel if they

6   would -- if they intended to put those records at issue, if they

7   would waive in advance so the prosecution team would have a

8   chance to look at them.  We have not had that opportunity, Your

9   Honor.  We have not seen them.  They're with a separate filter

10  team so that we protect that privilege unless either the court

11  determines it's waived or defense counsel says that it's waived.

12          THE COURT:  All right.  Mr. Eggert.

13          MR. EGGERT:  They got them by subpoena signed by

14  Amanda Gregory, and the FBI picked them up.  And there's one

15  government.  So to say, "Well, we haven't seen them," what, do

16  they close their eyes?  My point is, Judge, they breached the

17  privilege.  That's our position.  We're not changing it.  We're

18  not waiving anything because they've already got them.

19          THE COURT:  All right.  Thank you.

20      All right.  Any other witnesses then on detention,

21  Mr. Eggert?

22          MR. EGGERT:  Yes, Judge, I do.  I would call Monique

23  Williams.

24          THE COURT:  Thank you, ma'am.

25      Did you say Monique Williams?

Williams - Direct

```
1          MR. EGGERT:  Yes.
2       (MONIQUE WILLIAMS, called by the defendant, sworn.)
3                     DIRECT EXAMINATION
4    BY MR. EGGERT:
5    Q.  Could you state your name for the record.
6    A.  Monique Williams.
7    Q.  Okay.  Ms. Williams, what's your job?
8    A.  I am a researcher at the University of Louisville at the
9    School of Public Health and Information Sciences, but I'm
10   contracted with -- 75 percent of my time with the City.  So I
11   work for Louisville Metro Government as a director of the Office
12   for Safe and Healthy Neighborhoods.
13   Q.  I'm sorry?  It's the Office for --
14   A.  Safe and Healthy Neighborhoods.
15   Q.  And that is 75 percent of your time.  All right.  What do
16   you do in that job?
17   A.  In that role?
18   Q.  Yes.
19   A.  Develop the city's strategies for community led public
20   safety strategies for violence prevention.
21   Q.  Do you know Quintez Brown?
22   A.  I do.
23   Q.  How do you know him?
24   A.  I know Quintez from -- I started in this role with the City
25   in September of 2020.  Prior to that I was the director of our
```

Williams - Direct

1    National Center of Excellence and Youth Violence Prevention,

2    which was housed in the School of Public Health and Information

3    Sciences.  Within that center, we had a fellowship of students

4    known as the Louisville Youth Voices Against Violence, and

5    Quintez was one of our fellows.

6    Q.  Did you get to know him?

7    A.  Yes.

8    Q.  And did he actually work for y'all?

9    A.  Yes.

10   Q.  Okay.  And where was the office?

11   A.  Our office when Quintez joined was on 26th and Broadway.

12   Q.  And how many times a week would you see him?

13   A.  Most of the fellows worked three to four days a week.

14   Q.  Did they also -- did you also take trips with them to

15   places?

16   A.  Yes.

17   Q.  What would some of those places be?

18   A.  One of the trips that we took the fellows on was a civil

19   rights tour down through Tennessee and Alabama and which he went

20   to that trip; and there was another trip that Quintez just went

21   with me on to Nashville, Tennessee, to give a presentation at

22   Vanderbilt University.

23   Q.  Did you get to know him pretty well?

24   A.  I would say so.

25   Q.  All right.  What kind of a person -- what kind of person is

1   he?

2   A.   Nothing different than everything that's been said.  He was

3   our -- one of our brightest fellows.  He was the one that you

4   wanted everybody to be like, very bright and engaging and

5   just -- I mean, he was our scholar and gentleman.

6   Q.   Any hint of violence or anything like that?

7   A.   No.  It was the opposite.  I mean, our office and messaging

8   was antiviolence, and the purpose of their fellowship was to be

9   social agents of change for their community.  So he's very

10  community-minded, cared a lot about community and other young

11  people like himself, and the idea was to develop a campaign that

12  helped to shift the narrative around violence for young people

13  in the community.

14  Q.   You've heard the questions that the government has asked

15  other witnesses about did you know what was going on in January

16  and in February 2022, and do you know he purchased a gun and

17  these kinds of things.  Did you have any awareness of any of

18  those things?

19  A.   No.

20  Q.   Do you still support his release, ma'am?

21  A.   Yes.

22  Q.   All right.  And do you still support his release to his

23  grandmother's and continued mental health treatment?

24  A.   Yes.

25  Q.   Now, as part of that, have you agreed to visit the home?

Williams - Cross

1    A.   Yes.

2    Q.   All right.  And just tell me, how many days a week would you

3    be willing to visit?

4    A.   We're working that out.  One to two days a week between my

5    husband and I.

6    Q.   All right.  That you would go to his home where his

7    grandmother lives on Hill Street?

8    A.   Yes.

9    Q.   I want to ask you this:  Do you think -- let's say he

10   doesn't continue to get treatment.  Let's say he's incarcerated.

11   Do you think it would be disastrous for him?

12   A.   I do if there's a mental health issue that needs to be dealt

13   with.

14   Q.   All right.  And, finally, I guess I'd ask you -- ask you

15   this, ma'am:  You say that 75 percent of the time you work, I

16   guess, for Metro Government.  Is that out of the mayor's office?

17   A.   Yes.

18   Q.   All right.  And that's your job.  You'd be willing to go see

19   him and support his release to his mom -- to his grandmom's?

20   A.   Yes, me as a person.

21          MR. EGGERT:  Thank you.  I understand.  Thank you.

22   Nothing further.

23                          CROSS-EXAMINATION

24   BY MS. PORTER:

25   Q.   Good afternoon, Ms. Williams.

Williams - Cross

1    A.   Good afternoon.

2    Q.   You mentioned that you met Mr. Brown with the -- when he was

3    with the Louisville Youth Voices Against Violence; is that

4    right?

5    A.   Correct.

6    Q.   What year was that?

7    A.   2018.

8    Q.   And before the shooting in this case, so before February

9    14th of this year, when was the last time you saw Mr. Brown in

10   person before that?

11   A.   In January.

12   Q.   January?

13   A.   Of 2022.

14   Q.   Of 2022.  Do you know about the date?

15   A.   I don't know off the top of my head.  It was at a community

16   event.

17   Q.   What was the community event?

18   A.   There were violence prevention groups essentially presenting

19   to me about the strategies that they had for violence prevention

20   that they wanted to implement in the city.

21   Q.   Do you remember what the title of the event was?

22   A.   I don't.

23   Q.   Do you remember who some of the speakers were?

24   A.   There were several different community grassroots

25   organizations.  I'd have to look at the flyer.

Williams - Cross

1    Q.   Did you speak with Mr. Brown at that event?

2    A.   I did briefly.

3    Q.   What did you guys talk about?

4    A.   It was just a catch-up, good to see you.  I hadn't seen him

5    since, you know, the incident the summer before where he had

6    disappeared.  So I was just happy to see him, looked to be in

7    good health.  And we said that we were gonna connect so that we

8    could have lunch, and he talked some about, you know, running

9    for council.

10   Q.   You mentioned he disappeared in 2021.  Tell me about that.

11   A.   When there was a search for him when we couldn't find him,

12   was that 2021 or 2022 -- or 2021 or 2020?  It was 2021.  Yeah,

13   it was just last summer.

14   Q.   Okay.  So last summer Mr. Brown disappeared.

15   A.   Yes.

16   Q.   And did he disappear on his own?  Did he leave town on his

17   own?

18   A.   I'm not sure of the situation -- like, the circumstances

19   around his disappearance.  There was just like a "We don't know

20   where he is.  Help us find him," and we were a part of the help.

21   Q.   Was there a search --

22   A.   Yes.

23   Q.   -- that took place to try to find him?

24   A.   Yes.

25   Q.   And was it difficult to find him?

Williams - Cross

1    A.   I'm assuming.  My search was only here locally.

2    Q.   What did your search involve?  Did it involve looking

3    around --

4    A.   Passing out information, asking people if they saw him,

5    working with his family to just be a part of searching different

6    areas of the city.

7    Q.   Okay.  And then when he disappeared, are you aware that he

8    was found in New York?

9    A.   Yes.

10   Q.   Are you aware that he left his phone here in Louisville and

11   didn't take it with him?

12   A.   No.

13   Q.   Are you aware he was gone for at least 11 days?

14   A.   Yes.

15   Q.   Are you aware that his family had no idea where he went?

16   A.   Yes.

17   Q.   Okay.  So your interactions in -- since summer of 2021, you

18   saw him before or after he disappeared?

19   A.   Before he disappeared.

20   Q.   So the first time you saw him -- since the summer of '21

21   before he disappeared, the first time you saw him since then was

22   January?

23   A.   Correct.

24   Q.   And then from January to the shooting, you didn't see him at

25   all?

1   A.   No.

2   Q.   So you weren't with him when he was buying a gun in January,

3   were you?

4   A.   No.

5   Q.   And you weren't with him when he was going to the shooting

6   range?

7   A.   I was not.

8   Q.   You weren't with him when he went to his victim's home the

9   night before the shooting?

10  A.   No.

11  Q.   You weren't with him at all in the days of February -- from

12  February 1st to February 14th?

13  A.   I was not.

14  Q.   And you don't know what he was searching about his victim

15  online?

16  A.   I do not.

17  Q.   Are you familiar with his political views?

18  A.   Somewhat as was discussed in the fellowship, all of the

19  fellows.

20  Q.   Okay.  And in the fellowship did you learn that Mr. Brown

21  was politically active?

22  A.   Yes.

23  Q.   Did you learn -- or do you know his views on the mayoral

24  campaign?

25  A.   I do not.

Williams - Redirect

1    Q.   Did you know that he was opposed to certain mayoral

2    candidates?

3    A.   I did not.

4    Q.   And is -- using a gun to shoot at someone six times, is that

5    in line with the views of the Louisville Youth Voices Against

6    Violence?

7    A.   It is not.

8            MS. PORTER:   No further questions, Your Honor.

9            THE COURT:   All right.   Any redirect, Mr. Eggert?

10           MR. EGGERT:   Yes.

11                        REDIRECT EXAMINATION

12   BY MR. EGGERT:

13   Q.   You describe Quintez Brown going missing in 2021.   And I

14   guess, first, is that when you believe he first had a breakdown?

15   A.   I can't say, but that was odd.   So something -- it seemed

16   like something was going on at that point.

17   Q.   And, second, at that time was he on HIP?   Was he under any

18   rules that he couldn't leave?   Was there anything wrong or

19   illegal about that?

20   A.   No.

21   Q.   All right.   And, third, when they asked you were you aware

22   of this and are you aware of that, once again, do you want him

23   to get mental health treatment?

24   A.   Absolutely.

25   Q.   And are you still willing to visit his home?

Williams - Recross

```
 1    A.   Yes.
 2    Q.   And are you still asking this judge to release him?
 3    A.   Yes.
 4              MR. EGGERT:   Thank you.
 5                           RECROSS-EXAMINATION
 6    BY MS. PORTER:
 7    Q.   You mentioned that you believed that Mr. Brown had a -- his
 8    first breakdown in 2021.
 9    A.   I'm not saying I know when he had a breakdown.  That just
10    seemed to be an evident event that something was not right.
11    Q.   Okay.  And you believe that in 2022, at the shooting, he had
12    a mental breakdown or no?
13    A.   I would assume that maybe something mentally has been going
14    on for quite some time that is unaddressed.  So I can't say how
15    he -- whether it turns off or turns on.  I'm not the mental
16    health expert.
17    Q.   And are you aware that there are mental health services and
18    access to mental health services and medication in
19    incarceration?
20    A.   Yes.
21    Q.   You mentioned earlier that you would feel comfortable if he
22    were released.  Would you feel differently if he had shot at you
23    or your husband?
24    A.   No.
25              MS. PORTER:   No further questions, Your Honor.
```

1        MR. EGGERT:  Judge, I deliberately didn't object, but

2   it's obviously a completely improper, totally improper question,

3   and I'd like to note that for the record and also note the

4   answer is that her position would be exactly the same as it is

5   if it was her, that she would still support his release.

6        THE COURT:  All right.  Well, I think it's fair for

7   you to choose either objecting to the question or emphasizing

8   the answer but not both.

9        MR. EGGERT:  Well, yes, I'm gonna do both, Judge.

10       THE COURT:  Then I'll overrule the objection.

11       MR. EGGERT:  Thank you.

12       THE COURT:  You can step down.  Thank you, ma'am.

13       THE WITNESS:  Thank you.

14       THE COURT:  All right.  Mr. Eggert, any additional

15   witnesses?

16       MR. EGGERT:  Yes, Judge.  We would call Monica Wendel.

17       (DR. MONICA WENDEL, called by the defendant, sworn.)

18                     DIRECT EXAMINATION

19   BY MR. EGGERT:

20   Q.  Could you state your name for the record.

21   A.  Dr. Monica Wendel.

22   Q.  And what is your job?

23   A.  I'm a professor and the chair of Health Promotion and

24   Behavioral Sciences at the University of Louisville School of

25   Public Health and Information Sciences.

Wendel - Direct

1   Q.   And how long have you been at U of L?

2   A.   We moved to Louisville in 2014.  So eight years, almost

3   eight years.

4   Q.   Do you know Quintez Brown?

5   A.   I do.

6   Q.   How do you know him?

7   A.   So I was the principal investigator of the grant that funded

8   the Violence Prevention Research Center that Ms. Williams

9   mentioned that she directed, and he was one of our youth

10  fellows.

11  Q.   Did you get to know him?

12  A.   Not closely but interacted with him regularly while he was

13  working for us.  I wasn't in the office every day but did get to

14  travel to Alabama with him and spend some time with him there.

15  Q.   What was your opinion of him?

16  A.   At what point?

17  Q.   When he was working at the Prevention Center.

18  A.   Not different than what anybody else has said.  I mean, to

19  be around Quintez, you could -- he was obviously brilliant,

20  thoughtful, asked really good questions, liked to have fun.

21       I think one of the things that I appreciated about him was

22  that he made everybody feel included.  We had youth from lots of

23  different lived experiences and who came with a lot of different

24  kinds of trauma and were comfortable in certain spaces and

25  triggered in other spaces, and he made everybody safe.

Wendel - Direct

1   Q.  I mean, you've heard him described as brilliant, but did you

2   believe he was also a good person?

3   A.  Yes, I do believe that he's a good person.

4   Q.  All right.  Now, have you, I guess, organized a group that

5   if he was released, you and others would be willing to visit him

6   at his grandmother's home to make sure he was okay and that the

7   rules were being followed?

8   A.  Yes.  If she welcomed us into her home, we would absolutely

9   be there.

10  Q.  Okay.  Who all has agreed to do it?

11  A.  So you heard Ms. Williams talk about her and her husband who

12  also worked in the center when Quintez was a fellow with us.

13  Q.  Is that Aubrey Williams?

14  A.  Uh-huh, Aubrey Williams.  And then Trinidad Jackson, who was

15  also -- he's a faculty member at U of L, but he was a staff

16  member in the Youth Violence Prevention Research Center at the

17  time; and Dr. Gabe Jones, who is also a faculty member now who

18  was a doctoral student then.

19  Q.  Have you contacted these people and literally these people,

20  which I think a total of five now, would visit him at his home

21  to make sure he was okay?

22  A.  Correct.

23  Q.  And are you-all -- have you formed -- basically, did you

24  organize this?

25  A.  Correct.  So Monique and I, we've got a group text with this

Wendel - Direct

1   group to talk about, you know, how would we schedule and who

2   could go when.  And we've also talked about who else could -- we

3   recruit, you know, for times when somebody's out of town or has

4   family obligations or whatever to make sure that he's getting

5   the care that he needs and that he knows that he's loved.

6   Q.  All right.  You've heard the government's concern.  Would

7   you let your packages be searched?  Are you going to bring in

8   any illegal packages to Quintez at the grandmother's house,

9   anything like that?

10  A.  No.

11  Q.  All right.

12  A.  I love people with food.  So I would probably come with

13  cookies.

