UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

UNITED STATES OF AMERICA                                        PLAINTIFF

vs.                                     CRIMINAL ACTION NO. 3:22-cr-00033-BJB

QUINTEZ O. BROWN                                                DEFENDANT

## MOTION TO REVOKE RELEASE ORDER
### *Electronically Filed*

The United States respectfully requests this Court to revoke the anticipated release order regarding Quintez O. Brown pursuant to 18 U.S.C. § 3145(a)(1).  The defendant plotted the murder of a mayoral primary candidate and nearly succeeded in his goal on the morning of February 14, 2022, when he shot at the candidate six times in his campaign office.  Defendant, who is a danger to his victim and the community, has not overcome the statutory presumption in favor of detention. *See* 18 U.S.C. § 3142(e)(3)(B).  The defendant, therefore, should be detained pending trial.

### PROCEDURAL HISTORY

On April 6, 2022, a Grand Jury in the Western District of Kentucky charged the defendant with one count of Interference with a Federally Protected Activity by attempting to murder C.G., a mayoral primary candidate, in violation of Title 18, United States Code, Section 245(b)(1)(A) (Count 1) and Use and Discharge of a Firearm During and in Relation to a Crime of Violence, in violation of Title 18, United States Code, Section 924(c) (Count 2).  DN 1.  Defendant's initial appearance occurred on April 7 and 8, 2022.  DN 10.  Despite the statutory presumption in favor of detention and over the objection of the United States, the Magistrate Judge ordered the defendant released with special conditions.  DN 22.  At the conclusion of the detention hearing, the United

States orally moved to stay execution of the anticipated release order pending this appeal.  *See* DN 21.  The Magistrate Judge granted the United States' motion for a stay pending the filing and resolution of this Motion.  *See* DN 21.  On April 16, 2022, the District Court set the following schedule: "The United States' opening brief is due April 20, Defendant's response is due April 25, and the United States may file a reply by April 27," and there will be "an in-person hearing on April 28 at 3:00 p.m. in the Louisville courthouse."  DN 21.

## MEMORANDUM IN SUPPORT

### Evidence Relevant to the Charged Offense[1]

The defendant tried to murder a political candidate on the morning of February 14, 2022, at the victim's campaign office by shooting at him six times.  Following the shooting, the wall and baseboard behind the candidate's chair, where he was sitting, contained six bullet holes.  Gov. Ex. A at 1.[2]  The defendant came so close to hitting his victim, the candidate's sweater was ripped by a bullet.  *Id*. at 3-5.  The candidate was not the only person who could have been killed that day.  The victim was in the room with four campaign staffers.  The bullets went through the wall into the next-door office of a wedding planning business.  *Id*. at 2.  Surveillance video at the victim's campaign office show the defendant entering the building just before the shooting and fleeing right after the shooting.  Gov. Ex. G.  The defendant was arrested soon after the shooting less than a half mile away.  Following his arrest, officers located a loaded firearm magazine in his pocket and

---

[1] The Sixth Circuit has held, "conducting a bail hearing by proffer is acceptable under the law and at the discretion of the district court."  *United States v. Stone*, 608 F.3d 939, 948-49 (6th Cir. 2010); *United States v. Webb*, 2000 WL 1721060, at *2 (6th Cir. 2000) ("The government may proceed in a detention hearing by proffer or hearsay."); *see also United States v. Smith*, 79 F.3d 1208, 1210 (D.C. Cir. 1996) ("Every circuit to have considered the matter . . . [has] permitted the Government to proceed by way of proffer.").

[2] Exhibits A through G were admitted into evidence at the April 15, 2022 detention hearing. Exhibits H through M are new exhibits, and are, therefore, filed with this Motion, with Exhibits J, L, and M under seal.

the firearm he used to shoot at his victim in his backpack.  Gov. Ex. H at 1-3.  The jacket he was wearing on surveillance videos as well as a receipt for the firearm were stuffed into his backpack. *Id*. at 4-5.

The defendant began building toward the attempted murder in January 2022.  On January 10, 2022, the defendant published an article on Medium.com entitled "A Revolutionary Love Letter."  Gov. Ex. B.  The defendant announces, "Our situation is one of political warfare" and "Voting and petitioning will not be sufficient for our liberation."  *Id*. at 3, 9.  The defendant states, "we move in the present moment to rid ourselves of outdated programs and modalities that lead to our self-destruction and begin to help the masses define their needs, realize their strength, and go into action along a variety of lines which they must choose for themselves."  *Id*. at 6.

