```
1                    UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF KENTUCKY
2                         LOUISVILLE DIVISION

3
     UNITED STATES OF AMERICA,     )   Case No. 3:22-CR-00033
4                                  )
             Plaintiff,            )
5                                  )
     v.                            )
6                                  )
     QUINTEZ O. BROWN              )
7                                  )   April 28, 2022
             Defendant.           )    Louisville, Kentucky
8

9                             *  *  *  *  *
                     TRANSCRIPT OF DETENTION HEARING
10              BEFORE HONORABLE BENJAMIN J. BEATON
                     UNITED STATES DISTRICT JUDGE
11                            *  *  *  *  *

12   APPEARANCES:

13   For United States:        Amanda E. Gregory
                               Stephanie M. Zimdahl
14                             U.S. Attorney's Office
                               717 West Broadway
15                             Louisville, KY  40202

16   For Defendant:           Rob Eggert
                               Tricia F. Lister
17                             Patrick J. Renn
                               600 W Main St
18                             Suite 100
                               Louisville, KY  40202
19

20   [Defendant present.]

21

22                        Rebecca S. Boyd, RMR, CRR
                          Official Court Reporter
23                        232 U.S. Courthouse
                          Louisville, KY 40202
24                             (502) 625-3777

25   Proceedings recorded by mechanical stenography, transcript
     produced by computer.
```

1           (Begin proceedings in open court 3:08 p.m.)

2           THE COURT:  Good afternoon, everybody.

3           MS. GREGORY:  Afternoon, Your Honor.

4           THE COURT:  All right.  We are here for the detention

5  hearing in United States against Brown, Criminal Case 3-22-33.

6  Could counsel please state your appearances for the record?

7           MS. GREGORY:  Amanda Gregory for the United States,

8  Your Honor.

9           MR. EGGERT:  Good afternoon, Your Honor.  Rob Eggert,

10  Patrick Renn, and Tricia Lister for Quintez Brown, who's

11  present.

12           THE COURT:  Afternoon.  How are you?

13           MR. RENN:  Very well, Your Honor.

14           THE COURT:  Good.  So you guys obviously did a lot of

15  work with Judge Lindsay, and I've done my best to review that.

16  I think we can, in this posture, just recog -- acknowledge

17  that's the record that has been made in this case so far.

18      It sounds from the filings that there may be some new

19  evidence that either has been submitted or that you guys want to

20  talk about and/or put on today to add to that, but I think

21  we're -- you know, we're not starting from scratch today.  We're

22  starting from the record that was made a couple weeks ago,

23  right?

24           MS. GREGORY:  Yes, Your Honor.

25           THE COURT:  All right.  And in terms of evidence

1    today, what, if anything, does the government plan to put on?

2               MS. GREGORY:  So, Your Honor, the new evidence that

3    you referenced, if you're referring to the exhibits the

4    government filed, those were things that we summarized or

5    referenced at the initial detention hearing, but we didn't

6    provide them in actual exhibit form.  With at least one of

7    those, it was because it was so voluminous.

8       Other than the exhibits that we attached to our initial

9    motion to revoke release, we do not have additional evidence.

10              THE COURT:  Okay.  And any witness to put on today who

11   you would -- in addition to or beyond what was in the record

12   from last time?

13              MS. GREGORY:  No, Your Honor.

14              THE COURT:  Okay.  What about from the defense side?

15              MR. EGGERT:  Judge, we would incorporate by reference

16   all the evidence we put in front of Judge Lindsay.  I think the

17   only additional exhibit we had we attached, Dr. Chhibber's

18   report about what rule out means, and, otherwise, we'd just

19   incorporate all the testimony, witness testimony and exhibits we

20   already put on at the hearing.

21              THE COURT:  Okay.  So have you-all discussed at all

22   how you-all see today going or are you waiting to see what

23   questions I may have?

24              MS. GREGORY:  The latter, Your Honor.

25              MR. EGGERT:  I'm willing to proceed any way, Judge.

1          THE COURT:  Okay.  So we have the, what, two motions

2    to dismiss that are pending.  I'm not planning to talk about

3    those today but may want to at a later date, and, you know, I

4    just -- I do think it's important to note the differences

5    between the, you know, question at issue today in terms of

6    detention versus sort the legality of the -- of the case itself,

7    I suppose.  Those -- those questions are addressed by your two

8    separate motions, not this one.

9         Really, we're here to answer whether there are conditions

10   that would reasonably assure the defendant's appearance as

11   required and for the safety of other persons in the community --

12   and the community.

13        I have, you know, just a couple of questions.  I think I

14   have the gist of the parties' positions here.  I trust that you

15   guys will correct me if I'm wrong about anything or if my

16   questions reveal any misperception on my part.

17        Mr. Eggert, Judge Lindsay noted in the, I guess, subfactor

18   about employment and, under the statute, that Mr. Brown is a

19   student and sort of equated that to employment.

20        My question is just whether Mr. Brown was enrolled as a

21   student before he was -- before the incident, whether he was

22   in -- I mean, presumably, he wasn't attending classes, but I'm

23   not sure when he was arrested.

24        So, you know, I was just curious what the facts showed on

25   that, because under the law, obviously, the sort of attachment

1    to community while your release pretrial is different if someone

2    is, you know, continuing to work and attend classes and so forth

3    versus if that was something that he or she had been doing

4    previously.

5         MR. EGGERT:  Well, Your Honor, he -- obviously, he had

6    been having, as we said, mental health struggles, but he was

7    enrolled at the university, he was a senior at the university,

8    he was a Martin Luther King scholar still at the university, and

9    that was his -- that was his status when this occurred.

10        He also had previously worked -- as you saw from the

11   detention hearing, excuse me, he had worked for the prevention

12   of violence and for that particular program.  So he had worked,

13   he was enrolled in school, and he was at U of L, and I'm not

14   sure what other history he could have --

15        THE COURT:  But in terms of his -- sorry to interrupt,

16   but in terms of, you know, this semester, was he attending

17   classes?