14  Q.  All right.  Ma'am, you've heard all the things.  Are you

15  aware he bought a gun?  Are you aware he went to the firing

16  range and so forth and so on.  Do you still support his release?

17  A.  Absolutely.

18  Q.  Would you still visit him at his grandmother's home?

19  A.  Absolutely.

20  Q.  Okay.  And would you still interact with those people who

21  are gonna cover him, if necessary, seven days a week going to

22  his grandmother's home?

23  A.  Absolutely.

24          MR. EGGERT:  All right.  Nothing further.

25          THE COURT:  Ms. Gregory.

Wendel - Cross

1                          CROSS-EXAMINATION

2    BY MS. GREGORY:

3    Q.  Do you consider yourself a mental health expert?

4    A.  No.

5    Q.  But you do have some expertise, I guess, in youth violence?

6    A.  I have expertise in youth violence.  I have expertise in

7    community sciences, community change, structural violence.

8    Q.  Okay.  Do you have any knowledge of the pathway to targeted

9    violence?

10   A.  Can you be more specific?

11   Q.  It's a paradigm that's discussed by the Department of

12   Homeland Security regarding sort of things that lead people to

13   do things like school shootings or things like that.  Do you

14   have any experience in that?

15   A.  No.  We work farther upstream, root causes.

16   Q.  And you know, of course, that people engage in acts of

17   violence all the time without being under the influence of any

18   mental illness; correct?

19   A.  I mean, I guess that's debatable.  I'm not a mental health

20   expert.

21   Q.  Do you think that everyone who engages in an act of violence

22   is mentally ill?

23   A.  Mentally ill?  No.  Does it take some kind of mental state

24   to enact violence on someone?  I think that could be argued.

25   Q.  Do you have any knowledge or experience in the difference

Wendel - Cross

1   between, say, radicalization versus mental illness, like --

2   A.  No, that is not my area of expertise.

3   Q.  Mr. Eggert, when he was asking you about what you would

4   agree to do, he said that a group of people -- you and a group

5   of people had agreed to visit him and make sure that rules were

6   being followed.  What rules are you gonna make sure are being

7   followed?

8   A.  Whatever rules the court sets for his home incarceration.

9   Q.  Do you know what those rules would be?

10  A.  I mean, based on the person who testified earlier, that he

11  is not leaving the house, that he doesn't have access to things

12  that he's not supposed to have access to.  And quite frankly, I

13  mean, my goal would be to put eyes on him and make sure that

14  he's okay and then, if there was anything that seemed off, to

15  make sure that that was brought to the attention of people who

16  could help.

17  Q.  Do you have any experience in corrections?

18  A.  Define experience.

19  Q.  Have you ever worked in a correctional facility with

20  offenders?

21  A.  I have never been employed by a correctional facility.

22  Q.  Okay.  Do you have any experience in law enforcement?

23  A.  Only as the kid of two cops.

24  Q.  Okay.  If you were at the house and it was just you and

25  Mr. Brown and Mr. Brown decided he wanted to leave the house,

Wendel - Cross

1   how would you stop him?

2   A.   I mean, from a de-escalation standpoint, I would probably

3   start by trying to talk to him and reason with him.  And if that

4   didn't work, then I would probably try to physically stand

5   between him and the door.  That's an odd question.

6   Q.   Do you think that you are in a position to say that

7   Mr. Brown is not a danger to the victim in this case today?

8   A.   That's not my area of expertise.  I mean, is my 17-year old

9   a danger when he gets behind the wheel of a car?  Could he kill

10  somebody with it?  Yes, every time he gets behind the wheel of a

11  car.  Can I say that he is a danger to society?  I mean, depends

12  on how you define that.

13          MS. GREGORY:  One moment.

14  BY MS. GREGORY:

15  Q.   Do you think that the danger created by poor driving is

16  equivalent to the danger created by shooting at someone?

17  A.   Exponentially more people die in car accidents than

18  shootings every year so yes.

19  Q.   Okay.  But when you're shooting at someone generally, isn't

20  it intentional?

21  A.   I don't know.  I don't know the intentions of people.

22  Q.   Are you concerned that your son is going to intentionally

23  try to kill someone with his car?

24  A.   Not at the moment.

25  Q.   Are you aware that Mr. Brown intentionally tried to shoot

Wendel - Cross

1   someone on February 14th, 2022?

2              MR. EGGERT:  Judge, I'd object.  Now they're using

3   mental states.  You know --

4   A.  I don't know his intention.

5              THE COURT:  Hang on, ma'am.  I'll sustain the

6   objection on slightly different grounds.  I think it would be

7   appropriate for you to say that he's been -- I'll sustain the

8   objection.  If you want to rephrase it as "charged with" or

9   "accused of," then I'll -- would not sustain an objection to

10  that question.

11  BY MS. GREGORY:

12  Q.  Are you generally aware that he has been charged with

13  attempting to shoot someone on February 14th, 2022?

14  A.  Yes.

15  Q.  And is it your position that he did this as a result of some

16  mental illness?

17  A.  I'm not a mental health expert.  What I can say is that the

18  person that I have seen in the past -- and I say seen -- I have

19  heard about what was going on.  I have not interacted with him

20  directly.  I have read a little bit of his writing -- I've read

21  a lot of his writing.  I've read a little bit of his writing

22  since that time -- is not the same person that I interacted with

23  when -- you know, when he worked in my office.

24       And knowing from the times that we did spend together with a

25  group of other young people about the kinds of trauma that these

Wendel - Redirect

1   young people have endured -- and I don't know if you're familiar

2   with epigenetics, but intergenerational trauma, which is carried

3   in the body and passed on through genetics, that cumulative

4   trauma I have witnessed in that space, participated in a healing

5   circle with those students.  And so can I attest to the fact

6   that he carries a lot of trauma?  Absolutely.  Does that have

7   mental health impact?  The science says it does.  So, you know,

8   that is not my area of expertise.  I have not done a formal

9   assessment.

10  Q.  If you were acting under the belief that he was a danger at

11  the time of the shooting due to mental illness, are you in a

12  position to say he is not a danger now?

13  A.  I think that's for the court to decide.  I think that if he

14  -- he has demonstrated that on medication and with the kind of

15  mental health treatment he has been getting that he is not a

16  danger.

17  Q.  Do you know what kind of medication he's getting?

18  A.  Only just that people have talked about that he has been on

19  medication, had inpatient care and intensive outpatient care.

20  Q.  So you have no personal knowledge of that other than what

21  has been discussed here today?

22  A.  No.

23          MS. GREGORY:  Nothing further.

24          THE COURT:  Mr. Eggert, any redirect?

25                      REDIRECT EXAMINATION

1   BY MR. EGGERT:

2   Q.   Just one.   If there was -- you thought any hint of a problem

3   when you visited Quintez, would you call the authorities, call

4   pretrial, call whomever you needed to call?

5   A.   I would assume that if that were the case, there would be

6   some kind of protocol that we would be given.

7   Q.   And would follow?

8   A.   Absolutely.

9           MR. EGGERT:   Thank you.   That's all.

10          MS. GREGORY:   Nothing further.

11          THE COURT:   All right.   You can step down.   Thank you.

12          THE WITNESS:   Thank you.

13          THE COURT:   All right.   Mr. Eggert, additional

14   witnesses?

15          MR. EGGERT:   Judge, rather than call further

16   witnesses, I have letters here that I'll mark as Exhibit 3.

17   It's one, two, three, four -- and I have copies for the

18   government -- one, two, three, four, five letters.   I'd like to

19   submit them to the court in support of the defendant, and I have

20   copies for the United States.   And I've premarked it, if that's

21   permissible, as Exhibit 3.

22          THE COURT:   All right.   Thank you.   If you could show

23   those to Ms. Gregory, please.

24      (Counsel conferring off the record.)

25          MR. EGGERT:   Judge, obviously, I'm not gonna read --

1    they're for your submission.

2              THE COURT:  Understood.

3              MR. EGGERT:  I would just like to read a couple of

4    sentences from one.

5              THE COURT:  Let me interpose a question before you do

6    that.

7         Ms. Gregory -- and let me know if you need to look further

8    before answering the question -- but do you have any objection

9    to these as a collective exhibit?

10             MS. GREGORY:  No, Your Honor.

11        (Defendant Exhibit 3 admitted in evidence.)

12             THE COURT:  All right.  Mr. Eggert.

13             MR. EGGERT:  Thank you.  David Echevarria, who is

14   another Martin Luther King Scholar, and he talks about -- it's

15   April 11th, '22.  "Quintez has embodied the work and mission of

16   the program, that is, the MLK program.  He has been a servant

17   leader in his community.  He studied peace, conflict

18   transformation, inspired his peers.  His work has impacted many

19   students on campus and people in the community he calls home.

20   And he's -- he's written opinions -- opinion articles that

21   amplified the stories of the people from his community -- and

22   from his community highlighting the need for resolution to

23   violence that he has experienced as a young black man in the

24   west end of Louisville.

25        Another one there, Judge, is from a gentleman, Mr. Capillo,

1    who works for Saint John's Center for the Homeless who knew

2    Mr. Brown, and yet another one from Jenny Sawyer, who is -- and

3    works at admissions at the University of Louisville.  And,

4    again, quoting from her, "I wish everyone would have the

5    opportunity one day to hear him speak because unless you have,

6    it is hard to capture or express how magical his gifts are.  He

7    is a smart young man who in my experience put others ahead of

8    himself.  He does not shy away from giving of himself, sharing

9    his story, and fighting for justice.

10        And there are other letters, but I'm not gonna read excerpts

11   of those.  But those are the letters submitted without --

12   without objection that we're submitting to the court.  And,

13   honestly, Your Honor, I probably -- everyone in this room would

14   have written a letter for him on this side of the room.

15        Judge, the only other proof we have is a letter from the

16   doctor of Our Lady of Peace describing -- it's one page --

17   describing his inpatient treatment and his hospitalization,

18   medications he's on; and then one from the psychiatrist, Kellye

19   Singletary, who's treated him before his hospitalization and who

20   was continuing to treat him after he was released to home

21   incarceration.

22        I want the court to have these to know that he was and is

23   receiving mental health treatment while on home incarceration,

24   and that would be a condition we're proposing, a condition of

25   his release.  And I want the court to know that he would get

1    that treatment, is getting that treatment, is on medication,

2    would continue to get it if he's released.

3              THE COURT:  All right.  And I assume then, Mr. Eggert,

4    you're renewing your request that that document be kept under

5    seal and any discussion of it be done under seal; is that

6    correct?

7              MR. EGGERT:  Yes, Your Honor.  I believe they've

8    already breached the privilege, but I don't want that used

9    against me to say, "Oh, now we really can look at these records

10   that we already secretly got."

11             THE COURT:  Understood, but am I -- I don't even know

12   if concern is the right phrase or not.  My question or my task

13   is to make the right decision about whether something ought to

14   be sealed or not.  And whether there's a violation of -- whether

15   there has been a previous violation of a privilege does not

16   impact, I don't believe, that analysis.  And so I think the

17   chips will fall where they may on the waiver or whether there's

18   anything wrongful about seeking the documents by subpoena.

19        So for now I guess I'd like to hear, Ms. Gregory, the

20   government's viewpoint on whether that -- my consideration of

21   that letter ought to be done under seal, both the document

22   itself kept under seal and any questions I may have about it

23   asked on the record but in a sealed courtroom.

24             MS. GREGORY:  Your Honor, I guess I'd like

25   clarification.  Our understanding was it would be filed under

1    seal, but I'm not sure if the defense is seeking to file it ex

2    parte under seal.  We would object to filing it ex parte under

3    seal where we don't know the contents and can't object or

4    respond to it, but generally we don't have an objection to it

5    being filed under seal.  Usually medical records or things of

6    that nature would be filed under seal.

7            THE COURT:  All right.  Mr. Eggert, can you clarify

8    that, please.

9            MR. EGGERT:  Yes, Judge, we would ask to file it ex

10   parte.  If the court says we can't file it ex parte, we'll file

11   it under seal.

12           THE COURT:  All right.  I only -- I can only say with

13   confidence now that filing -- that considering anything ex parte

14   at the detention stage is disfavored.  I'm not saying that

15   neither of you could find a case in which there was a contrary

16   conclusion, but it's not the favored approach.

17     So I would be -- I start from a position of being

18   disinclined to consider it on an ex parte basis.  I don't have a

19   strong feeling about it -- I don't have any predisposition about

20   it being under seal.  Just the way that it is supposed to work

21   and it has sometimes not been the way that it actually does

22   work, but the way it is supposed to work is a proponent of any

23   record can file it provisionally under seal, but then the

24   proponent of sealing, not necessarily the proponent of the

25   record, the proponent of sealing has to articulate the reasons

1   why it should be filed under seal, and I have to balance that

2   against the public interest.  Oftentimes that is an academic

3   exercise.  In this situation it clearly would not be.

4       So I believe the -- Mr. Eggert, I'll give you the option.

5   If you want to offer me some authority for considering it ex

6   parte, I'll hear that now.  If not, I'm happy to accept the

7   document not ex parte but keep it provisionally under seal and

8   give you the opportunity to make the argument as to why it

9   should remain under seal.

10          MR. EGGERT:  Judge, this is what we'll do after

11   consulting with Mr. Renn and Ms. Lister.  We're not releasing

12   the records.  What we're giving you is a one-page document.  We

13   don't believe it constitutes any waiver, and I'll just file it.

14          THE COURT:  All right.  File it under seal or not?

15          MR. EGGERT:  No, I'll just file it.

16          THE COURT:  Okay.  That's fine.

17          MR. EGGERT:  And this is -- I'm gonna make this

18   Defense Exhibit -- I forget whether I'm -- what I'm on, Judge.

19          THE COURT:  It should be 4.  Four, Dena, is that

20   right?

21          THE REPORTER:  Yes, Your Honor.

22          MR. EGGERT:  This is a letter from Dr. Chhibber from

23   Our Lady of Peace, and he recounts that the defendant was

24   involuntarily -- well, not -- he reported there.  So it wasn't

25   involuntary, but he was hospitalized on an inpatient basis

1    February 27th to March 7th, treated with group therapy,

2    individual therapy, medication management.  He gives him a

3    diagnosis, all right, just so the court doesn't think that the

4    defense has been making this up all afternoon, major depressive

5    disorder, recurrent, severe.

6        He gave him -- he outlines or sets forth the discharge

7    medications, advises that after his release and after his

8    release to the -- from Our Lady of Peace, he was in an intensive

9    outpatient program that was done by Zoom.  He attended the

10   program via telehealth from March 8th through April 6th.  And,

11   of course, he was then going to be returned to the care of the

12   psychiatrist who had been seeing him while on HIP before he was

13   hospitalized.

14       And so this is a letter from Dr. Chhibber from Our Lady of

15   Peace, and we would move to admit this as our exhibit number, I

16   believe, 4.

17            THE COURT:  All right.  Any objection to the letter,

18   Ms. Gregory?  Ms. Gregory, any objection to the letter?

19            MS. GREGORY:  No, Your Honor.

20            THE COURT:  Thank you.

21       (Defendant Exhibit 4 admitted in evidence.)

22            THE COURT:  Thank you.

23            MR. EGGERT:  Then, Your Honor, as the next exhibit we

24   would introduce the letter from Dr. Kellye Singletary.

25   Dr. Singletary treated the defendant while -- while he was on

1    HIP.  She's a psychiatrist.

2        Now, the bottom of that letter says office visits/notes are

3    attached.  We are not attaching the office visit notes for

4    reasons we've already said.  It's the last thing, but this

5    describes -- because we believe that we have a right to keep

6    those notes confidential, but it describes what had happened.

7    He was referred for psychiatric assessment in an outpatient

8    setting, that he was assessed on February 18th, okay, started on

9    medication.  He was having some --

10            THE COURT:  Before you tell me anything more about

11   that, Mr. Eggert, why don't you just show that to Ms. Gregory.

12            MR. EGGERT:  I've got it here for her.

13            THE COURT:  Let me ascertain whether there's any

14   objection.