Two days later, the defendant purchased a Smith & Wesson M&P Shield EZ, thereby choosing his "line" of "action" – violence.  Gov. Ex. C.  On January 22, 2022, the defendant took his new firearm to the shooting range, where he practiced loading, shooting, and aiming the firearm.  Gov. Ex. D.  On January 24, 2022, the defendant publicly displayed his hostility toward the victim, C.G., by reposting to social media a composite image depicting C.G. engulfed in flames and perched on another person's shoulder, captioned by the hashtag "gentrification is violence." Gov. Ex. I.  On February 8, 2022, the defendant messaged others stating, "all hands against [C.G.] on Nov. 8."  *See e.g.* Gov. Ex. J at 4 (under seal).  Later that day, the victim received key endorsements, and became a frontrunner in the mayoral campaign.  The defendant again displayed his contempt for the candidate when he reposted an article about these endorsements with the caption, "dollar democracy?"  Gov. Ex. K.  Two days later, as revealed by the defendant's internet search history, he began researching the victim, including his location.  Gov. Ex. L at 594-610 (under seal).  The victim's campaign office address was not readily available online, but the victim

3

reviewed videos on C.G.'s social media page to reveal the campaign's suite number, which the defendant searched with various search terms to reveal his victim's location. *Id*. at 427-428, 470-475, 493-500. That weekend, the defendant further searched for information about the victim's family, including his wife and son. *Id*. at 117-119, 234-245, 248-252, 357-360, 634-652. The defendant also searched for the location information on the office of another candidate in the mayoral election. *Id*. at 21-26.

On the evening of February 13, 2022, the defendant went to C.G.'s home, where C.G. lived with his wife and children, with the apparent intent to shoot and kill C.G. Records from a rideshare company show the defendant was dropped off near C.G.'s home at 6:09 p.m. on February 13, 2022. Gov. Ex. M (under seal). The defendant took his Smith & Wesson M&P Shield with him. His gun jammed, however. At 6:22 p.m., the defendant searched online, "loading a bullet backwards." Gov. Ex. L at 69 (under seal). He continued to run searches about a bullet being stuck in a M&P chamber. *Id*. at 66-69. He also searched for a gun store located close to C.G.'s home. *Id*. at 68. According to rideshare records, around 6:46 p.m., the defendant ordered a ride home, apparently having failed to repair his mis-loaded firearm. Gov. Ex. M (under seal). Around 7:00 to 7:30 p.m., the defendant's web history shows that he was searching for a gun store close to his own home. Gov. Ex. L at 60-61, 64-65 (under seal).

The next morning, as shown by video surveillance, receipts, and an ATF transaction form, the defendant bought a Glock 9mm pistol at a Louisville pawn shop just after it opened at 9:00 am. Gov. Exs. E-F. Less than an hour after purchasing the gun, the defendant used it to try to kill C.G., as described above. Just before the shooting, at 9:54 a.m. the defendant searched on his phone, "how to load a glcok (sic) cartridge." Gov. Ex. L at 1-2 (under seal). Right after the shooting, at 10:12 a.m. the defendant searched on his phone, "safety on glock 17." *Id*. at 1.

4

**Legal Standard**

The Bail Reform Act of 1984, 18 U.S.C. § 3142 *et seq*., provides, in pertinent part, that if a judicial officer finds by clear and convincing evidence that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community, such judicial officer shall order the detention of the [defendant] before trial." 18 U.S.C. § 3142(e).  Thus, even if a defendant is not considered a flight risk, his or her danger to the community alone is sufficient reason to order pretrial detention, and vice versa. *United States v. Salerno*, 481 U.S. 739, 755 (1987); *United States v. Perry*, 788 F.2d 100, 113 (3d Cir. 1986); *United States v. Sazenski*, 806 F.2d 846, 848 (8th Cir. 1986).  Where the judicial officer's justification for detention is premised upon the safety of the community, the decision must "be supported by clear and convincing evidence." 18 U.S.C. § 3142(f)(2).