18        MR. EGGERT:  Judge, I don't know his strict

19   attendance.  I can't say he was attending class or not attending

20   class.  I do know this, though, Judge:  He was still there, he

21   was still at the university, and my understanding is he was

22   still going to be on a path to graduate.

23        THE COURT:  Okay.  And we don't know if he'd be

24   attending classes if he were released?  I mean, I, obviously,

25   don't know what the -- what the protocols are right now about

1    remote learning and so forth, but --

2            MR. EGGERT:  I mean, he could, I suppose.  I mean, we

3    wouldn't be asking for a release for that at all, obviously.

4    And if it was remote, he certainly -- he certainly could do

5    that.

6            THE COURT:  Okay.  Yeah.  It just wasn't clear to me

7    which way that cut for someone who, you know, previously was a

8    student but wasn't necessarily going to be connected in that way

9    while awaiting trial.

10           MR. EGGERT:  He had never left U of L, Judge.  He had

11   never left it.

12           THE COURT:  Okay.  And then, obviously, a major area

13   of dispute between the two sides is about mental state, and

14   which way that cuts.  I, you know, tread cautiously, because

15   some of this information is, obviously, you know, more public

16   than others, I suppose.

17       But I'll just tell you my question is I understand you-all

18   have a debate, a dispute over what conditions have been, as Mr.

19   Eggert said, you know, ruled out or not ruled out, what

20   conditions have been diagnosed or not.

21       But, you know, none of us sitting here are mental health

22   professionals, and I think the most relevant question for us and

23   answering the question the law asks of us, about flight and

24   danger to the community and others, goes not to the specific

25   diagnosis, but what does that mean in terms of flight and

1   safety.

2       I didn't see a whole lot in that in the hearing transcript

3   from last time.  I'm sure it wasn't for lack of trying, but I

4   just want to give you -- give each side a chance to address that

5   issue.  Again, not, like, what are the specific diagnoses, what

6   is the status of treatment and so forth, but what evidence is in

7   the record about which way it cuts.

8       Because I think we all understand that, you know, it

9   could -- could cut either way, and that's what I'm trying to

10  sort out as a factual matter.  If there are aspects of the

11  record that address this, please point me to them, but I think

12  that's worth us unpacking today, to the extent we can safely,

13  and if you guys want to go on the sealed record, that's fine

14  with me.  I don't -- I think most of this discussion happened on

15  the open record last time, though.  So that's my question, and I

16  guess I'll pose it first to the government.

17           MS. GREGORY:  Yes, Your Honor.  So the defense's

18  central position is that because the defendant is receiving

19  mental health treatment, he is not a danger to the community.

20  But that conclusion, that mental health treatment means he isn't

21  a danger, relies on assumptions that I don't think there is

22  support for in the record.

23      In order to get there, they need to say one plus two plus

24  three plus four equals ten, and they don't have one or two or

25  four, and so, basically, they're saying three equals ten.

```
 1              THE COURT:  So I appreciate the metaphor.  I do.
 2              MS. GREGORY:  Okay.
 3              THE COURT:  Could you walk me through what --
 4              MS. GREGORY:  Yeah.
 5              THE COURT:  -- the government's view is on, you know,
 6    what are these assumptions?
 7              MS. GREGORY:  Yeah.
 8              THE COURT:  What are the steps that are necessary to
 9    take in order to, in your -- I guess, in your view of the
10    defense's position, and we'll hear from them in a minute, you
11    know, what are the steps in that chain that we're missing?
12              MS. GREGORY:  So they have shown that he is getting
13    treatment, so I would say that is three, but treatment for
14    mental illness alone does not mean that he is not a danger.
15    What they need to show first is that he has a mental illness
16    that existed at the time of his conduct.
17         And then, second, that he -- the attempted political
18    assassination was caused by the mental illness.  And, finally,
19    that his -- the treatment that he is getting is sufficient to
20    ensure that he won't be a danger to the victim in this case or
21    the community at large.
22              THE COURT:  And Judge Lindsay asked a lot about -- or
23    parsed the distinction between evidence regarding the fact that
24    the grand jury, you know, indicted him on versus the question of
25    future dangerousness.
```

1      I take it the government's position on that is because we're

2  talking about sort of an offense that was attempted.  In view of

3  the grand jury's indictment, none of these are established

4  facts, but they're the ones alleged in the indictment, and the

5  offense was not completed, the government's view is that sort of

6  the dangerousness and evidence that goes to the underlying

7  offense is necessarily coterminous with the nature and evidence

8  of future dangerousness?  Am I understanding your position

9  correctly?

10      MS. GREGORY:  Yes.  We think the evidence related to

11  the underlying offense is relevant both to the factor of the

12  weight of evidence of dangerousness and also to the nature and

13  seriousness of dangerness -- dangerousness to any person or the

14  community.

15      And I wasn't exactly sure what was being said at the initial

16  detention hearing, whether it was this idea that we're not

17  supposed to use evidence of the underlying offense or that US v.

18  Stone means there is a prohibition of using evidence of the

19  underlying offense to go to those factors or if it was just the

20  thought that that -- that wasn't sufficient evidence, but if it

21  was the former, then US v. Stone itself clearly uses evidence of

22  the underlying offenses those five defendants were charged for

23  to -- to look at the weight of the evidence of dangerousness and

24  at the nature and seriousness of dangerousness, and other --

25  other district courts in this circuit routinely look at the

1    evidence related to the charged offenses and bo -- analysis of

2    those issues.

3            THE COURT:  I suppose the way to square that -- that

4    equation -- you know, to complete the -- to reconcile that, you

5    know, thought game is to -- is to acknowledge that evidence

6    regarding a crime may be relevant both to guilt or innocence,

7    which we're, obviously, not here to talk about, but the same

8    evidence might also be relevant in a different way to future

9    dangerousness.