15            MS. GREGORY:  No objection, Your Honor.

16            THE COURT:  All right.  So that's admitted as

17   Exhibit 5.

18        (Defendant Exhibit 5 admitted in evidence.)

19            MR. EGGERT:  That is correct, and I've got it here,

20   Judge.  But what she says is that she started seeing him --

21   initial assessment, February 18th, bipolar type, that was the

22   initial diagnosis, and then had him on medication.  He was

23   having what she described as passive suicidal thoughts, but then

24   there was more health -- you know, a concern about self-harm,

25   hurting -- potentially hurting himself.  And that's when she

1   recommended that he go inpatient, and that's when he was

2   accepted at Our Lady of Peace.

3        Then he was at Our Lady of Peace.  He was discharged and had

4   intensive outpatient -- it describes that -- by Our Lady of

5   Peace.  And their plan of care was to continue the medication

6   from the hospital and make adjustments, and he would work with

7   Dr. Singletary -- that's the psychiatrist -- and a therapist and

8   that he would do that through tele-Zoom.  A psychiatrist would

9   see him every two weeks, and the therapist would see him much

10  more frequently than that.

11       And I talked to Dr. Singletary.  She could have the

12  therapist see him nearly every day, if necessary, and that was

13  what was supposed to go into effect on April 6th when he just

14  completed the intensive outpatient program through Our Lady of

15  Peace.  And this one -- these two letters show the mental health

16  treatment.  They summarize the mental health treatment he's

17  received and the medications he's under and the plan for

18  continued treatment for Quintez Brown.

19            THE COURT:  And so is Dr. Singletary a provider in --

20  I'm not familiar with this letterhead -- is she a provider in a

21  private setting?

22            MR. EGGERT:  Yes, Judge, yes, she is, and she has an

23  office on Main Street.  And they do -- over Zoom is how they did

24  this, obviously, because he was on home incarceration.  She's a

25  private provider and has been working with him.

1          THE COURT:  Okay.  All right.  So I believe -- yes, so

2    Number 5 has been admitted.

3          MR. EGGERT:  Judge, there's one other thing we would

4    add before we complete, and that is we would ask that as part of

5    the record the pretrial services report be placed into the

6    record which recommends Mr. Brown's release.

7          THE COURT:  All right.  Any objection to that,

8    Ms. Gregory?

9          MS. GREGORY:  I mean, I generally think that's part of

10   the court's record anyway, but it does have some PII in it.  So

11   that's a concern.

12         THE COURT:  That was my hesitation as well.  I don't

13   know if it's necessary, but if so, then it's admitted.

14      (Sealed Cumulative Exhibit 1 admitted in evidence.)

15         THE COURT:  All right.  Ms. Gregory or Ms. Porter, is

16   the United States going to be calling witnesses?

17         MS. GREGORY:  No, Your Honor, though we do have some

18   exhibits.

19         THE COURT:  I'm sorry?  You do have --

20         MS. GREGORY:  Some exhibits but no witnesses.

21         THE COURT:  Okay.  All right.  In that event, why

22   don't you go ahead and tender those exhibits.  Show them to

23   Mr. Eggert.  Let's ascertain whether there's any objection to

24   them.

25      When you're done just wait a second, Ms. Gregory.

1      All right.  Where do we stand?  Is the defense still

2  reviewing these records?

3          MR. EGGERT:  Yes.  We're almost finished.

4          THE COURT:  That's all right.  Take your time.  I was

5  doing something else for a minute.  I wanted to make sure you

6  weren't waiting for me.

7      Mr. Eggert, any objection to the exhibits proffered by the

8  United States?

9          MR. EGGERT:  No, Your Honor.

10         THE COURT:  All right.  Ms. Gregory, obviously, in the

11  absence of there being a witness, I would ask you to keep it

12  somewhat limited, but can you just describe in general terms

13  what I'm looking at here.

14         MS. GREGORY:  I was gonna go through those in my

15  argument, Your Honor.

16         THE COURT:  Well, I may want to take a --

17         MS. GREGORY:  Okay.

18         THE COURT:  -- I may want to take a recess before we

19  do that.  So why don't -- tell me, if you need to tell me

20  anything, what these exhibits are, and then we'll go from there.

21         MS. GREGORY:  Exhibit A are five pictures that were

22  taken shortly after the shooting.  The first one is a picture of

23  the wall that the victim candidate was sitting in front of.  On

24  the white wall -- it's hard to see.  It's easier to see on a

25  computer -- but there you can see six bullet holes, five in the

1    white plaster and one in the baseboard.

2         The next picture is a picture in the adjoining office, which

3    was a wedding planning business, and that's where the bullet

4    holes came through the other side into the wedding planning

5    business.

6         The next picture is a picture of the victim candidate's

7    sweater after the shooting, as is the picture after that, which

8    is a -- it's a close-up.  And then the fifth picture is a

9    picture of the victim candidate's -- the shirt he was wearing

10   under the sweater after the shooting.

11        Exhibit B we've already gone over, which is "Revolutionary

12   Love Letter," which is an article the defendant published on

13   Medium.com.

14        Exhibit C is the Firearms Transaction Record for a Smith &

15   Wesson M&P Shield EZ that the defendant purchased on January 22,

16   2022 or -- I'm sorry -- January 12th, 2022.

17        Exhibit D are pictures of the defendant practicing using

18   that -- or they're still shots from surveillance footage of the

19   defendant using that M&P Shield at a firearm range in Indiana on

20   January 22nd, 2022.

21        Exhibit E is the defendant -- or surveillance -- stills from

22   surveillance footage of a pawn shop where the defendant

23   purchased a Glock 17 Gen5 shortly after 9:00 a.m. on February

24   14th, 2022.

25        Exhibit F is the Firearms Transaction Record for that Glock,

1    and Exhibit G is surveillance -- stills from surveillance

2    footage at Butcher -- at the building where the victim

3    candidate's campaign office was from the day of the shooting,

4    February 14th, 2022, showing the defendant coming in and then

5    exiting the building.

6        (Government Exhibits A, C, D, E, F, and G admitted in

7    evidence.)

8            THE COURT:  All right.  So let's do this.  Let's --

9    Ms. Gregory, what is your estimation on how long your argument

10   will be?

11           MS. GREGORY:  Like 20, 25 minutes.

12           THE COURT:  All right.  Mr. Eggert, likewise?

13           MR. EGGERT:  Less but, yeah.

14           THE COURT:  Okay.  Let's go ahead and take a short

15   recess.  Let's say ten minutes, just to be safe.

16       (Recess at 3:12 p.m. until 3:51 p.m.)

17           THE COURT:  All right.  Mr. Eggert or whoever is going

18   to speak for you-all, I want to hear from you-all first, just

19   given where the -- given that the rebuttable presumption is in

20   play, I'll hear from you-all first, please.

21           MR. EGGERT:  Your Honor, Quintez Brown is 21 years

22   old.  He has no prior record.  Under, as the court knows, 18

23   U.S.C. twenty -- 43(j), he is presumed -- 3142(j), he is

24   presumed innocent, that is, really he's supposed to be presumed

25   innocent.

1    I understand that this is a presumption case.  I understand

2    the law on that point, but really throwing someone in jail,

3    incarcerating them and saying they're presumed innocent -- I

4    understand it happens.  It happens every day, but we should

5    start with this presumption of innocence.  And that presumption

6    of innocence, Judge -- none of these factors that we're gonna

7    talk about is supposed to limit it, modify it, and nothing is

8    supposed to modify that -- the presumption.

9    Now, Your Honor, regarding comments that we've made that I

10   think the court has taken exception to -- and I understand that,

11   but I want to address a couple of things because they were

12   addressed by several witnesses, including Ricky Jones, and

13   they're also addressed by the government.  And the first is that

14   we do view this as a racial case.

15   In the time that we've had this hearing, I guarantee you

16   that there have been people shot in this city and yet they don't

17   have the benefit of this kind of prosecution, the victims don't.

18   They don't have the benefit of two prosecutors.  They don't have

19   the benefit of any of that.  It's life goes on in the city.

20   And once again, Judge, I would just submit to you that

21   there's a feeling or there's a belief -- there's absolutely a

22   belief that there's two tracks here, one for the people who are

23   connected and affluent and rich and then the other for the

24   Quintez Brown who, honestly, Your Honor, was poor, came up from

25   absolutely nothing to accomplish what he did, absolutely nothing

1    to accomplish.

2        And you know what, when someone's shot tonight, they're --

3    as I said, the U. S. Attorneys won't be in this case.  As I

4    said -- Ricky Jones said it better than I can -- when they asked

5    on Breonna Taylor, they didn't get in.  They fled from the

6    case --

7            MS. GREGORY:  Objection, Your Honor.  None of this is

8    relevant to the dangerousness or risk of flight, which are the

9    two criteria to be considered here.

10           MR. EGGERT:  Well, I think it is relevant, Judge.

11           THE COURT:  Hang on, hang on, Mr. Eggert.

12           MR. EGGERT:  Okay.

13           THE COURT:  I agree generally.  I am gonna allow some

14   leeway when it comes to argument beyond that that I might in

15   questioning witnesses.

16       I'll just take the opportunity, since we're interrupted

17   anyway, to remind everybody the question is one of detention.

18   There is no issue in front of me -- there's no decision I can

19   make to address these broader societal concerns.

20       So I don't want to put words in your mouth, Mr. Eggert, but

21   I would appreciate you not putting words in mine either.  You

22   have said that the court has taken exception to some of the

23   arguments that you have made.  The only exception I've taken to

24   those comments is that they have gone beyond what is relevant

25   certainly during the initial appearance.

1    And so unless and until these issues are connected to any of

2    the issues that -- you know as well as I do which ones I -- what

3    issues I have to consider and which ones I don't -- my patience

4    is less than infinite to listening to those types of arguments.

5             MR. EGGERT:  Well, I understand that, Judge, but --

6    and we would remind you that, obviously, for our client the

7    stakes in this are absolutely huge, especially because he's now

8    getting psychiatric treatment or was at home when he was

9    arrested.  So for our client the stakes are very big.

10            THE COURT:  Hang on.  That's a different issue

11   altogether.  You're not talking about Breonna Taylor now.  Now

12   you're talking about Quintez Brown, and so we're making progress

13   towards what is relevant in the case.

14            MR. EGGERT:  Well, Judge, we may have different views,

15   but I understand.  I'll move on to the point about political

16   because this is connected to the case, Your Honor.  They made

17   reference to his political writings, and they even talked about

18   this -- this was something he'd written that they describe as

19   some -- you know, a manifesto.

20       Your Honor, you know, it's been a long time since I went to

21   college, but I think, again, Ricky Jones -- this would be --

22   could be written by thousands, millions of students in college.

23   And this is supposed to be proof that he should be detained

24   without bond that they offered the court on cross-examination,

25   and they brought up his political views.

1      And let me remind you, if we're talking political views

2   here, Your Honor, the senior senator from Kentucky said he

3   should be detained.  He took exception to his release.  He gave

4   a speech on the senate floor.  He said it was jaw-dropping that

5   he was released, and lo and behold, he's indicted.

6      So I understand the court about relevancy, but they've

7   offered a screed of his, a written thing that they say is a

8   revolutionary manifesto.  That's bad politics, but when the

9   senior senator says he should be locked up immediately, that's,

10  I guess, good politics.

11     In any event, Judge, we're not arguing for his release

12  because we think the case is racial or political.  We're arguing

13  for his release because under the law we believe these factors

14  mandate his release, and that's what we would submit that we

15  have done.

16     Let's talk, if we can.  We acknowledge that this is a

17  serious offense.  All their proof has gone to that factor.

18  We're not in a position really to rebut it because there's --

19  you know, we don't have discovery yet but -- you know --

20          MS. GREGORY:  Objection.  That's inaccurate.

21          MR. EGGERT:  Well, we don't have discovery of -- full

22  discovery.  We've been given disks -- you know, it's been very

23  limited, and they know it's been limited.

24          THE COURT:  Hang on.  Hang on both of you.  Everybody

25  take a deep breath.

1      All right.  There usually isn't any discovery at this point.

2           MR. EGGERT:  Right, yes.

3           THE COURT:  All right.  The three of us all know he's

4      presumed innocent.  I still have to consider the nature of the

5      charge.  That's right out of the statute.

6           MR. EGGERT:  I agree.

7           THE COURT:  So let's -- that's the ground we're all

8      standing on.  So let's go from there.

9           MR. EGGERT:  Right, but my point is, Judge, that it is

10     a serious offense.  We've acknowledged that from the beginning.

11     And let's assume that there -- that they have good evidence or

12     strong evidence.  Again, that just goes to a factor that you're

13     supposed to -- that you're supposed to consider.

14      The statute does not say, if this is a serious offense --

15     and there's far more serious than this -- but the statute

16     doesn't say, if this is a serious offense, then he shall be

17     detained.  That's the only factor, I would submit, Judge, that

18     supports their request for detention, the only one.

19      So all this stuff about he pawned a gun, he went to the

20     house, he did -- that goes to seriousness of the offense, fair

21     enough, but it doesn't go to any of the other factors, none.

22     And when you look at any -- all the other factors, they all

23     favor his release, every single one of them.

24      They talk about, Judge, what you're supposed to consider,

25     and you're supposed to consider -- let's talk about the history

1   and characteristics of the defendant.  Goodness, Your Honor,

2   witness after witness after witness described this young man

3   that -- not he's brilliant, but -- that's the least of it --

4   that he cared about other people, that he cared about the

5   community, that he cared about his peers, that he worked for

6   nonviolence, that he worked to better the community, that he did

7   all these things.  Ricky Jones said that.  Ricky Jones said, "He

8   could stay with me."

9       Other witnesses said it repeatedly that he was a good

10  person, a person of good character, a person they admired, a

11  person they're willing to come in and stand up for, a person

12  that they believe in, still believe in, a person that they want

13  released.  That's his history and character.  A Martin Luther

14  King Scholar.  I think he's one of, what, 50 high school

15  students in his year to meet President Obama.  He's a person --

16  Judge, I could have filled the courtroom three times over, you

17  know.

18      I'll just tell you I got a call today from his old football

19  coach at Manual High School.  This is a person who had

20  character, has character, and is believed and supported by these

21  people who have come to court today.

22      So when you want to talk about his history and character, I

23  think it was evident.  Look at some -- what some of the people

24  said.  They said that they would visit him.  They said that

25  they'd go to his home.  They said he could -- they could stay

1    with him.  They said that they loved him.  They said that they

2    still love him.  That goes to his -- a testament to him.

3        I know that there's other defendants, many others, but I

4    think it's a rare case, maybe the only case where you've seen

5    this kind of unbelievable support, extraordinary support from

6    the community, and it has been absolutely extraordinary.

7        Again, if the statute says if you -- if you do something

8    like this you're detained, fair enough, but that's not what the

9    statute says.  And if this man isn't released, then you've --

10   we've essentially turned a permissive statute into a mandatory

11   statute and say, if you're accused of this then, by God, you're

12   detained no matter what, no matter what.

13       Let's keep going, Judge, on the history and character of

14   this particular defendant.  What do they talk about?  They talk

15   about employment.  Well, he worked for the Violence Prevention

16   Center.  He also worked, as you heard through -- at the Courier.

17   His main job though was student, was at the U of L until the

18   breakdown happened.  So you've got a history of employment.

19   You've got a history of school.  You've got all that.

20       Length of residence in the community, it's been for life.

21   He's been here for absolute life.  Also, he was a young man who

22   could have left the community.  He did not leave the community.

23       It talks about past conduct.  There is no past conduct.

24   There's absolutely no past conduct.  They can say he had a

25   breakdown and left town in 2021, but in terms of past criminal

1    conduct, zero.  This is it.  You saw in the PSI, unless -- I

2    think there was one charge of -- yes, here it was -- failing to

3    produce an insurance card.  And then they talk about a machine

4    or something being secured that was dismissed.  There is no

5    record.  Another super strong, major factor for the defense.