Section 3142 imposes a rebuttable presumption of dangerousness or flight risk on defendants charged with certain serious offenses.  *See* 18 U.S.C. § 3142(e)(3).  For purposes of determining whether a rebuttable presumption is triggered, "[a] grand jury indictment, by itself, establishes probable cause to believe that a defendant committed the crime with which he is charged." *United States v. Stone*, 608 F.3d 939, 945 (6th Cir. 2010); *United States v. Smith*, 79 F.3d 1208, 1210 (D.C. Cir. 1996) ("[T]he indictment alone would have been enough to raise the rebuttable presumption that no condition would reasonably assure the safety of the community.").

The presumption applies here because the grand jury charged the defendant with violating 18 U.S.C. § 924(c) by using and discharging a firearm in furtherance of a crime of violence, to wit, a politically-motivated attempted murder.  Accordingly, this Court must presume "that no condition or combination of conditions will reasonably assure [(1)] the appearance of the person as required and [(2)] the safety of the community."  18 U.S.C. § 3142(e)(3)(B).

Once the rebuttable presumption is triggered, it imposes a "burden of production" on the defendant to offer some credible evidence contrary to the statutory presumption. *Stone*, 608 F.3d at 945. The defendant must offer not mere speculation, but "at least some evidence," or basis to conclude that the presumption has been rebutted in his or her case. *Stone*, 608 F.3d at 945-46. Specifically, "a defendant should 'present all the special features of his case' that take it outside 'the congressional paradigm'" giving rise to the presumption. *Id.* at 946 (quoting *United States v. Jessup*, 757 F.2d 378, 387 (1st Cir. 1985)); *see also United States v. Portes*, 786 F.2d 758, 764 (7th Cir. 1985) (presumptions in § 3142(e) "are 'rebutted' when the defendant meets a 'burden of production' by coming forward with some evidence that he will not flee or endanger the community if released").

"Even when a defendant satisfies his burden of production, however, the presumption favoring detention does not disappear entirely, but remains a factor to be considered among those weighed by the district court." *Stone*, 608 F.3d at 945 (citing *United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001)). This is so because the presumption is not simply an evidentiary tool designed for the courts, but rather an expression of Congress's substantive judgment that particular classes of offenders should ordinarily be detained prior to trial. *Id.* at 945-46 (citation omitted)*; see also United States v. Dominguez*, 783 F.2d 702, 707 (7th Cir. 1986) ("[T]he presumption of dangerousness . . . represents Congressional findings that certain offenders . . . are likely to continue to engage in criminal conduct undeterred either by the pendency of charges against them or by the imposition of monetary bond or other release conditions.").

This matter is before the Court on the government's motion for review of the Magistrate's release order; it is accordingly governed by 18 U.S.C. § 3145, which provides in pertinent part:

> If a person is ordered released by a magistrate judge or by a person
> other than a judge of a court having original jurisdiction over the

offense other than a Federal appellate court - (1) the attorney for the
Government may file with the court having original jurisdiction over
the offense, a motion for revocation of the order or amendment of
the conditions of release;
. . .
The motion shall be determined promptly.

18 U.S.C. § 3145(a)(1). "[I]t is well-settled that district courts exercise *de novo* review of a

magistrate judge's release or detention order." *United States v. Demarcus Bristuan Fitzhugh*, No.

16-MJ-30364, 2016 WL 4727480, at *2 (E.D. Mich. Sept. 12, 2016); s*ee also United States v.

Carter*, No. 1:20-CR-62-1, 2021 WL 687858, at *2 (S.D. Ohio Feb. 23, 2021) ("Given that the

Second, Third, Fourth, Fifth, Eighth, Tenth, and Eleventh Circuits have directed district courts to

use *de novo* or independent review . . . the Court adopts the majority rule and applies *de novo*

review here.") (italics added); *United States v. Yamini*, 91 F. Supp. 2d 1125, 1129 (S.D. Ohio

2000).

If the presumption of detention is rebutted, the factors to be considered in determining

whether to release a defendant pending trial are set forth in 18 U.S.C. § 3142(g) and include: (1)

the nature and circumstances of the offense charged, including whether the offense is a crime of

violence, a violation of § 1591, a Federal crime of terrorism, or involves a minor victim or a

controlled substance, firearm, explosive, or destructive device; (2) the weight of the evidence

against a person; (3) the history and characteristics of the person; and (4) the nature and seriousness

of the danger to any person or the community that would be posed by the defendant's release.