10       And Stone would tell us, well, to the extent it goes to

11   guilt or innocence, that's, obviously, not the question before a

12   judge in my shoes, but if that evidence bears on future

13   dangerous -- dangerousness or flight risk, then that would be

14   relevant.  Is that a fair or the best reading of Stone, in your

15   view?

16           MS. GREGORY:  Yes, Your Honor.

17           THE COURT:  Okay.  So you've talked about sort of the

18   absence of links in the evidentiary chain from a mental health

19   condition, its timing, its causality.

20       What about that last link between -- you know, you have

21   someone who has received treatment, and -- and there is -- I

22   think it's fair to say that there is at least some evidence that

23   that treatment is -- you know, has been effective in not -- in

24   preventing, you know, anything else from happening to date.

25       I think Mr. Eggert might say, you know, regardless of what

1    happened at the time of the alleged incident, we're in a

2    different point now, and you have to look forward, under that

3    same sort of mental construct we just discussed, and looking

4    forward, what is relevant is not whether illness caused the

5    shooting, but it's whether a treated illness mitigates the risk

6    of danger to the community.

7        And what does the evidence or lack thereof, from the

8    government's perspective, say about that link in the chain?  You

9    know, we're not dealing with someone who is -- we're not going

10   back in time, months, to that moment.  We're dealing with

11   someone who is in a different point, who has been treated, who,

12   according to the defendants -- the defense counsel, will

13   continue to receive treatment, at least if he is released on

14   home incarceration.  So what do you say about that step in the

15   logic?

16            MS. GREGORY:  So I think the inference there is he is

17   being treated, and he hasn't had issues while he's on home

18   incarceration.  So the lack of -- lack of issues on home

19   incarceration must not meet -- must mean he's not a danger when

20   he is treated.

21       First, I would point out that, you know, it's very rare for

22   people to just -- even people who are very dangerous, to just be

23   committing crimes nonstop all the time, and I think too much

24   emphasis could be placed on the fact that the defendant hasn't

25   committed another act of violence since he was arrested.

1      In an Eastern District case, US versus Randolph, the Eastern

2    District is considering whether a Capitol rioter should be

3    detained, noted there is no evidence that Randolph engaged in

4    violence before or after January 6, 2021, but, again, the Bail

5    Reform Act does not that the defendant has engaged in a certain

6    number of assaults or any other crime to find that he poses a

7    danger to the community if released.

8      It terms of the -- what I think the --

9          THE COURT:  The mental illness --

10          MS. GREGORY:  Yeah.

11          THE COURT:  -- wasn't at --

12          MS. GREGORY:  Yes.

13          THE COURT:  -- issue in that case?

14          MS. GREGORY:  It hasn't been raised yet, but reading

15    that opinion, it might be.

16          THE COURT:  In the opinion -- it was irrelevant to the

17    opinion?

18          MS. GREGORY:  Yes.

19          THE COURT:  I guess one thing that has frustrated me,

20    and I'm sure it has you-all as well, is there seems to be just

21    kind of a dearth of caselaw addressing the -- what seems like

22    the biggest question in front of us, which is which way or how

23    does, you know, a mental illness or putative diagnosis cut in

24    this situation.

25      And are you aware of -- I'm sure you would have cited and,

1    you know, repeatedly if you were, but just to make clear, what

2    do you think is the authority that is sort of most on point,

3    even if it's not right on point, for this question?

4            MS. GREGORY:  So I think we cited some cases in our

5    brief that went to the idea of mental illness resulting in

6    suicidal ideation, and how that can be a basis of detention for

7    both --

8            THE COURT:  Cutting in -- suicidal ideation can be a

9    factor that supports --

10           MS. GREGORY:  Yes.

11           THE COURT:  -- detention?  Okay.  Anything else?

12           MS. GREGORY:  No, not -- not other than that, Your

13   Honor.  I will -- I will point out, as we did in our brief, the

14   psychiatric letters at issue, they don't say that treatment

15   through medication is going to prevent the defendant from being

16   a danger to the victim in this case, himself, or the community.

17     Defendant -- like, the two letters actually highlight, and,

18   actually, the subsequent letter that the defendant filed in --

19   attached to the response, they highlight that his diagnosis is

20   still in flux, and that two months is not enough time for a

21   definitive diagnosis.

22     And it would follow from that, like, even between the first

23   letter and the second letter outlining their treatment, like,

24   you know, his diagnosis and his treatment changed.  So to say

25   that two months is enough time to finalize effective treatment

1    here, and to ensure the defendant is not at -- who has done this

2    extremely violent thing to someone he didn't personally know,

3    and that that is enough -- two months of treatment is enough to

4    ensure that he is not a danger to the victim or the community, I

5    don't think there is support for that.

6         John Hinckley, the man who tried to assassinate Reagan, you

7    know, he was monitored for 30 years before they finally said,

8    you know, "Now we can say he's not a danger."

9              THE COURT:  That was po -- after his responsibility

10   had been established, not before --

11             MS. GREGORY:  Yes.

12             THE COURT:  -- though, right?

13             MS. GREGORY:  Yeah.

14             THE COURT:  Which is an important fact here, right,

15   that --

16             MS. GREGORY:  Well, yes, but in terms of --

17             THE COURT:  -- these are alleged -- you know, the

18   crime is alleged.  It's not -- I don't believe it's admitted.

19             MS. GREGORY:  Uh-huh.

20             THE COURT:  Obviously, the whole -- you know, one of

21   the reasons this question is tricky is because, you know,

22   defendants are both presumed --

23             MS. GREGORY:  Uh-huh.

24             THE COURT:  -- innocent, and we are presumed to retain

25   our liberty, and yet Congress has said there is a subset of

1   crimes, including many that are, you know, not obviously

2   violent, in which we do presume -- we do have a presumption that

3   detention is warranted.  Obviously, that can be overcome, but I

4   think we all recognize that's the rub that makes, as a legal

5   matter, this situation tricky.

6        Okay.  Anything else on the mental condition point?

7             MS. GREGORY:  In terms of the treatment?

8             THE COURT:  Just anything that the government would

9   like to call to the Court's attention.