6        Is there an alcohol problem?  No evidence.  Is there drug

7    problems?  No evidence that there is.  Does he have a record

8    that would cause you concern about appearing in court?  This is

9    basically his only case, and he's appeared in court every single

10   time.  Was he on probation?  No.  Was he on parole?  No.  Was he

11   on any form of legal release?  No, no, no, no.

12       I mean, they can put these pawn records in front of you, and

13   they can say there he is leaving this or getting a gun at the

14   firing range.  That goes to seriousness.  That's the only factor

15   they have.  That is the only factor they ever -- they ever will

16   have, period.

17       Now, let's keep going, Your Honor.  They challenged and they

18   said, "Well, you know, how do we know he's mentally ill?"  Well,

19   it would suggest you are when in 2021 you go to New York and

20   you're there 11 days, apparently without a car, and you're found

21   on a park bench.  All right?  And then certainly this would

22   suggest a mental breakdown, but while I'm not a mental health

23   professional, you've seen it.

24       He was put under the care of Dr. Singletary, Kellye

25   Singletary, a psychiatrist.  She believed that he -- there was a

1    risk of self-harm after -- after treating him starting in

2    February, February 16th.  She started February 18th.  What does

3    she do?  She recommends inpatient treatment.  He goes to Our

4    Lady of Peace.  He's treated for depression.  Recurrent, severe

5    depression is what they described.  He's put on medication.

6    He's put on a regiment.

7        Then what happened?  He's given medication.  He's released.

8    What happens next according to the letter from Dr. Chhibber?  He

9    is put on intensive outpatient treatment.  It was three hours a

10   day five days a week, and that's just the therapist.  And he

11   still obviously had access to the psychiatrist.  That is mental

12   health treatment then and continued on medication.

13       As soon as that was completed -- and it was completed April

14   6th -- Dr. Singletary was set to resume.  She would see him, and

15   her therapist would see him.  She'd see him weekly or biweekly

16   or every two weeks, but the therapist would see him even more

17   than that.  She would see him as necessary.  She was the one who

18   was on top of the situation and recommended Peace.  He is

19   getting mental health treatment.

20       And the correctional facilities do everything they can, but

21   you're talking about a significant mental illness and

22   significant treatment.  And I don't think it can be argued or

23   anyone can pretend that if he stays in a detention facility, I

24   submit, it's gonna destroy his mental health.  It will crush

25   him, and it will crush his mental health.

1     In any event, mental health treatment is what he was
2  receiving now, and he'd still be receiving it had they not come
3  to his home February 6th, when he already is being prosecuted in
4  state court on a $100,000 bond, home incarceration, receiving
5  treatment, coming in with the FBI and the helicopters and taking
6  him into custody where he's right where he was supposed to be in
7  the home of his grandmother.  So he is receiving that treatment,
8  and he'll continue to receive that treatment.
9     You may say we can't predict the future.  That's true,
10  Judge, none of us can, but look at what -- the record that we do
11  have.  He was released on the 16th, on February 16th and to HIP.
12  Everything he did was right.  He has had no violations, no
13  problems, nothing has he had that's been a -- has there been a
14  problem that he's had.
15     They made three home visits, perfect -- the compliance was
16  perfect.  He continued, as you heard, as you've seen from those
17  letters, to be in the intensive outpatient program.  When HIP
18  went there, he's where he's supposed to be.  He had no releases.
19  He stayed at home.  But if there's any doubt about his ability
20  to comply, willingness to comply, wanting to comply, obeying
21  your rules should you release him, Judge -- and this goes right
22  to the factors, absolutely to the factors -- he's released -- he
23  is actually released from HIP so he can go to a mental hospital,
24  and they released him.  He's not in the custody of Corrections.
25     And I know the government will say, "Well, state court

1   doesn't really matter, and those judges don't know what we're

2   doing, and we have a different system here," but look at this.

3   "Mr. Brown's treating psychiatrist, having recommended inpatient

4   hospitalization, and the parties being concerned about the

5   welfare and safety of Mr. Brown," that's signed by the assistant

6   county attorney who works for Mike O'Connell, County Attorney,

7   and it's signed by a judge.  And it's ordered that he's

8   permitted to travel to Our Lady of Peace, which he did.

9        And when he completed the treatment there and he was -- did

10   everything they asked him to, he had his family take him home

11   and back to where he was supposed to be.  And HIP checked that

12   and Detective Lamkin said, yeah, GPS shows he went right to the

13   hospital and right home.

14        Now, that's got to be huge in your consideration of

15   everything, of everything.  Will he flee?  Will he follow your

16   rules?  Will he do what you say?  When he's given the

17   opportunity to just leave, when he's permitted out of the house

18   without anyone to watch him but his family, when he's in a car,

19   what does he do?  He does exactly what the judge said.  And when

20   he's finished at Our Lady of Peace, he does exactly what a judge

21   said, and then he returns exactly when he's supposed to and

22   remains on HIP until he's arrested.

23        And, Judge, if he hadn't been arrested April 6th, if they

24   had waited until today, he'd still be on HIP.  If they waited

25   until next year, he'd be on HIP obeying those rules.  That's

1   exactly what would happen.

2       Now, Your Honor, let's further look, if we can, at the

3   pretrial services report.  What do they recommend here?  And I

4   think it's critical because they're independent.  They're not

5   for the defense.  They're not for the government, none of that.

6   What they recommend -- look at the things here, home

7   incarceration.  He's already on it.

8       Now, in addition to that, Judge, if they have any issue with

9   Tanya Hyde, his grandmother, who owns a house -- nothing I've

10  said has been disputed.  Pretrial checked her record.  They

11  didn't find anything.  She's been essentially a third party

12  custodian.  If they have a problem with that, Professor Wendel

13  said she'll be the third party custodian -- she advised us of

14  that -- and Mr. Brown can live with her, can live with her.

15      So, you know, if for some reason they take exception to

16  Tanya Hyde, even though I don't know that there'd be a reason

17  that they would, there's another third party custodian who would

18  step forward, and that's Professor Wendel.  And they can do a

19  record check on Professor Wendel.  So home incarceration we

20  already have, and we know he was complying.

21      It says GPS.  He already was.  That's how they monitored

22  from Our Lady of Peace and back.

23      Let's keep going, though.  Judge, when he's arraigned in the

24  state court in circuit court, Judge Cunningham makes the

25  determination he should stay out.  He should stay on the same

1    bond completely.

2        In addition, there's something else that you should know.

3    That $100,000 bond that he was released on in state court,

4    that's still up in state court, and the Community Bail Project

5    is standing by that bond.  And that bond can be made a condition

6    of your release because they're gonna stay with Mr. Brown.  They

7    put the bond up.  It's still there in state court for the

8    identical charge and that they've posted.

9        But let's keep going on what they say.  "No contact with the

10   victim."  There hasn't been any.  That's the recommendation of

11   pretrial.

12       "Report as soon as possible, you know, any contact with law

13   enforcement."  There won't be any.  The only release -- he's

14   asking for no releases except to go to pretrial.  I'm not even

15   asking for attorney release.  Mr. Renn and I'll go to Hill

16   Street.  It's not far from the office, and we can get there in a

17   few minutes.  And we can see his grandmother there while we're

18   there.  So we have no -- we're not asking for any releases, not

19   one.

20       "No firearms."  There are no firearms in the home.  Ms. Hyde

21   doesn't own any.  You can't have any if you're on HIP.  They can

22   search the home now.  They can search it tonight.

23       All right.  Third party custodian, we've offered you two,

24   but Ms. Hyde is where he's been living.  That's under number 5.

25   Pretrial, no problem, that's what he was doing.  You have to

1   report to HIP at times on HIP.  So we'd have -- you know, he

2   would accomplish that.

3       "Mental health treatment," we would absolutely go to mental

4   health treatment because we were doing it.  You don't have to

5   guess.  He was getting it.  Read those letters from Chhibber.

6   Read the letter from Dr. Singletary.  It was not just the

7   inpatient.  Three hours a day, five days a week is intensive

8   outpatient and that's continuing, continuing.  So, yes, we would

9   do that.

10      "No use of controlled substance," there's not an issue with

11  that.  There's never been an issue with that, absolutely not.

12  And then to say, beside all that, Judge, as I say, we're -- we

13  want to go beyond.  We understand the charge is serious, but all

14  their proof on that doesn't make their case on detention.

15      How many people said -- we have five people who would visit

16  their home -- visit the home.  And this idea, you know, what

17  would you do?  Well, they'd go to the home, and if there's any

18  problems, they would advise either pretrial or myself.  And

19  witness after witness said that.  Monica Wendel said, "I'll

20  visit his home."  Monique Williams already has visited the home.

21  And, Judge, these are responsible people.  They're citizens.

22  Aubrey Williams, her husband, would visit the home.

23      There's another -- Assistant Professor Jones would visit the

24  home.  Ricky Jones would visit the home.  The whole community

25  really would visit the home to check -- not that they're worried

1    he's gonna do anything.  They're just worried that he -- you

2    know, if there's a problem at all, they're worried about him and

3    his safety.  They would alert everybody in the world.

4       Let's talk about, too, Judge, not just the community

5    support, which is unbelievable, let's talk about his family

6    support.  They're here.  If they could just stand in the front

7    row.  They've been here all day.  He's got his mother,

8    grandmother, stepmom.  I believe his stepdad is here as well.

9    His family's here.  They were here last time.  They're always

10   gonna be here for him, and he lives with his grandmother.  All

11   right?  So he's got everything that you could ask for.

12      Finally, Judge, where are we going if we say Quintez Brown

13   should be detained?  I could see it if we don't have mental

14   health treatment.  We do.  I could see it if he hadn't gone to

15   Our Lady of Peace.  He has.  I could see it if he hadn't already

16   succeeded on HIP.  He already did.  I could see it if he hadn't

17   obeyed GPS monitoring.  He has.  I could see it if we didn't

18   have this outpouring of community support.  We do.  I could see

19   it if he didn't have family support.  He does.

20      Where are we going if we incarcerate him?  If we incarcerate

21   him, you incarcerate anybody charged with this offense, anybody,

22   because you can't do better than Quintez Brown.  You just

23   cannot.  It's a serious crime.  It's a very serious crime, but

24   every other factor favors release.  And if he's gonna be

25   detained, then they have to amend or should amend the statute.

1    Everybody should be detained who's charged with this.

2        So he will appear in court, obviously.  He'll obey your

3    rules.  He'll be home.  He'll receive the medication.  He'll

4    have the support.  He'll have the support of everybody.

5        And honestly, Judge, your decision, should you release him,

6    will basically -- we would submit, you know, it would reflect

7    and honor the presumption of innocence.  It would, you know,

8    show that despite political pressure that he'll be treated

9    fairly, and it would show a lot of things that would show that

10   there's not two tracks of justice.  But beyond all that, it

11   would show that the law regarding detention -- he should be

12   released, that would be following the law, and we'd ask the

13   court to release Mr. Brown on all the conditions that we set

14   forth.  Thank you.

15           THE COURT:  All right.  Mr. Eggert, before you step

16   away, I do -- and Ms. Gregory may touch on this, and I'll give

17   you a chance at rebuttal -- but I would like your thoughts on

18   one point.  We've talked a lot about mental health, mental

19   health conditions, mental health treatment.  I have some

20   information in front of me via these letters and proffers and

21   arguments that you-all have made.

22       One thing that hasn't been touched on is -- and I'm

23   interested in your thoughts.  I'm interested in the government's

24   thoughts on this.  To what extent do these conditions -- listen,

25   it's a -- I'm not gonna speculate about your reasons.  I'm not

1   gonna ask your reasons.  It doesn't matter.  There are reasons

2   why counsel would choose to release or would choose not to

3   release the underlying medical records, but regardless of why, I

4   don't have them.  All I have is these letters.

5       So how do I know that these mental conditions that are

6   described here do not actually present more of a danger?  How do

7   we know that a person who is on these five medications who's

8   been diagnosed -- and I'm certainly not trying to embarrass

9   Mr. Brown, but these have been offered for the record, not

10  offered under seal -- someone diagnosed with major depressive

11  disorder, recurrent, sever with psychotic features, what

12  assurance can I have and what assurance can I have for the

13  safety of the community that somebody with that diagnosis

14  doesn't present more of a danger or doesn't present a danger to

15  the victim in this case or to others?

16          MR. EGGERT:  Judge, first of all, we had hoped when it

17  was revealed that the grand jury was meeting, the federal grand

18  jury, that if they received information, which they have because

19  -- whatever team has it, they have his mental health records.

20  All right?  They have his mental health records -- that if they

21  knew and -- that he was mentally ill that they wouldn't indict

22  him.  All right?

23      Now the situation is reversed, and I understand the court's

24  question, but now the mental illness is being used against him.

25  And the mental illness is such that, "Let's keep him in because

1   he's mentally ill."  I have no problem with you reviewing these

2   records, none.  You know, I'll give them to you right now.  I

3   have no problem with that.  I don't think the records would --

4   you know, I just wouldn't.  I would not have anything of that.

5        There was -- I don't know what else we can do but give you

6   the psychiatrist who says they looked at him -- he's under

7   treatment -- who released him, who released him to the

8   community.  A psychiatrist is under a duty, if they think he's a

9   danger or threat to others, to keep him or seek to commit him.

10  That didn't happen.  But my point is two psychiatrists now have

11  written letters and said he's getting treatment and must

12  continue to get treatment.

13       And, Judge, we would happily sign a waiver that pretrial get

14  those records, if that's -- if that's what's necessary.  We'd

15  have no problem with that, none, none, even though we're in this

16  waiver situation.  We would hand the records to you.  We would

17  sign a waiver for pretrial, and we'd be more than willing to do

18  that.

19       Now, if the court's suggesting, "Well, these are pretty

20  severe mental illnesses.  Sorry, you go to jail," I don't think

21  that's what the statute's talking about.

22            THE COURT:  Well, that's not what I said.

23            MR. EGGERT:  No, but you know what I'm saying.  If

24  that's where we're going, we'll give you the mental health

25  records.  We'll happily give them to you.

1      In fact, we'll have our -- the psychiatrist, Dr. Singletary,

2   and the therapist sign releases.  Pretrial can talk to them, and

3   you can have the original records.  And that can be made a

4   condition of bail, that he has to sign those releases and that

5   they get to see whatever they want as a condition of release,

6   whatever.

7           THE COURT:  Yeah, well, I don't know that I would be

8   comfortable with a compelled release.  I don't know that a

9   compelled release is really a release --

10          MR. EGGERT:  We would do it.

11          THE COURT:  -- but if you're offering to release the

12  records, that's something else entirely.

13      And you have gotten to, I think, as much of an answer to my

14  question as you can give me at this point, and you -- gave you

15  some leeway.  You really answered some about what the

16  government's position is, and I'm not asking you to endorse the

17  government's argument.  I'm not adopting the government's

18  argument.

19      I'm just saying, from my standpoint, how do I know that by

20  releasing someone with -- as someone who's not a mental health

21  professional, how do I know that I'm not releasing someone who

22  is a danger to the community as a very result of these

23  diagnoses?  So that's my question.  So I think you've answered

24  the best you can, but if you have anything else to say about

25  that, I'm all ears.

1           MR. EGGERT:  Yeah, I would.  I don't think the fact

2    that someone is being treated for mental illness should be a

3    grounds -- I know you have to consider dangerousness -- should

4    be a grounds for detention, Your Honor.  Untreated perhaps, but

5    when he's being treated and is on medication and is seeing

6    mental health professionals who are under a duty to report -- if

7    they believe he's a danger or threat to himself or others, they

8    have to report that -- I would say that that favors release, not

9    detention.

10        And, again, the statute is "reasonably assure," and I don't

11   think you can do much more than we have.  And those are the

12   words of the statute, as you've said yourself, "reasonably

13   assure."  There's no a million percent assurance, none, but --

14           THE COURT:  Right.

15           MR. EGGERT:  -- I think that these things reasonably

16   assure the safety of everybody.