## <u>Analysis</u>

### 1.     **Application of the Rebuttable Presumption**

The rebuttable presumption in favor of pretrial detention pursuant to 18 U.S.C.

§ 3142(e)(3)(B) applies here.  While the government does not challenge that the defendant has

rebutted the presumption that he is a flight risk, the defendant has failed to produce credible

7

evidence contrary to the statutory presumption of his dangerousness were he to be released.  *See Stone,* 608 F.3d at 945.

Congress has instructed that individuals who, like the defendant, have been charged with use of a firearm in furtherance of a crime of violence, in violation of 18 U.S.C. § 924(c), presumptively pose a danger to the community.  *See Stone*, 608 F.3d at 945-46; *United States v. Bess*, 678 F. Supp. 929, 934 (D.D.C. 1988) (explaining that the presumption "represents Congress's general factual view about . . . the special risks of danger to the community presented by defendants who commit the crimes to which it attaches").  The defendant's community ties, although probative of his relatively low risk of flight, do nothing to rebut this presumption of dangerousness, because "this evidence would equally tend to suggest that Defendant would never have committed the crime with which he is now charged."  *Bess,* 678 F. Supp. at 935 ("The history and characteristics of Defendant—his family and community ties [and] his educational and employment record . . . did not deter him from committing armed robbery in the first instance.").  The defendant has therefore failed to overcome the presumption "that no condition or combination of conditions will reasonably assure . . . the safety of the community."  18 U.S.C. § 3142(e)(3)(B).

## 2.    Application of the § 3142(g) Factors

If the court finds that the defendant has fully rebutted the presumption of detention, the Court should consider the Bail Reform Act's four § 3142(g) factors.  Considering these factors, the conclusion is the same: the defendant should be held without bond pending trial.  All four factors under 18 U.S.C. § 3142(g) support detention of the defendant and outweigh evidence presented by the defendant to rebut the statutory presumption in favor of detention.  Further, where, as here, a rebuttable presumption applies, it "remains a factor" militating against release, to be weighted along with other evidence relevant to factors listed in § 3142(g), even if the defendant

has met his burden of production of offering some credible evidence to the contrary.  *Stone,* 608 F.3d at 945.  An analysis of the § 3142(g) factors reveals the defendant should be detained.

### a.  The Nature and Circumstances of the Crime Support Detention

The first factor, the nature and circumstances of the charged offense, favors detention.  This factor asks the Court to consider "the nature and circumstances of the offense charged" as a general matter, but especially points to instances where "the offense is a crime of violence . . . or involves a . . . firearm."  18 U.S.C. § 3142(g)(1).  The § 245(b)(1)(A) charge is a crime of violence, while the § 924(c)(1)(A) charge involves a firearm.  Thus, both charged offenses fall into categories identified by Congress as those in which the nature and circumstances favor detention.  The § 924(c) charge carries a mandatory minimum of 10 years, with a maximum sentence of life imprisonment, reflecting Congress' judgment as to the seriousness of the offense.  18 U.S.C. § 924(c)(1)(A)(iii).

The premeditated, violent, and potentially deadly nature of the defendant's criminal conduct weighs heavily in favor of detention.

First, the evidence shows that the defendant committed his violent offense in a cold and calculated manner.  He did not fire his gun at the victim in a sudden fit of passion or as the result of a sudden "snap."  Rather, as summarized above, the defendant plotted his attempted killing, practicing his aim and researching where the victim and the victim's family could be found.  The defendant's apparent first attempt to kill the victim at home was, fortunately, averted when the defendant loaded his weapon incorrectly.  Undeterred, and having no faintness of heart, the defendant tried again at the campaign office the next morning and came much closer to accomplishing his goal.  These facts show a premeditation that significantly increases the seriousness of this offense.