10             MS. GREGORY:  But -- but, again, on this last point

11   about the treatment, and whether the treatment makes him not a

12   danger, is that --

13             THE COURT:  That or anything else you would like to --

14             MS. GREGORY:  Okay.

15             THE COURT:  -- raise.

16             MS. GREGORY:  I mean, I guess I'd kind of like to go

17   back to the first two points and the first two underlying

18   assumptions.

19             THE COURT:  Sure.

20             MS. GREGORY:  We -- you know, at the hearing, the --

21   what I think they proffered for -- or not -- you know, what they

22   introduced to support the assertion, you know, that he was

23   suffering from mental illness at the -- at the time of the

24   conduct, and that it caused his conduct was basically testimony

25   from a number of people who knew him, though they hadn't had

1  significant recent contact with him, who basically said, you

2  know, this is so out of character, something mentally had to

3  happen here for this to have happened.

4      But many of these people hadn't seen the defendant in quite

5  some time.  I think the -- Ricky Jones, who Judge Lindsay

6  appointed as a third-party custodian, hadn't seen him since

7  spring of 2020.  And I believe Monique Williams was the one who

8  had had the most recent contact.  She ran into him at an event

9  in January of this year, but it was -- it was just a passing

10  contact.

11      First, given the time gap between the assassination attempt

12  and the last time the defendant had seen many of these people or

13  had significant contact with them, it's not something -- it's

14  not impossible that something changed that was not borne of

15  mental illness.  Something that made him angry enough to want to

16  engage in what he viewed as an act of revolution.

17      You know, I don't want to get into a debate on political

18  discourse, but, you know, we submitted Exhibit B, because this

19  is sort of in a timeframe of when all of this is going on, and

20  he puts forth these ideas that democracy is ineffective, voting

21  is ineffective, and people need to make their own choice about

22  how to get rid of outdated programs and the modalities that

23  aren't helping the people.

24      You know, this was a really well-written piece, and it

25  wasn't the process -- it wasn't the product of disorganized

1    thought.  And the people who testified on behalf of the

2    defendant at the last hearing, at least two of them both agreed

3    that the views he expressed there were consistent with long-held

4    rational views that, you know, he had in a time where, you know,

5    they didn't think he was suffering from any mental illness.

6        And then two days after he writes that piece and posts it,

7    he buys a gun.  And he doesn't shoot someone at random.  He

8    doesn't go into a store or a school or something and open fire.

9    He seeks someone specific out, and it's someone that he views as

10   someone who is responsible for gentrification, which he's very

11   much against, and someone who's part of what he views as

12   systemic problems, and he commits an act of violence based on

13   these long-held rational views.

14            THE COURT:  So is your -- sorry to interrupt, but --

15   so, I guess, you might say not conceding, but the government is

16   not accepting that's -- mental illness is a part of this?  Your

17   position is that -- because I think one of Mr. Renn's filings

18   made that point, which I, actually, didn't take to be the USA's

19   position.  I thought it was more that even if there is mental

20   illness involved, that doesn't cut the way the defense says,

21   because it can actually increase the risk of flight or

22   dangerousness, and you pointed to the New York incident.

23       But, I guess, does the -- not to -- we're not putting you to

24   your proof, really, right now, but just, like, should I

25   understand your position as, actually, there's not a mental --

1   there's not evidence of mental illness that sort of cuts in his

2   favor in -- there's not evidence of mental illness at all at

3   this stage of the proceeding or, you know, there is, but it cuts

4   the other direction, or even assuming there is, it cuts the

5   other direction?

6         MS. GREGORY:  Well, I would say that to the extent

7   there is, we've, obviously, been arguing that it cuts in the

8   other direction.  I mean, we're not going to dispute these

9   letters.  We don't have the same access to the defendant or, you

10  know, his -- the underlying medical records.  Like, they have

11  these letters with these diagnoses.  You know, these are real

12  doctors.

13     But what we're disputing is this idea that this caused the

14  conduct, because of the premeditated nature of it, and also the

15  fact, you know, it followed careful planning.  It wasn't some

16  sudden snap.

17     And, you know, we've talked to people who had more

18  conduct -- more recent contact with the defendant during this

19  time period, and, you know, I mentioned this at the -- at the

20  prior detention hearing, but, you know, his roommate was playing

21  video games with him two nights before the shooting, which would

22  have been the middle of the period -- if you're looking at the

23  defendant's search history, the middle of the period where he's

24  planning all this.  Then he had normal text exchanges with his

25  mom and his girlfriend an hour before he went to buy, you know,

1    the second gun on the day of the shooting.

2        You know -- you know, as you pointed out at the beginning,

3    no one -- we're not mental health experts.  I am not purporting

4    to be one, but I have prosecuted cases involving people with,

5    like, severe mental illness, including people who have shot

6    people as a result or related to severe mental illness, and

7    individuals at least who have long-term or what I have seen,

8    and, again, these -- these people have generally been people who

9    have long-term diagnoses of schizophrenia or something, and I

10   understand that this diagnosis for the defendant is relatively

11   not.

12       But in the cases that I've seen, it's rare for severely

13   mentally-ill people to be holding it together, I guess, in front

14   of other people, and for other people not to be aware of, you

15   know, their delusional beliefs or the plans, and it's also

16   somewhat rare for the first out-of-the-box violent event to be a

17   targeted act of violence against someone they didn't know as

18   opposed to harm to themselves or others.

19               THE COURT:  Right.  Seems like your stronger point is

20   that, even assuming mental illness, this isn't -- we're not

21   talking about a sort of totally random act that was abhorrent

22   and, therefore, would be, you know, no more likely to happen

23   again in the future than any other act.  This was something

24   that, regardless of its motivation, mental causation, was

25   planned, directed, rationally executed.  I guess, is that --

1          MS. GREGORY:  Yes, Your Honor.

2          THE COURT:  -- a fair summation?

3          MS. GREGORY:  And consistent with long-held beliefs he

4     had.