17           THE COURT:  And I'll say this for benefit of both

18   sides.  You know, I've, at the risk of stating the obvious,

19   given this some thought ahead of today's hearing and done some

20   research ahead of today's hearing.  And for a factor that is

21   explicitly culled out in the statute as one to be considered,

22   the person's mental condition, there is shockingly little case

23   law on what that means, not only what mental condition but what

24   to make of that mental condition.

25        And so the question has not been answered by other courts

1  much, if at all, and I don't think there was really anything --

2  I'm all ears if either side has anything different, but I

3  certainly don't think there's anything from the Sixth Circuit or

4  the Supreme Court that is instructive on what does it mean to

5  determine what one's mental condition is and what to make of it

6  once it has been considered -- once it has been determined,

7  rather.

8          MR. EGGERT:  Judge, we would just ask, though -- it's

9  hard to imagine that the statute would envision that a treated

10  mental illness be held against the defendant, and it doesn't say

11  that.

12          THE COURT:  I understand.  You know, the statute also

13  says that I'm supposed to consider his physical condition.  What

14  does that mean?  Does someone who has to use a walker not go to

15  prison -- or not go to jail, or does someone who has to use a

16  walker must go to jail?  It just -- it's not clear.  So thank

17  you.

18      All right.  Ms. Gregory, your argument.

19          MS. GREGORY:  Your Honor, first, pursuant to our

20  obligations to the Victim Rights Act, I want to make the court

21  aware that the United States has made the required notifications

22  under 18 U.S.C. 3771.

23      The victim specifically identified in the indictment is not

24  here today, but another victim who was in the room with the

25  victim candidate during the shooting is present.  She doesn't

1    want to be personally heard, but she did want me to let the

2    court know that she is suffering from mental illness as a result

3    of the shooting, and she is also receiving counseling and

4    medications.

5         The defendant in this case has been charged by the federal

6    grand jury with attempting to kill a mayoral candidate in order

7    to prevent him from running as a candidate in the election.  The

8    defense has not been saying, "Oh, they've got the wrong guy,"

9    though they're correct that there is a presumption of innocence,

10   but they haven't been saying that because it's clearly not the

11   case.  The defense has been saying, "Oh, he's severely mentally

12   ill."

13        So, first, the evidence that I've seen so far in this case,

14   even if the defendant is suffering from mental illness, is more

15   consistent with someone who has been radicalized or who is

16   radicalized than someone who is acting as a result of severe

17   mental illness.

18        Second, I will say that severe mental illness would only

19   make the defendant a greater flight risk and a greater danger to

20   the community, to the candidate victim in this case, and to

21   other potential targets.

22        As the court knows, this is a presumption case pursuant to

23   3142(e)(3)(B) because the defendant has been charged with an

24   offense under Section 924(C).

25        I will note that in preparing its recommendation, pretrial

1    does not take into consideration the presumption and thus is

2    essentially operating under a completely different legal

3    standard than the court.  Similarly, the state courts have

4    different legal standards that are not the ones that are

5    outlined in 3142.

6        The Sixth Circuit has noted that Section 3142(e)(3)'s

7    presumption in favor of detention imposes only a burden of

8    production on the defendant, and the government retains the

9    burden of persuasion.  Although a defendant's burden of

10   production is not heavy, he must introduce at least some

11   evidence.

12       But it's important to note, however, the Sixth Circuit has

13   said, "Even when a defendant satisfies his burden of production,

14   the presumption favoring detention does not disappear entirely

15   but remains a factor to be considered among those weighed by the

16   district court.  The presumption remains a factor because it is

17   not simply an evidentiary tool designed for the courts.  Rather,

18   the presumption reflects Congress's substantive judgment that

19   particular classes of defenders, like the defendant here, should

20   ordinarily be detained prior to trial."  And all of that is from

21   *United States v. Stone*, which is a Sixth Circuit case.  It's 608

22   F.3d 945.

23       Going through the detention factors, while defense counsel

24   said that the United States would only focus on one detention

25   factor, in fact, he only focused on one detention factor, which

1   is the history and characteristics of the defendant.  I will go

2   through each one of the factors under 3142(g), and all of them

3   favor detention.

4       The first factor under 3142(g) is (g)(1), and it's the

5   nature and circumstances of the offense charged, including

6   whether the offense is a crime of violence, a violation of

7   Section 1591, a federal crime of terrorism, or involves a minor

8   victim or a controlled substance, firearm, explosive, or

9   destructive device.

10       The charged offense in this case falls into two of the

11   categories that are specifically identified by Congress as those

12   in which the nature and circumstances favor detention.

13   Defendant has been charged with both a crime of violence and

14   also with a federal crime involving a firearm.

15       Further, the crime of violence he has been charged with is

16   not the run-of- the-mill robbery or carjacking.  He tried to

17   kill a political candidate.  The federal government has a strong

18   interest in prosecuting such crimes because attempts to kill

19   political candidates are a characteristic of failed states.

20   This is a serious crime.  It is not just an attack on a person.

21   It is an attack on the democratic process.  It's the sort of

22   very rare crime that targets the foundation of our social order.

23   The defendant wanted to have an impact on the upcoming election

24   in this city, and he was willing to kill a candidate to do it.

25       Because these are serious crimes, they also carry serious

1    sentences.  If convicted of the 924(c) charge, the defendant

2    would face a mandatory minimum of ten years with a maximum

3    sentence of life imprisonment.  The sentence for the 924(c)

4    charge by statute must run consecutive to the 245(b)(1)(A)

5    sentence, which carries a guideline range of approximately 135

6    to 168 months.  This in and of itself creates an incentive to

7    flee.  So to the extent the defendant is arguing that the

8    defendant did fine on home incarceration in state court, it's a

9    different calculus than what was presented there when the only

10   charges were pending at the state level which carry lesser

11   sentences.

12       I have been talking about the nature and seriousness of the

13   offense.  I want to go through some evidence related to that,

14   but a lot of it will also go to the second factor under

15   3142(g)(2), which is the weight of the evidence against the

16   person.  Under Sixth Circuit law, the weight of the evidence

17   relates to the evidence of dangerousness and risk of flight.

18       So let's talk more about the crime and the evidence.  The

19   defendant tried to kill a political candidate on February 14th,

20   2022, at the victim's campaign office by shooting at him six

21   times.  The victim was in the room with four campaign staffers.

22   The victim was seated by a wall.

23       Exhibit A, which has been previously provided, shows you

24   pictures of the wall.  On it you can see bullet holes in the

25   baseboard and in the white part of the wall.  A number of the

1   bullets went through the wall into the office of a wedding

2   planning business next door, and that is also something that you

3   can see in Exhibit A.

4       The defendant was found by police with the gun he used in

5   his backpack.  The jacket seen on the surveillance footage from

6   after the shooting was stuffed into his backpack.  The

7   defendant's phone was on the ground close to where he was found,

8   and a photo of C.G., the victim candidate in the case, was the

9   lock screen wallpaper of the defendant's phone.

10      Based on the information from the defendant's phone and from

11  Lyft records, we also know that the night before the

12  assassination attempt at the office, the defendant had gone to

13  C.G.'s home to try to kill him there.

14      But let's go back in time a bit, about a month before the

15  shooting, when the defendant published the article that has

16  previously been introduced, "A Revolutionary Love Letter,"

17  Exhibit B.  This was published on Medium.com on January 10th,

18  2022, 35 days before the shooting attempt at the campaign

19  office.  It's a well-written piece.  It doesn't seem to be the

20  product of delusions or paranoia or hallucinations.  Dr. Jones

21  said that it was consistent with the general quality of writing

22  that he knew from the Quintez Brown he knew and consistent with

23  his philosophical beliefs, but it does take an anti-democratic

24  position and argue that necessary change will never happen

25  through a democratic system.

1       Some quotes include, "The revolutionary consciousness of the
2   masses must understand that the struggle against the negative
3   forces of genocide and fascism will not end at the ballot box of
4   the ruling class.  Attempting to get within one of the two major
5   parties has caused our leaders to become co-opted with their
6   interests shunted to the background.  Accepting this premise, we
7   move in the present moment to rid ourselves of outdated programs
8   and modalities that lead to our self-destruction and begin to
9   help the masses to find their needs, realize their strengths,
10  and go into action along a variety of lines, which they must
11  choose for themselves."  And the article states, "Voting and
12  petitioning will not be sufficient for our liberation."

13      Two days later, two days after writing this article, on
14  January 12th, 2022, 33 days before the shooting attempt at the
15  campaign office, the defendant takes his own advice and chooses
16  a course of action.  He purchases a gun, and Exhibit C is the
17  River City Pawn Shop form.  It shows that he purchased a Smith &
18  Wesson M&P Shield EZ.  Then he practices.

19      Exhibit D, ten days later on January 22nd, 2022, 23 days
20  before the shooting attempt at the campaign office, he takes the
21  Smith & Wesson M&P Shield to a gun range in Indiana.  In
22  surveillance footage from the range, he learns how to shoot the
23  gun.  He practices firing.  He practices loading it.  Then he
24  has some trouble.  He doesn't know how to load the magazine, and
25  he has to get help.  The gun jammed several times due to

1    chambering of the first round, and he doesn't know how to clear

2    a jam.  And this becomes more important later.

3        Two days after that, on January 24th, 2022, 21 days before

4    the shooting attempt at the campaign office, the defendant

5    publicly displays his contempt for the candidate victim, C.G.,

6    through a Twitter post.  C.G., the victim in this case, was

7    involved in drafting legislation related to the West End TIF or

8    Tax Increment Financing.  Critics of the West End TIF are

9    concerned it would result in gentrification.

10        On January 24th, 2022, the defendant re-tweeted a post with

11   a picture of C.G. on fire and sitting on someone else's

12   shoulder.  The post included the hashtag "Gentrification is

13   violence."

14        About two weeks later, on February 8th, 2022, six days

15   before the shooting attempt at the campaign office, C.G.

16   received some key endorsements in the mayoral primary election,

17   causing some to consider him to be the front-runner for the

18   Democratic nomination.  The defendant reposted an article about

19   these endorsements with a caption "Dollar Democracy?" question

20   mark.  On the same day the defendant posted something on

21   Instagram that said "Gentrification is evil and we must organize

22   against it."

23        MR. EGGERT:  Judge, at this point none of this was

24   introduced into evidence, and I'd have to object.

25        MS. GREGORY:  Your Honor, this is --

1          THE COURT:  Hang on.  The last thing I heard was

2     evidence.  I didn't hear what you said after that.

3          MR. EGGERT:  I mean, really, a lot of this stuff has

4     not even been introduced into evidence, I mean, at this hearing.

5          THE COURT:  All right.  Your response, Ms. Gregory?

6          MS. GREGORY:  Your Honor, this is a detention hearing.

7     Under general practice in this district and under Sixth Circuit

8     law in *United States v. Webb*, the United States may proceed by

9     proffer.

10          THE COURT:  I agree.

11          MR. EGGERT:  Then it should be clear it's proffer, not

12     argument.  I mean, you know what I'm saying?  I proffered during

13     and "This is a proffer.  This is evidence," and they get up and

14     they just make an argument filled with things that they haven't

15     proved, tried to prove, and didn't introduce into evidence.

16          THE COURT:  Neither the rules of criminal procedure

17     nor the statute provide any -- delineate what proffer really

18     means.  And as a practical matter, it is simply counsel telling

19     the court what the evidence would be if they were to offer it.

20     So I'll overrule the objection.  As I said though before -- I

21     would have done so anyway, but I'll give you the opportunity to

22     respond to this.

23          MR. EGGERT:  Thank you, Judge.

24          THE COURT:  Ms. Gregory.

25          MS. GREGORY:  Two days after that, on February 10th,

1   2022, four days before the shooting attempt at the campaign

2   office, the search history for the defendant's phone shows that

3   he was trying to obtain location information for the victim

4   candidate, C.G.

5        This continued into February 11th, 2022.  The defendant

6   began running Google searches to figure out where C.G.'s

7   campaign office was.  There had been a social media video posted

8   that featured just the campaign office's suite number, but it

9   didn't include an address, and an address wasn't listed on the

10  campaign website.  So the defendant started Googling the suite

11  number in combination with different other terms to find out

12  where the campaign office was located.

13       On February 12th, 2022, two days before the shooting attempt

14  at the campaign office, the defendant was still trying to get

15  information on C.G.'s location.  C.G. had made a post on social

16  media about his son's appearance in a school play.  The

17  defendant started Googling the play along with the term "opening

18  night" to find out where it was located.  The defendant started

19  Googling the name of C.G.'s teenage son.  The defendant also

20  found C.G.'s home address.

21       On February 13th, the day before the shooting attempt at the

22  campaign office, the defendant had a plan of action.  Early that

23  morning he Googled how to delete his iPhone keyboard history.

24  Later that evening he went to C.G.'s home with the intent to

25  kill C.G.

1    The defendant took the Smith & Wesson M&P Shield with him.

2    Records from Lyft, the rideshare company, show the defendant was

3    dropped off on C.G.'s street at 6:09 p.m. on February 13th,

4    2022.  However, he had difficulties.  His gun was jammed.  At

5    6:22 p.m., he searched "loading a bullet backwards."  Then he

6    ran searches about a bullet being stuck in an M&P chamber.  He

7    also searched for a gun store close to C.G.'s home.  According

8    to his Lyft records, around 6:46 p.m., the defendant gave up and

9    ordered a ride home.

10    Around 7:30 p.m., his web history is showing that he is

11    searching for a gun store close to him.  Just after midnight on

12    February 14th, Valentine's Day, the day of the shooting at the

13    campaign office, the defendant is looking at C.G.'s campaign

14    office on a map on his phone.

15    At 8:01 a.m. on that day, Valentine's Day, the day of the

16    shooting, the defendant texts his girlfriend "Happy Valentine's

17    Day" and has a normal text exchange with her.  At 8:07 a.m., he

18    texts his mother "Good morning."

19    Less than an hour later, at 9:01 a.m., right after it opens,

20    the defendant is at a pawn shop downtown shopping for another

21    gun, and pictures from that surveillance footage of the pawn

22    shop are seen in Exhibit E.  There he bought the Glock 17 Gen5

23    he used to try to kill C.G., and the Firearms Transaction Record

24    is Exhibit F.

25    From there the defendant is seen on surveillance footage

1  taking a Bird scooter away from the pawn shop.  At 9:54 a.m.,

2  the defendant's phone shows he searches "how to load a Glock

3  pistol."

4      And then Exhibit G is surveillance footage from the building

5  where C.G.'s campaign office is.  At 10:09 a.m., the defendant

6  is seen on surveillance footage entering the building where

7  C.G.'s office was located.

8      At 10:10 a.m., the defendant walked into C.G.'s office where

9  C.G. was having a meeting with four other people.  C.G. was

10 seated.  The defendant shot six times at C.G. as C.G. dove for

11 cover.  The other people in the room managed to shut the door on

12 the defendant and barricade the door.

13     At 10:11, the defendant ran out of the building.  He quickly

14 took off the windbreaker jacket he was wearing and then stuffed

15 it, along with the Glock, in his backpack.  He made his way

16 northeast on foot and at 10:17 a.m. tried to order a Lyft to

17 take him away from the area.  However, officers spotted him and

18 arrested him in possession of the gun he used to try to kill the

19 victim candidate and a number of firearm magazines.  These facts

20 all go to both the nature and circumstances of the offense and

21 the weight of the evidence of the defendant's dangerousness.

22     The next factor under 3142(g), (g)(3), is the person's

23 personal history and characteristics, and that is the only

24 factor that the defendant focused on.

25     Now, the defendant does have family in the community and

1    long ties to the area, which normally go in favor of release.

2    However, these family ties and long history in the community

3    didn't keep him from disappearing for 11 days in 2021 prompting

4    a city-wide search and no one having any clue where he was.

5        So let's talk a bit about mental health.  With respect to

6    the court's question about what role mental health plays, the

7    United States has repeatedly held that the government's

8    regulatory interest in community safety can, in appropriate

9    circumstances, outweigh an individual's liberty interest.  I

10   would cite *United States v. Salerno,* 481 U.S. 739.  And the

11   Supreme Court has specifically held that the government may

12   detain mentally unstable individuals who present a danger to the

13   public.  That's same cite and that's citing *Addington v. Texas,*

14   which is 441 U.S. 418.