Second, the offense had the potential to cause grave harm.  The candidate victim was not the only individual whose life was threatened by the defendant's violent act; four campaign staffers were in the room when the defendant fired six shots.  If anyone had been present in the neighboring office, they could have been killed as well, as bullets ripped through the wall.  Beyond the harm imposed upon the direct victims, such political violence tears at the fabric of our society by harming free elections and potentially deterring political candidates and others from participating in our democratic process.  The actual and potential harm involved in this offense, therefore, weighs heavily in favor of detention.  *See Stone*, 608 F.3d at 948 ("[N]ature and circumstances of the charges against all defendants weigh in favor of detention" where defendants "demonstrated interest in committing actual, physical violence . . . and several have shown a lack of concern about the likelihood of killing civilians."); *United States v. McCollum*, No. 3:21-CR-35-TAV-DCP-2, 2021 WL 4468937, at *3 (E.D. Tenn. Sept. 29, 2021) (revoking release order despite "no history of violence . . . strong family ties and support" and "family members [who] offered to serve as third-party custodians" because of the "dangerousness" of defendant's crime).

### b.  The Weight of the Evidence Supports Detention

Second, the weight of the evidence against the defendant – as it pertains to dangerousness[3] – is substantial and favors detention.  As outlined above, surveillance video shows the defendant buying a firearm on February 14, 2022 and entering into the building where C.G.'s campaign office was located.  Receipts and ATF firearm transaction records further show that the defendant purchased the gun himself.  Law enforcement recovered that firearm, firearm magazines, and ammunition from the defendant upon his arrest, which occurred shortly after the shooting less than

---

[3] "This factor goes to the weight of the evidence of dangerousness, not the weight of the evidence of the defendant's guilt." *Stone*, 608 F.3d at 948.

half a mile away from C.G's campaign office. Law enforcement also recovered the defendant's phone, which contained substantial evidence of his premeditated plot to murder C.G., including an earlier attempt at C.G.'s home on the evening of February 13, 2022. Further, while law enforcement recovered the gun the defendant purchased on February 14, 2022 when the defendant was arrested, the Smith & Wesson M&P Shield EZ handgun the defendant purchased on January 12, 2022 has not been recovered. Presumably, the defendant knows where it is and how to access it. The considerable evidence of the defendant's dangerousness weighs in favor of detention.

### c.  The Defendant's History and Characteristics Support Detention

The third factor concerns the history and characteristics of the defendant. This factor covers a wide range of issues including the person's character, family ties, employment, financial resources, and criminal history. The defendant has strong family ties, was once an excellent student who received a scholarship to the University of Louisville and has lived in Louisville his entire life. Moreover, members of the community have come forward and expressed their interest in helping to look after the defendant should he be released.[4] Even with strong family and personal ties, however, the defendant was able to secretly plot to kill a mayoral candidate and nearly succeeded in his attempt. He was promising, excelled in school, was a voice of the community, and yet he was capable of surprising everyone with his violent actions. The defendant used his high intelligence to secretly plot a killing intended to influence the election.

The defendant also has some history of erratic behavior. For approximately eleven days in 2021, the defendant left town and went missing shortly after his stepfather died. His disappearance

---

[4] Local community members who testified on the defendant's behalf at the detention hearing admitted that they had not spent much or any time with the defendant in the months leading up to the shooting. Dr. Ricky Jones, who agreed to be the defendant's custodian, admitted on cross-examination that prior to the April 15, 2022 hearing, he had not seen the defendant since Spring 2020. April 15, 2022, Tr. at 12:9 – 13:6.

11

led to a city-wide search by friends and family.  Ultimately, the defendant was located in New York.  This instance of past conduct shows that he is a poor candidate for release to the community, even under careful supervision.  The defendant's violent and surprising behavior is the precise type of unpredictable conduct that pretrial detention is meant to prevent.  *See United States v. Wagers*, No. CR 08-MJ-6060-REW, 2008 WL 11351529, at *3 (E.D. Ky. June 9, 2008) (detaining defendant with "strong current family ties" who "has lived his entire life in the same community" and had an "uneventful 4-5 week period on state bond and self-report" where "the instant facts show that Wagers was prepared to use the firearm . . . to end the life of another person").