5          THE COURT:  Okay.  The last question I had was I

6     believe you raised this in -- well, I can't remember if it was

7     in the brief or in the last hearing, but this question of the

8     missing second weapon.  Has anything changed on that?

9          MS. GREGORY:  No.  No, Your Honor.  We know that HIP

10    did search the grandma's home, at some point, and it wasn't

11    found there, but we haven't been able to locate it any other

12    place.

13         THE COURT:  Okay.  And, in the government's view, that

14    increases the risk of dangerousness, because there is a weapon

15    that he allegedly did -- or evidence shows he had access to, at

16    some point, and may still.  I guess, is that the upshot, from

17    your perspective?

18         MS. GREGORY:  Yes, Your Honor.

19         THE COURT:  Okay.  All right.  Anything else?

20         MS. GREGORY:  No, Your Honor.

21         THE COURT:  Okay.  Defense.  Can we just start with

22    the -- this question of mental health evidence and caselaw in

23    terms of the direction in which this cuts?

24         Because, I mean, it strikes me that from a defense lawyer's

25    perspective, this is a particularly tricky issue, because it may

1    cut in a different direction in terms of guilt and innocence

2    than it might at the detention stage, and I'm just -- I guess

3    first, I would ask if there's any other law that you'd like to

4    sort of underscore in light of the conversation I just had with

5    the prosecutor, and then, after that, in terms of the -- well,

6    the evidentiary chain -- chain is how the government

7    characterized it, but, you know, the evidence that's actually in

8    the record that speaks to not just, you know, whether there is a

9    diagnosis or a putative diagnosis, but what that may mean as a

10   matter of fact in terms of future flight and safety risk.

11        MR. EGGERT:  Your Honor, regarding the mental illness,

12   they've offered, I don't think, any case that says that if a

13   defendant is suffering from mental illness, that that favors

14   detention or locking him up.

15        THE COURT:  I don't think they have either, and I

16   don't think the government has suggested as much.  I'm just

17   curious if you have caselaw that points the other direction.

18        MR. EGGERT:  No.  But as Judge Lindsay pointed out,

19   this Adding versus Texas -- this Addington versus Texas is a

20   civil commitment case.  This has absolutely nothing to do

21   with --

22        THE COURT:  I agree.  I agree with you.

23        MR. EGGERT:  Yes.  So there's really nothing says if

24   you're mentally ill.  Second, Your Honor, I point out that the

25   government is using mental illness both ways.  It's not -- it's

1    not saying he's mentally ill.  They don't say that.  They

2    haven't said that yet.  In fact, if you look at, I think, their

3    reply on page 4, they talk about -- they say that letters do not

4    express the opinion, the psych -- psychiatric letters, hat the

5    defendant was suffering from these disorders, so forth, and they

6    talk about the letters provide no information as to tests to

7    determine if the defendant is malingering.

8        So on the one hand, they -- they are telling you, well, gee,

9    he -- this all may be feigned.  On the other hand, they're

10   saying but if it's not feigned, hold it against him anyway and

11   keep him in jail.  I also would take exception, Judge, to the

12   idea --

13           THE COURT:  That's -- may I just follow up on that

14   point?

15           MR. EGGERT:  Yes.

16           THE COURT:  Because I think it's an important one, and

17   that's why I tried to tease it out --

18           MR. EGGERT:  No.  That --

19           THE COURT:  -- from your --

20           MR. EGGERT:  Yes.

21           THE COURT:  -- friend on the other side.  I agree with

22   you that there's no sort of clear position on one way or the

23   other.  At the same time, I don't know if that's, you know,

24   dispositive against the government, because it is possible that,

25   like, a diagnosis remains uncertain, and there could be a risk,

1    whether it is malingering or whether it was, you know, abhorrent

2    and rational or whether it's an accurate diagnosis and final.

3        All of these things could be true, and I don't think anybody

4    sitting here at counsel table, and certainly, not on this side

5    of the table, knows the answer, and that's why I'm trying to

6    press so hard on.  So we have this, at least, evidence, right,

7    of a mental condition --

8            MR. EGGERT:  Yes.

9            THE COURT:  -- and that treatment.

10            MR. EGGERT:  Yes.

11            THE COURT:  And what I'm really looking for is, okay,

12    what in the record gets us that last step or that next step in

13    terms of, okay, and, you know, assuming this diagnosis, assuming

14    this treatment, that means we're safer -- we're at less risk of

15    flight, which I know is your position, and I'm just -- I want

16    you to -- I want to make sure I understand the facts in the

17    record that support it.

18            MR. EGGERT:  Your Honor, when he went to Our Lady of

19    Peace, they would have the -- have had the right to keep him,

20    and, in fact, they would have had the right to commit him.  All

21    right.  For up to -- for -- for up to a year under state law.

22    And they further had the duty not to release him if he thought

23    they posed -- he posed a continuing danger to the public.

24        And they released him after a period of time, but they only

25    could do that, the medical professionals did, if they believed

1   he was not a danger to the community.  That's --

2          THE COURT:  Is there any finding or report to that

3   effect?  I understand your point that, look, if you're a

4   mandatory reporter, and you let someone go anyway, we can infer

5   that you didn't think this person was a danger, but I'm just

6   curious if that's ever said.  In black and white, anyway.

7          MR. EGGERT:  Well, it's not said in black and white,

8   but Dr. Chhibber, they -- Our Lady of Peace took responsibility,

9   medical responsibility for releasing him.  And when they did

10  that, Judge, they released him not to law enforcement.  They

11  released him to his grandmother, because he was free, at that

12  point -- point.  He had to return to HIP, but he was not taken

13  there or returned there by law enforcement.

14      So they made the decision that through treatment, he was not

15  a danger, and on that basis, they released him with continued

16  treatment.

17      I would point out too, Your Honor, that if and when he

18  returned, he continued to get psychiatric treatment and therapy,

19  and if the mental health professionals had believed he was a

20  danger, either to himself or anyone, they could have had him

21  recommitted, and would have had a duty to report that.