15       However, I want to point out that the very behavior that

16   I've just described shows the defendant's shooting attempt was

17   the result of rational planning.  On the same day the defendant

18   was Googling for information on the victim candidate's teenage

19   son and the victim candidate's location, he also played video

20   games with his roommate, who didn't think anything seemed wrong.

21   On the morning of the shooting attempt, as I said, the defendant

22   had normal text conversations with his girlfriend and his mom

23   shortly before he went to purchase the gun he used in the

24   shooting attempt.

25       After the shooting attempt at 10:12 a.m., his phone search

1    history shows he searched for information about the safety on a

2    Glock, clearly because he didn't want to accidentally shoot

3    himself.

4        A few minutes later, when the police spotted him, he was at

5    the end of the street.  The police car that turned onto the

6    street was an unmarked vehicle and did not put on lights or

7    sirens.  However, the defendant quickly dropped to his knees and

8    put his hands in the air.  He didn't shout anything about how he

9    was the messiah or how there was a chip in his head as someone

10   who is severely mentally ill might.  Instead, he calmly

11   surrendered for arrest and invoked his Miranda rights.

12       Now, I'm not a mental health expert, and I've not been given

13   access to the defendant or the defendant's mental health

14   records.  However, the evidence I've seen in this case is not

15   consistent with what I have seen in other cases with severely

16   mentally ill defendants who are acting as a result of their

17   severe mental illness.

18       Defense counsel claims that since the defendant has been out

19   on home incarceration without issue thus far, there is no

20   danger, but defense counsel's basic narrative is that mental

21   illness started when the defendant went to New York in June of

22   2021.  During this period his family had no clue he was about to

23   take off, and he went out off the grid for about 11 days.

24       Similarly, his family and friends had no clue the defendant

25   was going to attempt to kill a political candidate.  If the

1   defendant has mental health problems that have caused this, then

2   they have proven to make him erratic, unpredictable, violent,

3   and likely to disappear.  If this was caused by mental illness,

4   who is to say that he is safe now?

5       Is there anyone other than the defense counsel and the

6   people who love him very much and are hoping for the best that

7   will say that the defendant is not -- was a danger at the time

8   of the shooting due to mental illness and he is not a danger

9   now?

10      These are the questions that are relevant under 18 U.S.C.

11  3142.  How does mental illness relate to analysis of danger to

12  the community or risk of flight, not whether it would be better

13  for the defendant's mental health to be out of custody.  It's

14  probably better for anyone's mental health to be out of custody,

15  but that said, he will still have and still has access to mental

16  health treatment in custody.  He's still able to get medication.

17  He's still able to participate in the videoconference therapy

18  sessions that they've referenced.  All of that is available in

19  custody.

20      The mental health issues should be viewed in the context of

21  risk of danger to the community and risk of flight; and in this

22  case, if the defendant has mental health issues, they increase

23  both risks.  The United States is confident the defendant can

24  get the care he needs in custody.  The United States is not

25  confident that a round of visitors from professors at U of L

1  attempting to act as corrections officers or supervisory

2  officers is going to be sufficient to protect the safety of the

3  community.

4      The next factor is the nature and seriousness of the danger

5  to any person or the community.  While the second factor under

6  3142(g) considers the weight of evidence concerning

7  dangerousness, the final factor weighs the nature and

8  seriousness of the danger.

9      Now, under Sixth Circuit case law, danger to the community

10  can be proven by evidence that a defendant would continue to

11  commit crimes even if they are not violent, but violent crimes

12  weigh more towards detention in evaluating the nature and

13  seriousness of the danger.

14      The defendant is a continued danger not only to the victim

15  in this case but also to others.  The defendant was trying to

16  assassinate the victim to prevent the victim from running in the

17  mayoral primary.  This would have improved the chances of the

18  defendant's favored candidate winning the mayoral primary.

19      However, the morning of the shooting on February 14th, 2022,

20  the defendant began searching for information on the internet

21  related to another mayoral candidate.  Based on interviews and

22  the defendant's social media, we know that this other candidate

23  was not the defendant's favored candidate but potentially

24  someone who could have provided competition for the defendant's

25  favored candidate.  That morning the defendant started searching

1    for location information related to this other competitor

2    candidate, specifically the candidate's office.

3        If the defendant had been successful in shooting the victim,

4    the defendant's search history provides evidence he might have

5    planned to attempt to locate and likely harm yet another mayoral

6    candidate.

7            THE COURT:  What was the day that you said of that

8    search, Ms. Gregory?

9            MS. GREGORY:  It was the morning of the 14th, the

10   morning of the assassination attempt.

11       The primary election still hasn't happened.  The general

12   election still hasn't happened.  The defendant was unsuccessful

13   in his attempt to kill the victim.  If released, he still has

14   time to finish the job and disrupt the election.  And it is

15   clear that influencing the outcome of this primary election is

16   still a high priority for the defendant.  Just a few days ago

17   the defendant filed a motion implying that the hole in the

18   victim candidate's sweater was not caused by multiple gunshots

19   that were fired at the victim --

20           MR. RENN:  Objection, Your Honor.  That wasn't done by

21   the defendant.  That was done by the defendant's counsel, and

22   that's what we're required to do under the Sixth Amendment.  And

23   I take serious offense with any other kind of reference by the

24   government at this time.

25           THE COURT:  Well, counsel and defendant are routinely

1    and typically referred to interchangeably, and if you did it on

2    Mr. Brown's behalf, then Mr. Brown did it.  So I'll overrule the

3    objection.

4         MS. GREGORY:  -- again, implying that the hole in

5    victim's candidate's sweater was not caused by multiple gunshots

6    that were fired at the victim candidate and demanding that the

7    defense experts have the opportunity to examine the sweater.

8    But most importantly, they demanded access to the sweater before

9    the mayoral primary election.  The date of the primary election

10   has no bearing on this case.

11        Defense counsel has told the court that this is a

12   politically motivated prosecution.  This is false, but this bit

13   of information is particularly ironic because it is the conduct

14   at issue in this case that is politically motivated, and now the

15   defense is filing motions that are politically motivated.

16        But in terms of the nature and seriousness of the danger,

17   what is important is the defendant's politically motivated

18   shooting attempt failed to disrupt the election in the way that

19   the defendant wanted to, and his requested deadline in the

20   motion shows the defendant has not given up.  He is still

21   fixated on the election and focused on affecting the outcome.

22        Further, as I've already said, on January 12th, 2022, the

23   defendant purchased a Smith & Wesson M&P Shield EZ 9mm pistol.

24   This is the gun he took with him to C.G.'s house on February

25   13th, 2022, the night before the shooting attempt at the

1    campaign office.  This is the M&P Shield gun the defendant

2    purchased in January that likely jammed causing him to search

3    for information on what to do if you load a bullet backwards and

4    it gets stuck while he was near C.G.'s home.

5        This gun is still out there somewhere.  Despite their best

6    efforts, law enforcement has not located it.  The defendant

7    would know where it is.  If he is on home incarceration, he is

8    not being constantly supervised.  People can visit him.  People

9    can bring him things.  No one is checking bags.

10       The HIP -- state HIP person who testified said people just

11   cut off their ankle bracelets all the time.  People just leave

12   home incarceration all the time.

13       The defendant has tried twice to kill the victim candidate.

14   First, he went to C.G.'s home on February 13th and the gun was

15   jammed.  Second, he went to C.G.'s office on February 14th, shot

16   six times and miraculously missed.  The defendant should not be

17   given a third chance to get the job done.

18       All of the 3142(g) factors weigh in favor of detention.  The

19   defendant has not overcome the presumption that no condition or

20   combination of conditions will guarantee the safety of the

21   community and his appearance, and as a result, he should be

22   detained.

23       But specifically to address the central argument that

24   because he has been on HIP for two months he is not a flight

25   risk or danger to the community -- this is stuff I've already

1   covered, but just to hit it again -- first, as I stated, the

2   calculus is different for the defendant now that there are

3   federal charges pending that have a steep mandatory minimum.

4       Second, the defendant has twice tried to assassinate a

5   political candidate in the mayoral primary to affect the outcome

6   of the election.  Now, as the election approaches, the risk he

7   poses to the candidates only increases if he's given another

8   opportunity.

9       And, third, he was able to buy two guns and plot a murder

10  without his grandmother or other family or friends knowing.  He

11  played basketball, spent time with loved ones, texted with loved

12  ones, played video games with his roommate all while this was

13  going on.  He was able to hide his violent intentions well

14  before, and there's nothing to stop him from doing so again.

15  The defendant should be detained pending trial.

16          THE COURT:  Ms. Gregory, before you step away, what

17  else, if anything, can you tell me to support the -- I thought

18  implication but now explicit claim that Mr. Brown currently

19  intends to try again to kill the victim in this case?

20          MS. GREGORY:  I believe we've laid it all out.  He was

21  very focussed on it.  He tried twice.  They're still filing

22  politically motivated --

23          THE COURT:  I guess the distinction I'm drawing or

24  attempting to draw is the difference between was and is.

25          MS. GREGORY:  Well, we don't have current access to

1   the defendant.  So other than what we've laid out, we have no

2   assurance that he is not.  I think the assumption is that this

3   was something that was very important to him, that he was

4   fixated on, and there's no proof that he's no longer fixated on

5   that.  And, again, I think the recent motion with the deadline

6   of the mayoral primary is an indication that that is still a

7   high priority.

8           THE COURT:  Well, let's take that in two pieces.

9   First of all, let's talk about the motion.  I know the motion

10  you're talking about.  I've read the motion.  I took note of the

11  requested deadline as well.

12      What does that -- what is the government's position about --

13  I believe you used the word implication.  What is the

14  government's position as to exactly what that implication is as

15  it relates to the danger of the community if Mr. Brown were to

16  be released?

17          MS. GREGORY:  That there is a fixation on this

18  election and the fact that he has not accomplished his

19  objectives of either disrupting the election or killing this

20  victim candidate.

21          THE COURT:  All right.  So you believe that that

22  motion is an implication that the defendant continues to intend

23  to kill a mayoral candidate?

24          MS. GREGORY:  Well, I believe that it could be --

25          THE COURT:  As opposed to -- well, I shouldn't say as

1    opposed to anything.

2        Fair enough.  All right.  Beyond the motion, what, if

3    anything, would you tell me?  And there's a very significant

4    difference between saying that the defendant has not proven that

5    he's not a threat and the United States saying that he is a

6    threat.  So what, if anything else, would you tell me to

7    convince me of the United States' apparent position that

8    Mr. Brown is persisting in his attempt or even his desire to

9    kill the victim in this case?

10           MS. GREGORY:  That it was such a priority and a focus

11   that he went to the victim's house, that when he was unable to

12   do that there, the next day he went to the campaign office.

13   Like, that --

14           THE COURT:  All right.  Okay.  Thank you.

15       Mr. Eggert.

16           MR. EGGERT:  Thank you.  Right now, Judge, you've

17   heard the answer.  There is no proof that he intends to do

18   anything.  Mr. Renn filed the motion, and he can state under

19   oath, if necessary, he didn't show it to Mr. Brown.  Mr. Brown

20   has nothing to do with the motion.  It's a motion to test

21   evidence.

22       And he probably gave the mayoral candidate -- the deadline

23   there because we're hit with this ad every day, as you've

24   probably seen, where Mr. Brown is basically the subject of the

25   political ad.  But in any event, when he filed that motion --

1   Mr. Renn did -- Mr. Brown had never seen it.  There's no proof

2   that he intends to do harm to anybody, none.  They're just

3   saying that.

4       And that goes with the second thing I want to say.  It's a

5   parade of horribles.  It's one candidate this way -- and I know

6   this case is serious -- and maybe another one, and he's got this

7   plan.  There's no proof of that at this point at all over the

8   last two months or ever since he's got treatment, zero, zero

9   evidence that he intends to do it now.

10      Your Honor, this stuff about radicalization, they really

11  talked out both sides of their mouth on whether he's mentally

12  ill.  "Well, we don't think he's mentally ill."  Then why make

13  an issue of it?  "But if he is mentally ill, he ought to be kept

14  in custody."

15      But when they talk about radicalization, this thing --

16  quoting, as professor Jones says, Huey Newton -- I mean, even

17  I've read a little Huey Newton, Judge.  I mean, give me a break

18  about that means he's radicalized.  He's not radical.  There was

19  no evidence of that, that he's radicalized.

20      And they talk about politics.  Your Honor, again, we're not

21  the ones who wrote the op-ed piece saying, essentially, he's

22  guilty and should be -- and should be in custody, which is what

23  the senator did.

24      When they talk about all this proof about he went there

25  before and the gun jammed, I didn't see a -- I haven't seen any

1   proof on that, zero proof.  But, again, that goes to seriousness

2   and so forth.  It doesn't go to any of the other factors.

3       Let's be, I guess, realistic.  Really, is it really wrong

4   that these people want to check on him?  They're not

5   substituting for Corrections.  HIP, he'd be on HIP.  He'd be on

6   GPS monitoring.  He was directly monitored by Corrections on

7   home incarceration.

8       Fourth, when they said, "Well, we have different rules," we

9   may have different rules in the two courts, but as I said, it's

10  supposed to be presumed innocent in both courts, and the point

11  is he obeyed the rules in both instances.

12      They can make him out to be this monster based on what they

13  did -- and, obviously, one isn't gonna tell their grandmother if

14  they're going through a mental health crisis.  They're not gonna

15  tell they're grandmother or dad, "Gee, I'm going through a

16  mental health crisis."  They do hide it.  But the point is today

17  the person we've presented to you is the person he is, and the

18  person he is is now receiving the treatment he probably needed

19  for a significant amount of time.  It's set up to receive.

20  We've got it received.  We got the medication.  Their blithe

21  statement, "Don't worry.  He'll get it in jail," I think isn't

22  supported at least in this instance by the record.

23      We've got the mental health treatment he deserves.  He's got

24  the community support he needs.  He's got the family support.

25  He's got the GPS.  He's got everything, and that's why pretrial,

1  which is totally familiar with all the factors governing

2  release, has recommended his release.  Thank you.

3          THE COURT:  All right.  I do have one question I want

4  to see counsel at the bench for, please.  And it can be two of

5  you or all five of you or -- it's up to you-all.

6      (Bench conference on the record.)

7          THE COURT:  So I'm gonna have to go back and give this

8  some thought.  All right?  I know every time I ask a question or

9  do anything it's taken as a spoiler alert.  It's just a

10 question.  Okay?

11     Mr. Eggert, you mentioned in particular some of the people

12 being willing to be third party custodians.

13         MR. EGGERT:  Yes.

14         THE COURT:  All right.  If I were to release him,

15 there's no question who's gonna be a third party custodian --

16         MR. EGGERT:  Right.

17         THE COURT:  -- and any number of other things, all

18 right?  I'm still -- I'm gonna think about that.

19         MR. EGGERT:  Right.

20         THE COURT:  Who among your people is -- have you

21 discussed specifically -- with whom have you discussed what it

22 really means to be a third party custodian, as opposed to a

23 visitor, and who is willing to do it?

24         MR. EGGERT:  Tanya Hyde.

25         THE COURT:  The grandmother.

1          MR. EGGERT:  Absolutely.

2          THE COURT:  I was taking that as --

3          MR. EGGERT:  As a given.  And, honestly, the other

4    person is -- Monica Wendel is -- we asked her specifically, and

5    she said she would.

6          THE COURT:  And is she the --

7          MR. EGGERT:  Professor at U of L.

8          THE COURT:  Professor at U of L.

9          MR. EGGERT:  Right.  The reason I stuck with Ms. Hyde,

10   Judge, is that she's had him now for this -- yeah, yeah, but --

11   I mean, if they have any concerns, we have this other one.

12         THE COURT:  Understood.  Any other questions,

13   follow-up, anything -- I'm going to take a recess and give this

14   some thought.  Any other questions, comments?

15         MR. EGGERT:  No.  And if the court has any doubts

16   about that, you can -- you can question them thoroughly and

17   everything else.  I have no problem with that.