The defendant has submitted two letters from mental health professionals that provide serious – but differing – mental health diagnoses.  In a letter dated on April 11, 2022, Kellye Singletary, MD with UpSing Telepsychiatry Services, wrote that the defendant "was seen for an initial psychiatric assessment on February 18, 2022, and was diagnosed with bipolar disorder, type 1. . . mixed with Anxiety Disorder, unspecified with some features of Post-traumatic Stress Disorder."  Def. Ex. 5.  On April 12, 2022, Sunil Chhibber, MD provided a letter stating that the defendant was diagnosed with "Major depressive disorder, recurrent, severe, with psychotic features."  Def. Ex. 4.  The letter goes on to explain that the psychiatrist "rule[d] out" "schizophrenia, chronic paranoid type" as well as "schizoaffective disorder, bipolar type."  *Id*. Because the prosecution team does not have access to the underlying mental health records,[5] it cannot assess the validity of these diagnoses.  Nor can the prosecution or Court assess whether the

---

[5] All mental health records obtained by the government via grand jury subpoena during the investigation are currently held by a filter team, which is securing records that are potentially protected by the psychotherapist-patient privilege until the defendant expressly waives this privilege, or the Court determines that he has waived the privilege by putting his mental health at issue.  *See Simon v. Cook*, 261 F. App'x 873, 886 (6th Cir. 2008) ("[T]his circuit has held that placing one's mental health at issue constitutes waiver of the [psychotherapist-patient] privilege.").

defendant's mental health issues present a danger to his victim or the community.  It is unclear whether the defendant has been assessed for dangerousness to the community by a competent and unbiased mental health professional.   If the defendant is mentally unstable, correctional confinement will provide a place with access to medication and mental healthcare[6] without the added risk of him committing another violent attack.  The defendant does not need to be released in order to receive mental health treatment, and the community is safer with him detained.  The third factor favors detention.  *See Salerno*, 481 U.S. at 748-49 ("[T]he government may detain mentally unstable individuals who present a danger to the public"); *see also United States v. Cobb*, No. CR 08-111-GFVT, 2016 WL 9346851, at *2 (E.D. Ky. Jan. 8, 2016) (describing finding in favor of detention where defendant's "history of mental instability" raised "much concern . . . in the detention analysis."); *United States v. Platt*, No. 18-cr-195-WJM, 2018 WL 4698616, at *4 (D. Colo. Oct. 1, 2018) ("The Court does not doubt that Platt has a genuine need for treatment, but under the statutory framework that binds this Court, Platt's needs are secondary to the question of whether he poses a flight risk or a danger to himself or the community.").

Additionally, the defendant has allegedly exhibited suicidal ideation in recent weeks.  At the detention hearing, defense counsel provided a letter from Kellye Singletary, MD, which states that on February 25, 2022, the defendant exhibited "ruminating thoughts of 'not wanting to be

---

[6] Early in the week of April 11, 2022, the USMS asked defense counsel for the medical records and prescriptions of the defendant so that they could facilitate the defendant's mental healthcare while he is detained.  Defense counsel did not provide the requested records to the USMS.  Should defense counsel ask the USMS to facilitate access to telemedicine appointments with the defendant's psychiatrist or other mental healthcare provider, the USMS will do so, subject to the availability of bandwidth and a room at Grayson Detention Center.  No such request has been made by defense counsel to date.  On April 18, 2022, the undersigned provided the USMS with copies of Defense Exhibits 4 and 5.  The USMS provided these medical letters to the Medical Director at the Grayson Detention Center, who immediately took steps to start the defendant on the prescribed medications listed in Exhibit 4.

here.'"  Def. Ex. 5.  The defendant "expressed some specific thoughts and urges to cut himself

while in the bathroom."  *Id*.  On February 26, 2022, a Jefferson Judge issued an order permitting

the defendant to travel for a psychological evaluation where "the parties [were] concerned about

the welfare and safety of Mr. Brown."  Def. Ex. 1.  These facts make the defendant a danger to

himself as well as to the broader community, weighing further in favor of detention.  *See Demarcus*

*Bristuan Fitzhugh,* 2016 WL 4727480, at *5. ("Notwithstanding the mitigating effect of [the

defendant's mother's] involvement and the Defendant's lack of a criminal history, the Defendant's

suicidal history and unstable mental health make him a danger to himself.  Therefore, the

Defendant's history and character favors detention rather than release.").