22      In addition, there has been, I think, a significant time.  I

23  mean, you know, this -- this treatment began very quickly.  It

24  began in January, I think January 18th, and he was -- February,

25  March, and into -- into April, was getting treatment every day

1    and medication.  And these mental health professionals, if they

2    thought he was dangerous, surely would have notified or done

3    something about it.

4        In fact, they thought just the opposite.  That his situation

5    was completely under control and manageable, along, of course,

6    with the other conditions there on home incarceration.

7            THE COURT:  In terms of the medication, and, again, I

8    don't want -- I want to tread lightly here, but is there

9    evidence in the record that indicates, you know, oh, we -- the

10   medical professionals believe that, you know, X condition

11   existed beforehand.  We have diagnosed it.  Now, we have

12   prescribed, you know, drug Y, and we believe this will, you

13   know, bring about a change in behavior, mental state, risk?

14       I'm not aware of anything as specific, I'm not saying it's

15   your burden to have it, but, obviously, that would be really

16   important to know, and my understanding of the evidence is that

17   we're a degree or two removed from that, in terms of, you know,

18   there is a treatment plan.  We're in a different place now than

19   we were, but nothing at the level of specificity that I just

20   described.

21           MR. EGGERT:  Well, Dr. Chhibber, upon the release,

22   gave his discharge diagnosis, and that he also outlined his

23   discharge medications that he should take, and how much he

24   should take, and how many milligrams and so forth, and,

25   obviously, they did that -- I'm not a mental health expert

1    either, obviously -- but to control -- to make sure that his

2    mental health was not impaired.

3        And they -- I don't think that he would have had him on

4    these various medications absent the strong belief and evidence

5    at Our Lady of Peace that this -- these medications would help

6    the defendant, improve him, make the community safe.  I mean, he

7    doesn't say so in this letter, but I don't know that any

8    psychiatrist would.  This is the discharge.  This is what we

9    treated him for.  These are the medications he should take.

10            THE COURT:  Okay.  I understand.

11            MR. EGGERT:  And, Judge, I don't think any

12   psychiatrist would say, "And from now on, everything's perfect

13   for the fu" -- I mean, you know, they're not going to say that.

14   They -- their actions speak louder than words, and that's

15   releasing him.

16            THE COURT:  I understand, and, look, please don't take

17   any of my questions as a signal that, you know, if evidence of

18   such-and-such doesn't exist, then that's dispositive.  I'm just

19   doing my best to understand --

20            MR. EGGERT:  Yes, sir.

21            THE COURT:  -- exactly what to make of the record in

22   front of us.  Could you -- if you're ready to move on from the

23   mental health point, I am curious what the defense would say in

24   response to this point about the missing second gun.

25            MR. EGGERT:  Well, Judge, it certainly isn't

1    anywhere -- I have no access or knowledge of any second gun, but

2    assuming there is a second gun, the defendant has no access to

3    it.  That's -- he's on HIP at his grandmother's, subject to

4    searches, and HIP made home visits.  There is no weapon in the

5    home.

6        Of course, pretrial would do another visit, make sure

7    there's no weapon, but his mother has no -- his grandmother,

8    Tonya Hyde, has no weapon, would have no weapon.  He has no

9    access to that weapon.  I know nothing about a second weapon.

10       And the idea, Judge, that he could slip out of the house

11   with GPS monitoring and somehow go to a second weapon, but who

12   knows where it is, I think, again, the standard is reasonably

13   assure.

14       Nothing can prevent anyone, I guess, from doing something,

15   if that's -- if that's the case, but I think the second weapon

16   is really a red herring.  Where he is, and the only place he

17   would be, there is no weapon.  His, his grandmother's,

18   anybody's.

19            THE COURT:  Yeah.  I guess another difficulty of this

20   case and just this situation, in general, is, you know,

21   obviously, if someone stays home and does the right thing, then

22   none of this matters, right?  And so, necessarily, we have to

23   think about not just the best-case scenario but also the

24   worst-case scenario, which would be, you know, if someone,

25   obviously, doesn't adhere to the terms of confinement.  So I

1   understand what you're saying.  I'm just trying to get the

2   complete picture.

3       Okay.  Anything else the defense would like to raise?

4           MR. EGGERT:  Yes.  Yes, Your Honor.  If you look at --

5   and the United States has -- and I think in this case too is not

6   dismissive but, certainly, not impressed by state court, but,

7   you know, their standards of release are very similar to here.

8   They don't have no bond, except in a death case, but they can

9   impose and do million-dollar bonds.

10      Every judge who considered the case thought that this man

11  should have a bond and be released.  All right?  Judge Karem set

12  a bond.  Judge Ryan released him to his family to get treatment.

13  Judge Langford continued the bond when the case was sent to the

14  grand jury.  Judge Cunningham continued the bond when he was

15  indicted.  And then Judge Lindsay looked at everything in the

16  world and every single factor and weighed them all and said yes,

17  he should be released.

18      So, honestly, there has been at least four judges who have

19  already looked at this.  I know it's a de novo review, I get

20  that, but I think that that's -- that's important.

21      In addition, Your Honor, if you look at the timeline of

22  this, everything he's done has shown that what the -- what Judge

23  Lindsay did was -- was correct.  He gets out the 16th of

24  February.  He then, you know, immediately gets mental health

25  treatment through Zoom.  He obeys HIP.  He's on GPS.  All the

1    things that Judge Lindsay has ordered.

2         He then goes to Our Lady of Peace.  He gets inpatient

3    treatment.  He returns -- his family returns him to HIP.

4    Lampkins, Kevin Lampkins said he went right to Peace, and when

5    he was released, he went right home.  He continues there on home

6    incarceration.  There has been no violation.  He hadn't even

7    been on the porch.  He continues to get treatment.  He's

8    indicted.  He has -- appears in court.

9         And then finally, Your Honor, Judge Lindsay's conditions are

10   even more stringent, and I think this is an important point.