18         THE COURT:  Question what?  I'm sorry.

19         MR. EGGERT:  Question the third -- "Do you understand

20   what this means?"  I have no problem with that.

21         THE COURT:  I typically go over most of that --

22         MR. EGGERT:  Yeah, I know.

23         THE COURT:  -- if I get to that point.

24         MR. EGGERT:  I know.

25         THE COURT:  And let me make one thing clear,

1   especially -- it's not why I called you up here, but while

2   you're all here -- Mr. Renn, I certainly am not saying that I

3   think you implied anything about anybody killing anybody.  All

4   right?  I was just -- when someone says --

5            MR. RENN:  Yeah, I do want to hear what you're saying.

6            THE COURT:  I said I was not implying that you were

7   threatening to kill anybody or --

8            MR. RENN:  Well, you weren't threatening, but the

9   government prosecutor used it against my client in her argument

10  in front of all these people.  That was done by me, and it was

11  done for a very specific reason because they put that ad out

12  there trying to get political points for somebody who's accused

13  of a very serious crime and facing a serious amount of time in

14  prison and who's mentally ill.  I was offended by it, and I

15  don't think that's a bullet hole in that sweater one iota.

16  That's why I want it tested.

17           THE COURT:  Okay.  All I'm trying to say is that I

18  felt that that -- when I said what I said, I felt that it may

19  have landed a little more personally than I intended it.

20      All I'm saying is, if counsel files a motion on behalf of a

21  party, then a party has done that.  I mean, that's just the law.

22  All right.  So -- hang on, hang on.

23           MR. RENN:  Okay.

24           THE COURT:  So Mr. Brown filed a motion seeking

25  testing, period, as far as I'm concerned.  All I wanted to say

```
 1    up here is I don't think that means that you have any nefarious
 2    intent about any of this.  That's all I'm saying.
 3              MR. RENN:  Again --
 4              MS. GREGORY:  I think the intent --
 5              MR. RENN:  I did do it for a reason.  Let me finish,
 6    please.  I did do it for a reason.  I filed the motion, and this
 7    prosecutor stood in this court, knowing that the press is here,
 8    and used it against my client saying that he may be looking to
 9    cause future harm because of what I put in there, knowing darn
10    good and well he didn't file the motion and had nothing to do
11    with the filing of the motion.
12              THE COURT:  I don't know what she knew or if she had
13    any basis for knowing what any of you -- for all I know,
14    Mr. Brown wrote it himself and sent it to you and told you to
15    file it.
16              MR. EGGERT:  But he didn't.
17              THE COURT:  I mean, how is she supposed to know that?
18              MR. RENN:  Well, it was typed, and I signed it, not
19    Mr. Brown.  "Comes the defendant by counsel" means I did it.
20              THE COURT:  All right.  Well, you're almost making me
21    regret -- I said you're making me regret clarifying this for
22    you.  I mean, I was trying to tell you I didn't mean that
23    personally to you, but all you're doing is turning it around and
24    using that as a springboard to attack Ms. Gregory personally.
25    All right?  So I think it's out of bounds.
```

1          MR. RENN:  Well, again, I hope my point has been well

2     made because I took offense to it.

3          MS. GREGORY:  I would add that --

4          THE COURT:  You know, there's no crying in baseball.

5     You know, sometimes you just take offense at the other -- you

6     know.  Sometimes the other -- the other lawyer says something

7     and it hurts your feelings.  All right?  Tough.

8       Ms. Gregory.

9          MS. GREGORY:  I would add that the intent that

10    Mr. Renn has outlined here at the bench is something that I

11    would interpret as a nefarious intent that is completely

12    unrelated to this case.

13         THE COURT:  Say that again.  I'm sorry.

14         MS. GREGORY:  Mr. Renn said he --

15         THE COURT:  I mean, I can hear you.  My brain wasn't

16    keeping up.

17         MS. GREGORY:  I would add that the intent that he

18    stated, which is -- again was to influence the election for

19    something related to this campaign ad, that is a nefarious

20    intent unrelated to this case.

21         THE COURT:  Okay.  All right.  All I was doing was

22    clarifying what I meant.

23         MR. EGGERT:  You know, Judge, just let me say this and

24    you can get mad.  And I could be wrong, too, okay?

25         THE COURT:  Could be what?

1          MR. EGGERT:  Wrong.

2          THE COURT:  All right.

3          MR. EGGERT:  But, you know, most of those people who

4    tried to influence a national election weren't detained.  We're

5    acting -- I mean, we deny that -- we think it's a product of

6    mental illness.  You know what I'm saying?

7          THE COURT:  Yeah, but I'm not doing a detention

8    hearing on that.

9          MR. EGGERT:  I know.  I get it, but you know --

10         THE COURT:  I'm not doing a detention hearing

11   on Breonna Taylor or on Brett Hankison.

12         MR. EGGERT:  I understand.

13         THE COURT:  I'm only doing a detention hearing on this

14   defendant.  So, listen, I've given you both a ton of leeway to

15   talk about politics.

16         MR. EGGERT:  We're not the one's doing the ads --

17         THE COURT:  Oh, come on now.

18         MR. EGGERT:  No, on TV?

19         MS. GREGORY:  Nor is the United States.

20         THE COURT:  You have said Mitch McConnell -- both of

21   you've said Mitch McConnell in this courtroom repeatedly.

22         MR. EGGERT:  Yes.

23         THE COURT:  So please do not insult my intelligence by

24   telling me that you were not talking about politics.

25         MR. EGGERT:  Yes, we are.

```
 1              THE COURT:  You're talking about politics.

 2              MR. EGGERT:  We are.

 3              THE COURT:  The both of you.

 4              MR. EGGERT:  Yes, I'll say that I did, and I'm proud

 5    to.

 6              THE COURT:  Okay.  Well, you said no a minute ago.

 7              THE REPORTER:  Mr. Eggert, you're being very loud in

 8    the microphone.

 9              THE COURT:  When I first accused you of that you said

10    no.

11              MR. EGGERT:  I was --

12              THE COURT:  The answer is yes, you were talking about

13    politics.

14              MR. EGGERT:  Fine, Judge, fine.

15              THE COURT:  Let's take a recess.

16         (End of bench conference.)

17              THE COURT:  Dena, I'm going to at least for now leave

18    these exhibits up here.

19         I'm going to take a recess.  I'll be back as soon as I can.

20         (Recess at 5:19 p.m. until 5:44 p.m.)

21              THE COURT:  All right.  Thank you-all.  I appreciate

22    everybody's patience.

23         So I appreciate the hard work of counsel.  I've considered

24    the evidence and the proffers and the factors that I'm required

25    to consider under the Bail Reform Act.
```

1        Under that statute, there are four enumerated factors that a

2   court is to consider, but when you look at kind of the string of

3   factors within some of them, they're -- by my count there are

4   actually 15 factors.  If you want to count the presumption

5   either for or against detention, then there are effectively 16.

6        So in this case there is, of course, as we previously

7   indicated, a presumption in favor of detention.  I do believe

8   that the defendant has brought forth sufficient evidence to

9   rebut that presumption, but as Ms. Gregory points out, the

10  presumption does not disappear.  It's more than just a

11  procedural rule.  And so in this case we do have that factor

12  that militates in favor of detention.

13       The next factor is the nature of the offense, and Mr. Eggert

14  is correct that the statute would presumably have this effect

15  anyway, but if there's any question about it, the statute says

16  that it shan't affect the presumption of innocence.

17  Nonetheless, the court is required to consider what the charge

18  is while also presuming the defendant to be innocent of it.

19  Here the nature of the offense clearly militates in favor of

20  detention.  It's an extraordinarily serious offense that has

21  been charged.

22       The next factor is weight of -- weight of the evidence, and

23  I will say that -- and, listen, I've got some criticism for both

24  sides here.  And I don't mean any of this personally, and I

25  don't mean any of it for more than -- any more or less than what

1    it is, just an observation on what I've heard.  The United

2    States have nodded to the case of *United States v. Stone* which

3    says that the weight of the evidence, notwithstanding the

4    language of the Bail Reform Act, means the weight of evidence of

5    dangerousness or risk of nonappearance, as opposed to the weight

6    of the evidence in favor of guilt.

7        And by saying that the United States nods at that -- I mean,

8    the United States said that and Ms. Gregory said that, and I

9    know she knows that -- but nonetheless, I interpret that portion

10   of the United States' argument, which was a very substantial

11   portion of the overall argument, as really truly being devoted

12   to a discussion of the weight of evidence with respect to

13   Mr. Brown's guilt.

14       Given that this is a detention hearing and only a detention

15   hearing and given that I do not believe that there has been

16   significant evidence of future ongoing danger, I find that the

17   weight of the evidence militates in favor of release.

18       The next more than handful of factors that are all lumped

19   together in one subsection of the Bail Reform Act -- the

20   defendant's character, family ties, employment, financial

21   resources, length of residence, community ties, past conduct,

22   drug or alcohol use, criminal history, and record of

23   appearance -- all of those taken together, there is either very

24   strong evidence militating in favor of release or at most kind

25   of a neutral finding or a tie.

1    There is no evidence of alcohol or drug use.  There's no

2   evidence that there's an absence of alcohol or drug use, but

3   again, there's no evidence either way.

4    Although Mr. Brown does not appear to be employed, I would

5   say that his being a student would stand certainly for purposes

6   of this statute as the equivalent of employment.  So all of

7   those factors militate in favor of release.

8    The next factor is whether the defendant was on release --

9   any form of release or supervision at the time of the alleged

10  underlying criminal offense.  The answer to that question is

11  clearly no.  Here that militates in favor of release.

12   We had a healthy discussion and a bit of a debate about

13  mental illness and how that fits into this.  The mental

14  condition of the defendant is specifically listed by the Bail

15  Reform Act, but there is no guidance in the Bail Reform Act

16  itself as to what that means.

17   I differ with the United States' argument that this is

18  something that the courts have spoken on, and I don't remember

19  the precise word that Ms. Gregory used, but it isn't something

20  the courts have spoken on.

21   *United States v. Salerno* makes passing reference to mental

22  health, but *United States v. Salerno* was a seminal case that

23  established that allowing the courts to evaluate the danger that

24  a defendant represented just does not constitute a violation of

25  the constitution.  So *United States v. Salerno* was a facial

1   attack on the constitutionality of the Bail Reform Act.  It was

2   not a case about anyone's mental health condition.

3       *Salerno* makes reference to and cites apparently approvingly

4   to another -- a previous United States Supreme Court case,

5   *Addington v. Texas*, but that case -- and it's the only case that

6   the United States Supreme Court cited.  And the exact phrase is

7   this -- the exact quote is, "We have also held that the

8   government may detain mentally unstable individuals who present

9   a danger to the public."  All right.  So that's the statement

10  that the court has made.  The court cited *Addington v. Texas,*

11  which is a case about civil commitment.

12      So the case that -- even though *United States v. Salerno* is

13  about detention, the case that the U.S. cited is not about

14  detention, pretrial or otherwise.  That's about civil detention.

15  And the plain language of *United States v. Salerno* speaks to an

16  individual -- not only someone who is, quote, "mentally

17  unstable," not someone who is suffering from a mental illness,

18  but someone who is mentally unstable who presents a danger to

19  the community.

20      I will say parenthetically about mental illness, much of the

21  argument has been -- has kind of devolved into a zero sum

22  analysis of whether Mr. Brown is going to receive treatment or

23  not.  That is not the question.  And I understand that each of

24  you may have a reason for taking the position you do and arguing

25  it the way that you did, but I'm not making a decision about

1    whether Mr. Brown gets mental health treatment or not.  Mental

2    health treatment is available if he's released.  Mental health

3    treatment is available if he's detained.  And so it's not as

4    simplistic as that.  It's not as binary as that.

5         There's also a lot of discussion about what is better from a

6    mental health standpoint, what is better for Mr. Brown.  And

7    this is something that I will acknowledge that I have struggled

8    with, because that is a perfectly understandable and legitimate

9    human concern, what is better for the person who is sitting

10   here.

11        There is nothing in the Bail Reform Act that suggests that

12   I'm supposed to take into consideration what's better for

13   Mr. Brown.  What's in the Bail Reform Act is about what I'm

14   supposed to consider, and the things I'm supposed to balance are

15   the risk of his appearing or not appearing and any risk that he

16   represents a danger to the community.  That's the balancing, not

17   about what is better for him.  That doesn't mean I don't care

18   about it personally, but it does mean that that is not what

19   drives the analysis.

20        And I would say that -- again, I don't mean this

21   hypercritically or even critically, but, you know, you're each

22   entitled to take the positions that you've taken.  And I put the

23   mental health issue right out there on the table, and the

24   position the United States chose to take is he's not mentally

25   ill.  So there you have it.  I mean, that's a choice to argue,

1    that he's not mentally ill.

2        I believe that I have been proffered and given evidence that

3    Mr. Brown is suffering from some degree of mental illness.  I

4    don't mean mental illness as some sort of proclamation or my own

5    separate diagnosis, but he appeared -- he is certainly under

6    treatment for a mental health condition.

7        And so the adverting in a very perfunctory way as the United

8    States did to "He's not mentally ill, but if he is, that makes

9    it more dangerous," I simply -- I'm just simply not convinced by

10   that.  I don't think the mere fact of a mental illness standing

11   alone is sufficient to show dangerousness to the community.

12       So that leads directly to the last factor in the analysis,

13   and that is the nature of any danger to the community going

14   forward.  Again, with all due respect, I believe the United

15   States has conflated the dangerousness of what Mr. Brown is

16   accused of having done with the dangerousness of him being

17   released.

18       And although I see just as seriously as anyone in this

19   courtroom does the nature of what Mr. Brown is accused of doing,

20   what I have not heard is any convincing evidence or argument

21   that on release, while being supervised by probation, that he

22   would continue to present any danger to the identified victims

23   in this case or to the community more generally.

24       And perhaps the most unnecessary thing that I've said thus

25   far, but I -- for reasons I can't quite articulate, I feel the

need to say this.  We had a discussion at the bench about the motion filed on behalf of Mr. Brown seeking testing of some of the evidence in this case.  There's a question about what the implication was of that motion, and I will simply say that I believe that the suggested implication for that is no less than absurd, that the implication that that motion is a threat or somehow constitutes a threat or reflects a threat, or somehow indicates that Mr. Brown is going to continue to try to assassinate a political candidate, that's just groundless.

So for all of those reasons, I do believe that the defendant has shifted the presumption.  I do believe that I can impose a combination of conditions that will reasonably protect against danger to the community.

I am going to adopt all of the conditions recommended by probation, that is, home incarceration.  And let there be no doubt about this.  This means that Mr. Brown is not allowed to leave the place of residence with his grandmother without express advance permission by probation.  There is no walking across the street to fetch the neighbor's dog who's gotten out. There's no running down to the corner store to get a quart of milk.  He is not to leave the -- and it will be up to probation during a site visit to show him -- and they will -- exactly where he can go and where he can't.

I don't know what the house looks likes.  I don't know what it's shaped like, but if that means he doesn't go into the

1    backyard, that means he doesn't go into the backyard.  All

2    right?

3        And, Mr. Brown, I'll skip ahead to something.  I say this

4    directly to everyone who I deal with who is in your position.  I

5    do not operate on what some people call a zero tolerance policy.

6    I do not say in advance, if you do X, then I'm going to do Y

7    because I feel that that would constitute me prejudging the

8    situation.  So I'm not going to sit here and tell you, if you

9    set one foot outside that property, I'm going to have you

10   arrested.  All right?

11       I am telling you this:  The government has articulated more

12   than enough reason to show that what you are accused of doing in

13   the past constituted a very extraordinary danger to several

14   people.  And my patience will be very limited, and my tolerance

15   for mistakes will be very limited.  All right?

16       So I'm gonna order that Mr. Brown have no contact with any

17   of the victims.  They've not been identified in this proceeding.