### d.  The Defendant is a Danger to His Victim, The Community, and Himself

Finally, courts must consider the nature and seriousness of the danger to any person or the

community that would be posed by the defendant's release.  Even with third party custodians and

location monitoring, the defendant remains a risk to himself,[7] to his intended victim, and to the

community at large.  While GPS monitoring identifies where a person is when he is wearing the

monitor, Louisville Corrections Officer Kevin Lampkin testified that individuals on location

monitoring cut off their monitors "all the time."  April 15, 2022, Tr. at 27:9-11.  Moreover, a GPS

monitor cannot advise supervising probation officers "what" the person is doing, and it cannot

alert law enforcement if the defendant is plotting another political attack.  The defendant still has

---

[7] As described above, there is evidence that the defendant has suicidal tendencies.  This is a factor
relevant to dangerousness, insofar as it shows the defendant to be a danger to himself, especially
since there is at least one firearm still unaccounted for.  *United States v. Krueger*, No. 13-20242,
2013 WL 8584873 at *2 (E.D. Mich. July 10, 2013) (concluding that the court must consider the
defendant's own mental health condition under § 3142(g)(4), since the court must consider "the
nature and seriousness of the danger to any person or the community"); *see also United States v.
Workman*, 680 F. App'x 699, 702 (10th Cir. 2017) (concluding that a district court was "within its
discretion to consider suicidal ideation and previous suicide attempts in determining whether it
[could] reasonably assure [the defendant's] appearance").

14

internet access, which he used to plot his attempted murder. The defendant still owns the pistol that he purchased on January 12, 2022 and took to his victim's home on February 13, 2022. Despite attempts, law enforcement has been unable to locate that gun. No conditions of home confinement can prevent someone from bringing the defendant his gun or another weapon. Nor can it stop the defendant from cutting off his location monitor and leaving his grandmother's house.

The defendant's motivation for his political attack – his desire for his victim to lose the mayoral election – did not disappear when he nearly killed his victim. That candidate victim is still running for office. As the May 17, 2022 primary then the November 8, 2022 general election draw closer, the impetus behind the defendant's attempted political killing continues to exist. The defendant knows where his victim lives. He has been to his victim's house. He has researched the victim's wife and son. As the defendant pursued his violent plan, he had many opportunities to consider the consequences. When his first gun malfunctioned, preventing him from shooting the victim at home, the defendant could have taken it as a sign to abandon the plot. Instead, he bought another gun the very next morning and tried again, coming within inches of killing C.G. At that time, the fact that he might be arrested and throw away his promising future failed to deter him. The defendant poses a serious danger to his victim and the community, and, therefore, should be detained. *See Salerno*, 481 U.S. at 748 (Supreme Court has "repeatedly held that the Government's regulatory interest in community safety can, in appropriate circumstances, outweigh an individual's liberty interest.").

The defendant is a danger to his victim, the community, and himself. The fourth § 3142(g) factor, therefore, weighs in favor of detention.

## <u>Conclusion</u>

Based on the foregoing, the United States respectfully submits that it has met its burden of persuasion to demonstrate that the statutory presumption in favor of detention applies in this case. Furthermore, deliberative evaluation of the factors to be considered when determining whether there are conditions of release that will reasonably assure the safety of any other person and the community weigh in favor of detention. Therefore, the United States respectfully requests entry of an Order revoking the order of release and directing the detention of the defendant pending disposition of the criminal action against him in this jurisdiction.

Respectfully submitted,

MICHAEL A. BENNETT
UNITED STATES ATTORNEY

*s/ Amanda E. Gregory*
Amanda E. Gregory
Assistant United States Attorney
717 West Broadway
Louisville, Kentucky 40202
(502) 582-5016 (Tel.)
(502) 582-5067 (Fax)

COREY R. AMUNDSON
CHIEF, PUBLIC INTEGRITY SECTION
Criminal Division, U.S. Department of Justice

*s/ Jolee Porter*
JOLEE PORTER
Trial Attorney
U.S. Department of Justice
Public Integrity Section

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing was sent by electronic transmission through the Court's ECF system on April 20, 2022, which generated an electronic copy that was emailed to counsel for the defendant.

<div style="margin-left: 40%;">

*/s/ Jolee Porter*
Jolee Porter
Trial Attorney
U.S. Department of Justice
Public Integrity Section

</div>