11   Not only do you have all the family and community support, but

12   Dr. Jones is here again.  And I don't think it should be lightly

13   disregarded that a person who's a faculty member for 26 years

14   and an active member in this community, a prominent member in

15   this community, has said, "I'll be the second custodian," and

16   has even said, "He could go to my home."

17        And I don't know how many more conditions than two

18   custodians, pretrial, home incarceration, GPS, and a condition

19   of continued mental health treatment, when you show you can obey

20   all those things, those reasonably assure the safety, they

21   reasonably assure his appearance, they reasonably assure

22   everything, and that's why Judge Lindsay ruled as he did.

23             THE COURT:  Well, I assure you we're not going to

24   lightly disregard Dr. Jones' involvement or that of any of the

25   other witnesses or custodians.  Obviously, that's a serious and

1    noteworthy and laudable part of the case, I assure you.

2        As you know, a lot of -- a lot of defendants come through

3    this courthouse and, as I mentioned earlier, are accused of

4    crimes that are not violent.  And I know you-all have done --

5    the defense has done an outstanding job of drawing out the many

6    admirable aspects of Mr. Brown's past.  But there, as -- I mean,

7    again, as you know, there are many people who come through here

8    and who have aspects of their characteristics and history that

9    are remarkable too.

10       Do you have any authority in law, any examples that you

11   would point to in terms of someone who is, you know, not a --

12   involved in a drug offense but nonviolent, not that was involved

13   in a gun offense but was not -- nonvi -- but was nonviolent, but

14   any -- an alleged act of this, you know, significance and

15   dangerousness who was, nevertheless, released pretrial?

16           MR. EGGERT:  Judge, it happens every day.  It's so

17   rare that they take a case like this to federal court.  All

18   right?  Quintez Brown is in state court.  People are released on

19   bonds.

20           THE COURT:  I under --

21           MR. EGGERT:  And that happens every day.

22           THE COURT:  I understand --

23           MR. EGGERT:  Yeah.

24           THE COURT:  -- and that state court proceedings are,

25   perhaps, more analogous here.  They are not irrelevant, but

1   there's also a different standard than the one that's in front

2   of me regarding flight and dangerousness to others and to the

3   community.  And so I'm just curious if there is an example in

4   federal court that you believe is particularly telling or

5   illuminating here.

6         MR. EGGERT:  I don't have one offhand except, Judge,

7   as you know, many, many, I think a majority of the January 6th

8   defendants are released, and they're not released with

9   third-party custodians or Ricky Jones, and they're accused of

10  impeding an election, trying to overthrow an election.

11        THE COURT:  But aren't -- but any of them, including

12  the detention ruling that the government cited, yes, some are

13  out, but some are in, right, and --

14        MR. EGGERT:  But many are out.

15        THE COURT:  To your point --

16        MR. EGGERT:  Yeah.

17        THE COURT:  -- you know, different judges in different

18  jurisdictions can reach different conclusions based on the facts

19  here.  So I take your point that there are a lot of people

20  who -- who do remain free.  That's, obviously, for most crimes,

21  though not this one, the presumption in our federal system.

22        MR. EGGERT:  But those were crimes of violence.  Some

23  of those people are charged with violent acts.  January 6th,

24  police were assaulted.

25        THE COURT:  But you're not taking a position that the

1    judge has said this was a case of presumptive detention, and our

2    analysis is that he or she should be released for reasons that

3    bear on this case, are you?

4              MR. EGGERT:  Oh, no.  There were crimes of violence,

5    Judge, and people are released.  I can't say what the government

6    argued --

7              THE COURT:  Okay.

8              MR. EGGERT:  -- or anything like that.

9              THE COURT:  It just seems a bit far afield from this.

10   I take your point.  Okay.  Anything else?

11             MR. EGGERT:  Yeah.  Judge, I understand, and we've

12   said from the beginning that we recognize that this is a serious

13   case, and they could have drafted a statute that says, "If

14   you're charged with this, you shall be detained," and they

15   don't, and they didn't, and I think under the law, he's -- he

16   should be released.

17      That's -- that's the -- if their -- if their argument wins,

18   it's, essentially, a mandatory detention.  If you're charged

19   with this, you should be in.  Because every other factor here

20   favors Quintez Brown, and the community is, certainly,

21   supporting him, the custodians are, the families are, and he

22   showed everybody that he can do what he's supposed to and has

23   done that since his release.

24             THE COURT:  What would you say to the -- and sorry, I

25   should have asked this earlier, but the New York incident

1   earlier, that seems, at least, relevant to the flight question.

2        What's your -- and I know -- I know your first response is

3   going to be, "Well, he's on home incarceration, and so that

4   can't happen again," but, again, assume -- I think we have to

5   think about both a best-case and the worst-case scenario here,

6   and wouldn't that aspect of the record be relevant, in

7   particular, on the flight point?

8             MR. EGGERT:  You know, Judge, I think the only way it

9   might possibly be relevant is I think it shows he's -- he is

10  struggling -- you know, struggling with mental health -- mental

11  health and emotional issues.  Other than that, he wasn't --

12  there was -- he was not charged with anything.  All right?

13  He -- there was nothing wrong with him going to New York and

14  sleeping on park benches.

15       And I think the Court could be concerned about flight, but

16  when you look at the record of this case and see his grandmother

17  driving him to and from Our Lady of Peace, I think that rebuts,

18  and I think even the government has lightened up on the flight

19  issue, because there's just no evidence that he's going to flee.

20            THE COURT:  Okay.  Thank you.

21            MR. EGGERT:  Thank you.

22            THE COURT:  Any response for the government?

23            MS. GREGORY:  On that issue particularly or just

24  generally?

25            THE COURT:  Just anything that you didn't address the

1    first time that came up in the defense's response that you'd

2    like to reply to.  I'm not asking you to cover ground we've

3    already trod, but if there's anything new that you didn't speak

4    to already, you certainly can.