18   They are identified both in the press and in the state court

19   indictment.  He's not to have any contact of any kind.  That

20   means no phone calls, no letters, no in-person visits, no

21   Twitter, no Facebook, no -- I don't know what they all are -- no

22   communication of any kind.

23       Report as soon as possible any contact with any law

24   enforcement.  The fact that Mr. Brown is on home incarceration

25   does not mean that he won't have contact with law enforcement.

1   It may be that the law enforcement comes to see him.  He just

2   needs to tell probation if that happens.

3       He is prohibited from possessing any firearms or other

4   deadly weapons.  He is prohibited from being in the same place

5   of residence -- he shouldn't be in any motor vehicles anyway --

6   but he is prohibited from being in the same place of residence

7   or motor vehicle where there is a firearm, regardless of whether

8   he is possessing it or whether someone else is possessing or if

9   no one is possessing it.

10      I take as a given the statement made by Mr. Eggert.  I take

11  that as an assurance made by an officer of the court that there

12  is no -- that there are no firearms in the residence.  That

13  means there shall not be any firearms in that residence going

14  forward where he's going to live.  Any presence of a firearm in

15  that residence is a violation of the conditions of bond by

16  Mr. Brown.  It's not going to be treated as a violation by

17  someone else.  It's going to be treated as a violation by

18  Mr. Brown.

19      You must report to pretrial services as they direct.  You

20  must continue to participate in mental health counseling.  You

21  are prohibited from using any illegal drugs of any kind.  I

22  remind everyone at this stage that marijuana -- I have no

23  indication -- I don't know whether you use marijuana or have.

24  It is still illegal under federal law or state law.  I don't

25  care whether it should be or shouldn't be.  It is.  So you're

1    prohibited from using it or any other illegal drug.  You are

2    prohibited from using or possessing any narcotic unless that

3    narcotic is accompanied by a prescription from a -- a valid

4    prescription from a licensed health care provider.

5         All right.  I am going to appoint -- and, ma'am, I

6    apologize.  I've misplaced it.  So I've lost track of your name,

7    but I'm going to appoint two third party custodians here.  I'm

8    going to appoint Mr. Brown's grandmother as a -- I'm sorry.

9    Tanya Hyde.  Thank you -- as a third party custodian and order

10   that he live with her.

11        Ms. Hyde, Mr. Eggert or Mr. Renn -- I can't remember which

12   one of them said it -- but one of them has assured me that

13   they've explained to you what this means, but again, I want to

14   say it directly to you.  As a third party custodian, you will be

15   sworn to a bond, and you will -- and, ma'am, could you stand up?

16   I think I know which one you are.  Yes, thank you.  Making sure

17   I was looking at the right person.

18        You will have an independent obligation, an independent

19   sworn, binding legal obligation to the court to notify the court

20   or to notify probation immediately if Mr. Brown either, (a), is

21   no longer residing with you or staying with you -- and given the

22   fact that he's on home incarceration, if he's out of the house

23   for a split second or if he violates any of these terms, you

24   have an independent legal obligation.

25        Now, it would take an extraordinary situation.  I don't

 1    think I've seen it in seven years, but legal action can be taken

 2    against a third party custodian if the third party custodian

 3    does not act on that independent legal duty.

 4        All right.  Do you understand all that, ma'am?  All right.

 5    And are you willing to serve as a third party custodian?  I'm

 6    sorry?

 7                MS. HYDE:  Yes, sir.

 8                THE COURT:  All right.  Thank you.  I wasn't doing

 9    that for dramatic purposes.  I couldn't hear you.

10        All right.  And, also, I gave some thought to this, and I

11    did ask probation to ask if Dr. Jones would be willing to serve

12    in a limited capacity as third party custodian.

13        Dr. Jones, you've heard what I've said to Ms. Hyde about

14    what it means to be a third party custodian and having an

15    independent legal obligation to the court.  I'm not gonna order

16    you to live with Mr. Brown or vice versa, but I am going to

17    direct that you visit him on at least a weekly basis and as

18    often as you believe is necessary and, likewise, to inform the

19    court or probation immediately if you believe that Mr. Brown is

20    either not residing with his grandmother or is violating any of

21    the terms of his release.  Are you willing to do that?

22                DR. JONES:  Yes, sir.

23                THE COURT:  All right.  All of these will be

24    conditions on a $25,000 unsecured bond.  "Unsecured," Mr. Brown,

25    means that no one's going to have to put up any money or any

1   property.

2        And I'll say this for all three of you.  No one has to put

3   up any money or any property, but if Mr. Brown fails to comply

4   with any of the conditions, then one or more of you may be --

5   one or both or all three of you may be subject to owing the

6   United States $25,000.

7        All right.  Mr. Brown, do you understand all of that?

8             THE DEFENDANT:  Yes, sir.

9             THE COURT:  All right.  Dr. Jones, do you understand

10  that?

11            DR. JONES:  Yes, sir.

12            THE COURT:  All right.  Ms. Hyde?

13            MS. HYDE:  Yes, sir.

14            THE COURT:  All right.  Thank you.

15       All right.  So, Theresa, what do we have by way of a further

16  proceeding or trial date?

17            DEPUTY CLERK:  Your Honor, it's set for a telephonic

18  conference on May the 5th at 11:30 with Judge Beaton.

19            THE COURT:  All right.  The only one thing that I've

20  covered that I want to expand on just a little bit and that is

21  no contact with the alleged victims.  That is oftentimes easier

22  or -- not necessarily easier, more simplistic than it is here.

23       When one of the candidates [verbatim] is candidate for mayor

24  and the other -- I take it one or more of the other alleged

25  victims works for that campaign, then an extra degree of

1    vigilance is going to be necessary.  Mr. Brown ought to be in

2    that house.  There shouldn't be any reason for any confusion.

3        I would just ask that -- I'll leave it at this.  I'll ask

4    counsel to just assist in seeing to it that there's no

5    accidental proximity.  And if there's strict compliance with the

6    home incarceration, that shouldn't matter, but I'm assuming that

7    someone who is a candidate for office is going to be out and

8    about and in different places more often than someone who's not.

9    Just be aware of that, please.

10        All right.  So what else for today?  Ms. Gregory, what for

11    the United States for today?

12            MS. GREGORY:  Yes, Your Honor.  We would request a

13    stay of the release order so that we can file our motion to

14    appeal this to the District Court.  We can file the motion to

15    revoke the release order by the close of business on Monday, and

16    we can file the motion to stay the release pending disposition

17    of the motion to revoke later this evening.

18            THE COURT:  All right.  Mr. Eggert.

19            MR. EGGERT:  Judge, we would oppose that.  You know,

20    he has --

21            THE COURT:  I'm sorry.  I'm having a little trouble

22    hearing you.  If you'd come up to the -- that one --

23            MR. EGGERT:  My apologies.

24            THE COURT:  That's all right.  That one's not working.

25            MR. EGGERT:  Yes.  We would object, Judge.  I mean,

1    everything is in place now.  His grandmother's here.  Dr. Jones

2    is here.  Honestly, if the decision had gone the other way, he

3    would remain in custody pending an appeal.  By essentially

4    getting a stay, they're winning despite the court's order, that

5    is, they keep him in custody.

6        He would go on home incarceration where he's been.  I know

7    mental health treatment is -- what the court said about it, but

8    we do have it set up to start Monday, and it would.  He'd be at

9    home.  He'd be back on HIP.  He would be at his grandmother's.

10   Dr. Jones would be getting him.

11       And if they prevail on appeal, they'll prevail on appeal,

12   and he'll go back in.  But we would ask -- you know, we don't

13   know when this hearing is going to be, and we would ask that

14   having ruled how you did and having considered everything and

15   considered everything so carefully, that he be released in

16   accordance with your order rather than kept in jail.

17              THE COURT:  All right.  Thank you.

18       Any response to that, Ms. Gregory, or a reply, I should say?

19              MS. GREGORY:  No, Your Honor.  Numerous courts have

20   found that the stay authority is intrinsic to 3145 and that

21   without it the district court's review power would be illusory,

22   and we are going to be appealing.  And as I said, we can do it

23   by the end of the day Monday.

24              MR. EGGERT:  I don't think they're entitled to a stay

25   as a right at all.  I don't think the statute says that.

1          THE COURT:  Hang on for just a moment, please.

2          MR. EGGERT:  And, Judge, the hearing -- and, again, we

3     requested this because we had to get ready, but the hearing was

4     a week.  And, you know, we -- obviously, they didn't tell us

5     they were gonna go out and arrest him, but the hearing was

6     delayed.  He's been in a significant amount of time already in

7     light of the court -- the fact that the court's ordered him

8     released, and they're not automatically entitled to a stay at

9     all.

10         THE COURT:  All right.  Thank you.  Give me just a

11    moment to look at the statute.

12      All right.  So, Ms. Gregory, I don't think I heard this, but

13    maybe I missed it.  Are you saying that the government is

14    automatically entitled to a stay, or are you requesting a stay?

15         MS. GREGORY:  No, Your Honor, I'm requesting a stay.

16    And there are cases that say that without the stay that

17    essentially the district court's review power would be illusory.

18    In *United States v. Brigham* in the Fifth Circuit, the court

19    pointed out that if the district court disagrees with the

20    magistrate judge's determination regarding release versus

21    detention but no stay is in place, the person in question may

22    harm the community or disappear by the time the district court's

23    ruling is rendered and detention is ordered.  So we believe a

24    stay is very important in this case.

25         THE COURT:  All right.  Thank you.

1          MR. EGGERT:  Judge, the power is not illusory.  Come

2     on.  They can appeal and --

3          [Inaudible.]

4          THE COURT:  Here, hang on for a sec.  I'm really not

5     trying to be picky about decorum.  I'm just having trouble

6     hearing you when you're --

7          MR. EGGERT:  No, I understand, Judge, and I should

8     come up here before I speak, but the power would not be

9     illusory.  They can appeal and we'll appeal, obviously, in front

10    of Judge Beaton.  And Mr. Brown will be there, and he can make

11    his -- the court can make its ruling.

12         And then if they prevail against this very considered

13    opinion, then he would go back into custody, but it doesn't

14    detract or make the power of the district court illusory at all.

15    It still has the power and would still put him back into

16    custody.  In the meantime, he'd be at home on home incarceration

17    supervised.  And you wouldn't be releasing him but for the facts

18    you've found.

19         So, essentially, it would be defeating your opinion for a

20    period of time without, as the court already said, evidence of

21    -- any evidence of future dangerousness.  It would basically

22    undue the ruling.

23         THE COURT:  All right.  Understood.  So I am going to

24    grant the motion to stay.  3145 requires that the court hear the

25    objection promptly, and I have no doubt that Judge Beaton will

1    do just that.

2        At the risk of stating the obvious, I made the decision I

3    did because I thought it was the right decision, but if I'm

4    mistaken and if Mr. Brown does flee the jurisdiction, or if he

5    does commit some other serious offense while I have him on

6    release before Judge Beaton hears the appeal, then -- to that

7    extent then the reveal could be illusory.

8        So this is one of these things where we have to see the

9    future to know whether this is a real concern or not, and

10   because I can't, I'm going to err on the side of caution and

11   grant the motion to stay.  And I'm sure you-all will be hearing

12   from Judge Beaton, as the statute says, promptly.

13       MR. EGGERT:  Judge, we appreciate the court's ruling

14   and understand, but we would state this for the record:  With

15   all the due care that the court went through, every single

16   factor, to have this reversed just means they found another

17   judge who -- I know he has more power -- that doesn't like the

18   ruling.

19       This ruling cannot be said to be legally wrong.  They can

20   say they don't like it, but to say that this ruling is legally

21   wrong, I just -- and they may say a judge can say that, but it

22   wasn't legally wrong.  You considered everything, and that's the

23   fact.

24       THE COURT:  Right.  Well, a couple of things.  You

25   don't just find another judge.  There are two judges assigned to

1    this case, and I'm one of them.  Judge Beaton is the other one.

2          MR. EGGERT:  I understand.

3          THE COURT:  And so, you know, this is not -- you know,

4    I wouldn't call this forum shopping.

5       And, secondly, appeal of a detention decision is a de novo

6    decision.  Judge Beaton does not have to decide that I was

7    wrong.  He will make up his own mind.  Once there's an appeal

8    made, he'll make up his own mind about whether Mr. Brown ought

9    to be released or not.

10      The other thing I was thinking but I didn't say but should

11   have, there is -- putting aside any concern about Mr. Brown

12   himself, there is risk involved to anyone when someone has to be

13   arrested again.  And so to have him released and if Judge Beaton

14   were to reverse my ruling and then to have him arrested again

15   constitutes a risk that would otherwise -- those who are at risk

16   would not otherwise be subjected to.

17         MR. EGGERT:  Understood, Judge, understood.  It's just

18   when -- if you order him detained, it could be months before

19   we'd even get a hearing, and we might not get one.  You know

20   what I'm saying?

21         THE COURT:  Right.

22         MR. EGGERT:  He'd sit in jail.  They couldn't release

23   him, you know what I'm saying, pending an appeal.  It's a huge

24   benefit for the United States.

25         THE COURT:  Well, I am -- and, again, I should have

1   said this.  I will take the United States up on this.  I don't

2   know that it's necessary that they file a written motion to

3   stay.  They've made an oral motion to stay.  I'm granting it,

4   but I will give them until 5:00 on Monday to file the objection

5   or appeal or whatever the right title of it is.

6          MR. EGGERT:  Thank you, sir.

7          THE COURT:  All right.  What else, if anything, for

8   today, Ms. Gregory?

9          MS. GREGORY:  Nothing from the United States, Your

10  Honor.

11         THE COURT:  All right.  Mr. Eggert, Mr. Renn,

12  Ms. Lister, anything further?

13      (Bond oath administered to the defendant.)

14         THE COURT:  Dr. Jones, can you and Ms. Hyde come

15  forward, please, you and Ms. Hyde, please.  Thank you.

16      Theresa, do you want them to come to the podium?

17      Why don't you go to the smaller podium.  I'm looking for a

18  place for you to be able to sign something.

19      (Bond oath administered to third party custodians.)

20         DEPUTY CLERK:  Thank you.

21      (Off the record.)

22         THE COURT:  We all set?  Okay.  Thank you-all.

23      (Proceedings concluded at 6:19 p.m.)

24

25

1              C E R T I F I C A T E

2       I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM

3    THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

4

5
         _____s/Dena Legg_____          _April 19, 2022_
6    Certified Court Reporter No. 20042A157     Date
     Official Court Reporter
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          INDEX

2     DEFENSE WITNESSES:

3     DR. RICKY L. JONES
           Direct Examination Mr. Eggert                5
4          Cross-Examination By Ms. Gregory             9
           Redirect Examination By Mr. Eggert           20
5
      KEVIN LAMKIN
6          Direct Examination By Mr. Eggert             22
           Cross-Examination By Ms. Gregory             27
7          Redirect Examination By Mr. Eggert           31

8     TAMARA RUSSELL
           Direct Examination By Mr. Eggert             37
9          Cross-Examination By Ms. Porter              42
           Redirect Examination By Mr. Eggert           48
10
      MONIQUE WILLIAMS
11         Direct Examination By Mr. Eggert             53
           Cross-Examination By Ms. Porter              56
12         Redirect Examination By Mr. Eggert           61
           Recross-Examination By Ms. Porter            62
13
      DR. MONICA WENDEL
14         Direct Examination By Mr. Eggert             63
           Cross-Examination By Ms. Gregory             67
15         Redirect Examination By Mr. Eggert           71

16

17

18

19

20

21

22

23

24

25

```
 1                           EXHIBITS

 2      GOVERNMENT:
        A - photos                                84
 3      B - "A Revolutionary Love Letter"         34
        C - Firearms Transaction Record           84
 4      D - photos                                84
        E - photos                                84
 5      F - Firearms Transaction Record           84
        G - photos                                84
 6

 7      DEFENDANT:
        1 - court order                           34
 8      2 - indictment                            35
        3 - letters of support                    73
 9      4 - Chhibber letter                       78
        5 - Singletary letter                     79
10

11      SEALED:
        Cumulative 1 - phone number and bail report
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```