5           MS. GREGORY:  Well, just -- just on your question of

6    other people who have been charged with -- with something like

7    this and not detained.  I mean, with this particular charge,

8    it's a very, very rare charge.  There aren't many people,

9    period, who have been charged with it.

10   Certainly, the last one who was charged under 245(b)(1)(A),

11   I think, with attempt to kill and with actual killing was Jared

12   Loughner, I believe, and, obviously, he was detained pretrial,

13   and he -- you know, he also had mental health issues.

14   And I think that if the defendant's aim had been a little

15   better, if he had adjusted by an inch or so, then this would be

16   a murder case and not an attempt-to-kill case, and I think if

17   that was true, you know, there would be no question about

18   detention, but the reason that this is not a murder case is --

19   has nothing to do with the factors in front of this Court under

20   3142.

21   It doesn't have an impact on, you know, any -- any of the

22   numera -- or enumerating factors, because, you know, firearm

23   proficiency isn't something to take into consideration.

24   So, you know, at the -- at the detention hearing, I think,

25   you know, defense and maybe also Judge Lindsay said that the

1 government was giving a nod to these other factors but really

2 focusing on the evidence of the crime here.  I feel like there's

3 just a nod to the seriousness of the defense from the other

4 side, because, you know, the victim in this case wasn't killed,

5 and because of that, they feel at liberty to, you know, attack

6 the victim at press conferences, try to file motions to mess

7 with the victim, and --

8    THE COURT:  Well, none of that is really relevant to

9 my decision today, is it?

10    MS. GREGORY:  Well, I think what's not relevant is --

11 in terms of the analysis, is that he wasn't killed.  I think

12 that it's the same analysis --

13    THE COURT:  Your position is that the fact that there

14 was -- this was an attempted crime, in your view, means there

15 may be a greater risk of further criminal activity, because, as

16 you put it, the shot missed.  Not that the fact that this is an

17 attempt rather than a murder charge actually makes it any safer.

18 In your view, it means --

19    MS. GREGORY:  Yes.  That's my point.

20    THE COURT:  -- it's more dangerous.  I don't think

21 the -- anything to do with press conferences and motions really

22 bears on that, does it?

23    MS. GREGORY:  I think it's how this case is being

24 treated differently because it's an attempt versus a murder, and

25 I think it highlights the point.  But if Your -- if Your Honor

1    doesn't agree, then --

2          THE COURT:  All right.  Just seems a bit far afield

3    from the evidence in front of us.  Okay.  Is there anything else

4    before we adjourn?  I'll tell you I'm not prepared to rule

5    today.  I appreciate the careful arguments, the respectful,

6    insightful points made by both sides, and I will expect to issue

7    a written decision.

8      I know we have a status conference set for May the 5th, at

9    this -- I certainly will -- I have no doubt that a decision will

10   issue before then, but, you know, we may -- we may or may not

11   need that conference, given -- given where things stand, because

12   I know I have these two other outstanding motions that we'll

13   address regardless of the decision on the detention question.

14         MR. EGGERT:  Judge, I'd like to respond to one thing

15   they -- they said.  Two things.  One, they said, well, it could

16   have been a murder, but it's not.  In court, obviously, we deal

17   with what is.  Okay?  There's many things that could have been.

18   Any drunk-driving case could have been, but it's not.

19     The second thing is when they said we filed motions, we've

20   had press conferences.

21         THE COURT:  I told her that I don't see that's

22   relevant.  Okay?  So I don't even see any need to go there.  If

23   you want to make your point, I'm not cutting you off, but I

24   don't know that it's necessary, because --

25         MR. EGGERT:  I understand what you're saying, but

1    we're going to defend the man, Judge, and if they -- that seems

2    to be what they don't like.

3              THE COURT:  Well, my only point is your defense is

4    when there is a jury in the box instead of me making a detention

5    hearing may be different --

6              MR. EGGERT:  I understand.

7              THE COURT:  -- but I don't view that's relevant here.

8    Okay?

9              MR. EGGERT:  Okay.

10             THE COURT:  All right.  Would you-all prefer to

11   convert the status conference set for next week to a hearing to

12   discuss the motions to dismiss or would you -- would each side

13   like me to just take those on the papers?

14             MR. EGGERT:  Judge --

15             MS. GREGORY:  Your --

16             MR. EGGERT:  Go ahead.

17             THE COURT:  I may make you -- I may make you come

18   argue it regardless, but I just thought I'd ask, since we're all

19   here, what the parties' position was.

20             MR. EGGERT:  Go ahead.  We would like to argue it,

21   and, honestly, I'm not going to be here next week, but if you

22   want to have it, Mr. Renn can certainly argue it or we'll do

23   whatever you want.

24             THE COURT:  Okay.  Thank you.

25             MS. GREGORY:  I'm not -- I don't know if they are

 1   planning on filing replies, but I'm not sure that the 5th is --

 2   I think that might be before the reply is due.

 3           THE COURT:  Are you planning to file replies?

 4           MR. EGGERT:  I'll have to ask people smarter than I

 5   am, Judge, but yeah, probably.

 6           THE COURT:  Okay.  I think you probably should.

 7           MR. EGGERT:  Okay.

 8           THE COURT:  All right.  So we'll figure out what to do

 9   the 5th after we get past this stage.  Okay.  Anything else

10   before we adjourn today?

11           MS. GREGORY:  Nothing from the United States, Your

12   Honor.

13           MR. EGGERT:  No.  Thank you.

14           THE COURT:  All right.  I'd like to thank everyone who

15   attended today.  I'd like to thank the lawyers and parties for

16   your respectful attention and arguments, and with that, we will

17   adjourn, and, like I said, I'll aim to get a decision out very

18   soon.  Thank you all.  Have a good day.

19       (Proceedings concluded at 4:03 p.m.)

20                 C E R T I F I C A T E

21     I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM

22   THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

23

24
         _____s/Rebecca S. Boyd_____        May 2, 2022____
25   Official Court Reporter                       Date