UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

UNITED STATES OF AMERICA

v.                                                                                                No. 3:22-cr-33-BJB

QUINTEZ O. BROWN

\* \* \* \* \*

## OPINION & ORDER

Congress authorized the federal government to detain criminal defendants before trial if necessary to ensure their appearance in court and protect the community. Although release before trial is the norm for most offenses, detention is presumptively appropriate for defendants accused of a class of serious crimes. 18 U.S.C. § 3142(e). Last month, a federal grand jury indicted Quintez Brown for such an offense: using a gun to interfere with Louisville's upcoming mayoral election by attempting to shoot a candidate.

The facts before the Court at this early stage confirm Congress's presumption that detention is necessary. Brown, a 21-year-old student, achieved an impressive record of academic achievement, local journalism, and community engagement during his first 20 years. Since June 2021, however, his course has changed dramatically, as the testimony of his mentors and friends readily acknowledged. Brown suffered an onset of apparent mental illness, disappeared for 11 days, triggered a community-wide search, and turned up sleeping on a bench in New York City. Earlier this year, his actions became graver. Brown bought a gun, practiced firing it, and searched for information regarding a Louisville mayoral candidate's family and address. He traveled at night to the candidate's house, where his weapon apparently jammed. The next morning—Valentine's Day 2022—Brown bought a second gun, entered the candidate's campaign headquarters, and fired six shots into a room of five people. One shot tore a hole through the candidate's sweater. Fortunately, no one suffered any physical injury.

This evidence indicates Brown is a threat to flee and a threat to others in the community. If the Court accepted the invitation to release Brown to home confinement, no set of conditions could reasonably ensure he wouldn't again leave the state or threaten the safety of the candidate or others in the community. The alleged crime remains incomplete, the campaign remains in full swing, the first gun remains unrecovered, and the implications of Brown's current mental health—despite treatment and medication—remain inconclusive at best. On this basis, the Court

1

grants the United States' appeal, revokes the Magistrate Judge's release order, and orders Brown's continued detention.

To be clear, the evidence the parties have thus far put before the Court does not bear on Brown's guilt or innocence. That question is for a jury to answer. Nor does today's decision turn on the many sympathetic and sensational aspects of this case highlighted by the prosecutors and defense lawyers alike. The events underlying this prosecution are undoubtedly tragic—for Brown, for the victims, for each side's loved ones, and for the already-strained city of Louisville. Rather, the question today relates only to flight and safety. Both considerations confirm Congress's presumption in favor of detention during the limited period of time before Brown's trial, which the law ensures will occur in a speedy and public manner.

### THE CRIMINAL PROCEEDINGS AGAINST BROWN

After the shooting, police officers arrested Brown a few blocks from the campaign headquarters. The Commonwealth of Kentucky charged him with attempted murder and wanton endangerment, and those charges remain pending. Def's Ex. 2. A state-court judge ordered him detained subject to a $100,000 cash bond. After Brown made bail, he stayed at his grandmother's house on home monitoring, attended a 9-day mental-health inpatient treatment program, and returned to his grandmother's home while continuing to receive treatment. *See* Hearing 1 (Apr. 15, 2022) Transcript (DN 24) at 25:7–24.

Four weeks later, on April 6, a federal grand jury indicted Brown for interfering with "federally protected activity" (the mayoral election), 18 U.S.C. § 245(b)(1)(A), and using a firearm during and in relation to this criminal interference, § 924(c). Indictment (DN 1) at 1–2. Federal agents arrested him the next day. DN 9. Since then, he's remained in federal custody. In response to his motion for release, the Magistrate Judge held a thorough evidentiary hearing that included testimony from several witnesses. DN 23. The Magistrate Judge ruled from the bench, ordering Brown's release to home incarceration subject to monitoring by federal authorities and two third-party custodians, among other conditions. Hearing 1 Tr. at 141–42.

The Magistrate Judge stayed his release order, however, pending this Court's consideration of the government's appeal. *See* 18 U.S.C. § 3145(a)(1); Hearing 1 Tr. at 141–42. After additional briefing, further evidentiary submissions, and a second hearing, this Court considered the question of pretrial detention de novo. *See, e.g., United States v. Carter*, No. 1:20-cr-62, 2021 WL 687858, at *2 (S.D. Ohio Feb. 23, 2021) (collecting cases supporting district judges' de novo review of pretrial-release orders).

2

## THE BAIL REFORM ACT

The U.S. Supreme Court upheld the constitutionality of the Bail Reform Act, whose provisions govern this dispute, in *United States v. Salerno*, 481 U.S. 739 (1987). Pretrial detention, the Court underscored, "is regulatory, not penal." *Id.* at 746. And the rules limiting its imposition embody Congress's reconciliation of competing interests in personal liberty, the integrity of the judicial process, and community order:

> Responding to the alarming problem of crimes committed by persons on release, Congress formulated the Bail Reform Act of 1984, 18 U. S. C. § 3141 *et seq.*, as the solution to a bail crisis in the federal courts. The Act represents the National Legislature's considered response to numerous perceived deficiencies in the federal bail process. By providing for sweeping changes in both the way federal courts consider bail applications and the circumstances under which bail is granted, Congress hoped to give the courts adequate authority to make release decisions that give appropriate recognition to the danger a person may pose to others if released.

*Id.* at 742 (internal citations and quotation marks omitted). The *Salerno* opinion went on to describe the Act as a limited and regulated solution tailored to a specific concern:

> The Bail Reform Act … narrowly focuses on a particularly acute problem in which the Government interests are overwhelming. The Act operates only on individuals who have been arrested for a specific category of extremely serious offenses. 18 U. S. C. § 3142(f). Congress specifically found that these individuals are far more likely to be responsible for dangerous acts in the community after arrest. Nor is the Act by any means a scattershot attempt to incapacitate those who are merely suspected of these serious crimes. The Government must first of all demonstrate probable cause to believe that the charged crime has been committed by the arrestee, but that is not enough. In a full-blown adversary hearing, the Government must convince a neutral decisionmaker by clear and convincing evidence that no conditions of release can reasonably assure the safety of the community or any person. 18 U. S. C. § 3142(f). While the Government's

3

> general interest in preventing crime is compelling, even this interest is heightened when the Government musters convincing proof that the arrestee, already indicted or held to answer for a serious crime, presents a demonstrable danger to the community. Under these narrow circumstances, society's interest in crime prevention is at its greatest.

*Id.* at 750 (citations omitted).

Judges, the Supreme Court emphasized, are "not given unbridled discretion in making the detention determination." *Id.* at 742. Rather, the Bail Reform Act includes numerous protections and procedural requirements applicable to defendants, prosecutors, and judges. Three of those instructions guide this Court's resolution of the government's appeal in this case.

*First*, the government generally may detain a defendant pending trial only if "'no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of other persons in the community.'" *United States v. Stone*, 608 F.3d 939, 945 (6th Cir. 2010) (quoting 18 U.S.C. § 3142). Either finding—flight risk or community danger—can support detention. Two different evidentiary standards apply to the two findings: a preponderance of the evidence regarding the risk of flight, but clear and convincing evidence regarding the safety of the community. *See United States v. Namer*, 238 F.3d 425, *1 (6th Cir. 2000) ("the government need only demonstrate the risk of flight by a preponderance of evidence"); *United States v. Hazime*, 762 F.2d 34, 37 (6th Cir. 1985) (distinguishing the two standards). Unless a judge makes at least one of the two determinations, "a defendant should be released pending trial." *Stone*, 608 F.3d at 945.

*Second*, if a "judicial officer finds that there is probable cause to believe" a defendant committed a specified violent felony—a list that includes the interference charge against Brown—Congress imposes a presumption in favor of detention. 18 U.S.C. § 3142(e)(3) (citing § 924(c) as a qualifying felony). The presumption applies here because the grand jury's indictment establishes probable cause to believe the defendant committed the felony. *Stone*, 608 F.3d at 945; *Gerstein v. Pugh*, 420 U.S. 103, 117 n.19 (1975). In this case, therefore, the law "presume[s] that no condition or combinations of conditions will reasonably assure the appearance of the person as required and the safety of the community." *Id.*

A defendant may rebut that presumption with evidence that he is neither a danger to the community nor a flight risk. *Stone*, 608 F.3d at 945. This burden of production is light: any "favorable information about [the defendant's] character and criminal history" and the testimony of "character witness[es]" may suffice. *Id.* at 947; *see United States v. Foster*, No. 20-5548, 2020 WL 6791572, at *2 (6th Cir. July 20,

4

2020) (the "burden of production is not heavy"). Brown introduced character evidence, discussed below, that easily clears this slight burden.

Making this showing, however, doesn't mean the presumption in favor of detention simply disappears. Instead it becomes one of several factors the court must weigh. *Stone*, 608 F.3d at 945. That is because the presumption is not just an "evidentiary tool" for courts to use, but also "reflects Congress's substantive judgment that particular classes of offenders should ordinarily be detained prior to trial." *Id.*; *United States v. Johnson*, No. 20-5572, 2020 WL 9813540, at *1 (6th Cir. Aug. 6, 2020). In this circumstance, the legislature "intended magistrates and judges, who typically focus only upon the particular cases before them, to [also] take account of the more general facts that Congress found." *United States v. Fortna*, 769 F.2d 243, 251 (5th Cir. 1985).

*Third*, even if a crime that carries a presumption of detention is at issue, the Government bears the ultimate burden of persuasion. It must show by a preponderance of the evidence that no conditions can "assure the appearance of the defendant," *Namer*, 238 F.3d at *1, or by clear and convincing evidence that no conditions can "assure the safety of the community," *Stone*, 608 F.3d at 945. *See* 18 U.S.C. § 3142(f). In addition to Congress's presumption that offenders like Brown should ordinarily be detained, § 3142(g)(1)–(4) requires the Court to consider four other factors in assessing flight risk and dangerousness:

(1) "the nature and circumstances of the offense charged, including whether the offense is a crime of violence, … or involves a … firearm";[1]

(2) "the weight of the evidence";

(3) "the history and characteristics of the person," including "physical and mental condition," "community ties," "criminal record," and other similar traits; and

(4) "the nature and seriousness of the danger to any person or the community that would be posed by the person's release."

---

[1] Congress defined a "crime of violence" as "an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another." 18 U.S.C. § 16(a). Brown's first alleged offense, under § 245(b)(1)(A), is a crime of violence because it includes as an element the use of "force or threat of force" to injure, intimidate, or interfere with a campaign for elective office. Brown's second alleged offense, under § 924(c), also triggers this provision because it is an "offense [that] involves a … firearm." 18 U.S.C. § 3142(g)(1). So the grand jury's return of this indictment against Brown for both a crime of violence and a firearm offense is relevant to the Court's assessment of the nature and circumstances of the offense and ultimate determination regarding the risk of flight and community danger.

5

Each of these factors, along with Congress's presumption in favor of detention for crimes including this one, is relevant to the ultimate determination whether conditions short of detention could reasonably assure community safety and prevent flight.

### THE FACTUAL RECORD IN THIS CASE

In answering this question and addressing these factors, the Court relies on the record assembled by the Magistrate Judge as supplemented by the evidentiary submissions in advance of the second detention hearing. *See, e.g.*, *United States v. Romans*, No. 00-5456, 2000 WL 658042, *1 (6th Cir. May 9, 2000) (affirming district court's detention order based on evidentiary record developed before the magistrate judge). In light of that record, plus the additional evidence proffered before and during the second hearing, the Court makes several factual findings regarding its detention determination. These are of course distinct from the factual findings a jury may be asked to make regarding Brown's guilt or innocence. *See* 18 U.S.C. § 3142(i) (requiring judicial officers to set out findings of fact in writing).

As recently as 2020, Brown was a student at the University of Louisville, a volunteer with a local non-violence group, and a guest political writer for the *Louisville Courier-Journal*. Hearing 1 Tr. at 6:4–18; *id.* at 53–54; *id.* at 91:13–92:22. Brown's witnesses all acknowledged that in June 2021, however, he absconded to New York and evaded communication or contact with his family or friends for more than eleven days. *Id.* at 59:7–16. One of Brown's character witnesses testified that a "mental breakdown" precipitated this covert trip to New York." *Id.* at 40:6–12. And another confirmed that when he disappeared "his family had no idea where he went." *Id.* at 59:15–16. Eventually, Brown was found sleeping on a park bench in New York. *Id.* at 92:17–23.

Back in Louisville, in January 2022, Brown published an article on medium.com titled "A Revolutionary Love Letter." Much of the column quoted liberation-movement figures and spoke in abstract and intellectual rather than local or violent terms. But Brown also described the United States as a country in a state of "political warfare," condemned the political system as "[in]sufficient for our liberation," and encouraged readers to reject "outdated programs and modalities that lead to … self-destruction" in favor of "action along a variety of lines." Article (DN 27) Ex. B at 3, 6, 9.

Two days after publishing the article, Brown purchased a Smith & Wesson revolver and visited a shooting range where he practiced loading, aiming, and shooting his new gun. ATF Form 1 (DN 27) Ex. C; Gun Range Images (DN 27) Ex. D. In the next few days Brown, increasingly focused on the Louisville mayor's race, posted several social media posts condemning a particular mayoral candidate. *See, e.g.*, DN 28-2 (retweeted image of candidate and others in flames, alongside

6

"#gentrificationisviolence" hashtag). Shortly thereafter, Brown began searching online for this candidate's home and office addresses, as well as information regarding his wife and minor child. *See* Search Records (DN 30-2) at 594–610; Motion to Revoke Release (DN 28) at 3 (citing *id.* at 117–19, 234–45, 248–52, 357-60, 634–52).

On February 13, Brown took a rideshare service to the candidate's home. Rideshare Data (DN 30-3). Information extracted from his phone-search history—concerning tips on how to un-jam a gun—strongly implies that Brown brought his gun and ammunition to the candidate's house, and that the gun jammed after Brown loaded one or more bullets in backwards. Search Records at 66–69. Apparently failing in this effort, Brown searched without success for gun shops near the candidate's home before returning home in a rideshare. *See id.* at 68; Rideshare Data.

The next morning, Brown purchased a Glock pistol at a pawn shop. Pawn Shop Surveillance Video (DN 27) Ex. E; ATF Form 2 (DN 27) Ex. F. He then made his way to the candidate's campaign headquarters. There he fired six shots into a room in which the candidate and four campaign staffers were sitting. Ex. A at 1–2. One bullet ripped through the candidate's sweater, while the rest hit the wall. *Id.* at 3–5. The candidate's staffers managed to barricade the doors, which stopped the shooting. Hearing 1 Tr. at 116:8–12. Shortly thereafter, when police arrested Brown near the campaign headquarters, he was carrying the Glock and its purchase receipts. DN 28-1 at 1–5.

After Brown's arrest and indictment in state court, as discussed above, third parties posted $100,000 bail on his behalf, which secured his release to home incarceration. A state-court liaison officer testified that Brown complied with the conditions of his release, including by returning to his grandmother's house following his departure from inpatient mental-health treatment. Hearing 1 Tr. at 22–27. Critical to Brown's argument is the fact that since his release from state custody he has received counseling, medication, and at least tentative diagnoses for his mental-health issues, including "[m]ajor depressive disorder … with psychotic features" and "bipolar disorder … mixed with [a]nxiety [d]isorder … with some features of [PTSD]". Def's Ex. 4 at 1; Def's Ex. 5 at 1. Although at least one physician letter notes that Brown received these therapies to help stabilize his mood, the written and testimonial evidence does not specifically address what effect these conditions and medications have had (are likely to have) on the critical issues of flight and dangerousness. Def's Ex. 4 at 1; Def's Ex. 5 at 1; Hearing 1 Tr. at 92–96 (discussing past mental-health treatment, but not whether and how that treatment reasonably mitigated ongoing flight risk or dangerousness)[2]

---

[2] The Pretrial Services Report, which "the Court may reference," *Carter*, 2021 WL 687858 at *2, recommends Brown's release. But as the Government pointed out, that report did not

### RISK OF FLIGHT AND DANGEROUSNESS DESPITE CONDITIONS OF RELEASE

This evidence supplies the requisite proof that pretrial detention is appropriate because no conditions of release could reasonably assure either Brown's presence in court or the safety of the community. 18 U.S.C. § 3142(f). After considering the record placed before this Court in light of the factors set forth in the Bail Reform Act at § 3142(g)—the nature and circumstances of the offense, the weight of the evidence, the history and characteristics of the person, and the nature and seriousness of the community danger—the Court concludes that Brown is both a flight risk and poses a continuing risk to victims in this case and the public at large.

#### A. Flight risk

Brown's 2021 disappearance to New York, heavy potential criminal penalties, and medical instability establishes, by a preponderance of the evidence, that Brown has the ability and potentially the inclination to flee Louisville, despite his longstanding ties to the community.

His prior disappearance constitutes evidence that he could do so while evading detection by concerned family, friends, and even his character witnesses—many of whom testified to serving on the search committee that tried to find him in 2021. 18 U.S.C. § 3142(g)(2) (weight of the evidence regarding flight); Hearing 2 Transcript (DN 42) (Apr. 28, 2022) at 40; *id.* at 58–59. The fact that he successfully and secretly left Louisville once is evidence that he could do it again. *See United States v. Glasgow*, No. 1:20-cr-27-7, 2021 WL 2403136, at *12 (D.D.C. June 11, 2021) ("[The defendant] has left the area in the past … and the Court sees no reason to believe he will not leave again."). Brown's previous disappearance also is connected, through multiple witnesses' testimony, to Brown's apparent mental break and diagnoses, discussed at greater length below. Hearing 1 Tr. at 40:6–11; *id.* at 58:4–59:16. Brown's "history and characteristics" including his "past conduct," therefore, militate in favor of detention. § 3142(g)(3).

Although Brown's potential home confinement and interest in defeating the state and federal charges against him create some incentive for him to remain compliant and homebound, the potential penalties they carry create countervailing incentives to flee. These crimes carry high minimum and maximum sentences. The "use, attempted use, or threatened use of a dangerous weapon" has a minimum sentence of ten years and a maximum life sentence. § 924(c)(1)(A)(iii); *United States v. Morgan*, 572 F. App'x 292, 300 (6th Cir. 2014). And the interference charge carries

---

account for Congress's presumption of detention. Hearing 1 Tr. at 106–07. Nor did it address whether the treatment Brown received mitigated his dangerousness or risk of flight. So this preliminary report is relevant, but hardly dispositive, with respect to the judicial determination of whether Brown must be detained under § 3142(g).

8

a 10-year sentence. *See* § 245(b)(1)(A), (b)(5). Such "significant penalties," the Sixth Circuit Court of Appeals has explained, "provide a strong incentive to flee." *United States v. Shuklin*, No. 19-4171, 2020 WL 2992522, at *1 (6th Cir. Mar. 18, 2020); *see also United States v. Kiper*, No. 3:22-cr-3, 2022 WL 943958, at *3 (E.D. Ky. Mar. 29, 2022). The "nature of circumstances of the offense charged," therefore, likewise lean in favor of detention. § 3142(g)(1).

True, Brown has consented to electronic-monitoring and his witnesses all offered to help supervise him. That willingness to aid Brown is commendable, and adds to the conditions that would at least mitigate the risk of flight. *See United States v. Byrd*, No. 5:22-cr-10, 2022 WL 964189, at *4 (E.D. Ky. Mar. 30, 2022). And during his seven weeks of home incarceration, Brown apparently never attempted to flee. Hearing 1 Tr. at 26–27. But Mr. Lamkin also testified that defendants cut off their electronic monitors "[a]ll the time." *Id.* at 27:9–11. And other courts within the Sixth Circuit have deemed electronic tethers insufficient guarantees of a defendant's appearance compared to other evidence of flight risk. *See, e.g., United States v. Edwards*, No. 07-20605, 2010 WL 157516, at *5 (E.D. Mich. Jan. 13, 2010); *United States v. Tawfik*, No. 17-20183, 2017 WL 1457494, at *8 (E.D. Mich. Apr. 25, 2017) ("a tether offers little assurance of an appearance or an intent to forego activities that pose a danger to the community").

Defense counsel also points to Brown's status as a scholarship college student, which the decision below emphasized in terms of Brown's work status under the statute. *See* § 3142(g)(3)(A). But that status doesn't obviously cut in favor of release. *See* Hearing 1 Tr. at 138:4–7. Although counsel represented that Brown remained affiliated with the University of Louisville, no evidence (or representations of counsel) indicated in response to the Court's questions that Brown would attend classes in person or remotely during his release, or was doing so before his arrest. Hearing 2 Tr. at 5:18–22 ("I can't say he was attending class or not attending class."). So the community attachments allegedly supplied by Brown's theoretical class attendance is late-blooming and speculative at best.

Considering the nature of the offenses charged, the high maximum penalty, the weight of the evidence of flight risk, and Brown's recent history of unannounced travel out of state, the Court finds by a preponderance of the evidence that he poses a flight risk and must be detained pending trial.

### B. Dangerousness

In addition to the evidence of Brown's flight risk, the United States has offered a second, independent basis for his detention. The evidence proffered at this early stage shows by a clear and convincing margin that he poses a continuing danger to the victims and community. The crime at issue obviously involves substantial danger to the community, the charges are quite serious, and the record before the Court is

substantial and concerning. Those three factors, along with the congressional presumption discussed above, point decidedly in favor of detention. And as discussed below, the characteristics of the defendant are at best in equipoise. Given this record and Congress's instructions, the risk of danger also warrants pretrial detention.

**1.** The seriousness of the offense is directly relevant to the dangerousness analysis Congress requires under § 3142(g)(1). Congress instructed courts to give careful attention to whether the offense charged is a "crime of violence" or if it is one that "involves … a … firearm." *Id.* Here we have both. This is not a non-violent drug possession or conspiracy charge—even though such cases regularly lead to pretrial detention under the Bail Reform Act.[3] So it almost goes without saying that Brown's alleged attempt to shoot a political candidate is a dangerous felony and serious offense. *See* § 3142(g)(1); *Salerno*, 481 U.S. at 750.

**2.** And the "nature and seriousness of the danger to any person or the community" also militates in favor of detention rather than release. § 3142(g)(4). The nature of the alleged crime is violent and incomplete. As explained above, the location of one of the two guns remains unknown to the government. And the candidate continues to campaign for the upcoming election. The seriousness of the risk, moreover, could hardly be higher—not only for the candidate, but also for his family, campaign associates, and others, and leans strongly in favor of detention. *Id.* Because of this, the fourth prong likewise leans strongly in favor of detention. § 3142(g)(4).

**3.** The "weight of the evidence" discussed above is also considerable. § 3142(g)(2). Yet the defense and the Magistrate Judge's ruling fault the government for emphasizing the evidence of the underlying crime rather than of future danger. In a case involving an attempted but incomplete crime of targeted violence, however, that evidence necessarily overlaps. *See, e.g.*, *Stone*, 608 F.3d at 948–50 (analyzing dangerousness, in part, by reference to evidence of the defendants' alleged statements and preparation to commit (incomplete) acts of political violence); *Glasgow*, 2021 WL 2403136, at *8 n.5 (citing *Stone*, 608 F.3d at 948) (if a defendant is "charged with an inherently dangerous crime," the "evidence proffered by the Government in support of the … charge is probative of dangerousness"). To be sure, under § 3142 courts must

---

[3] The Sixth Circuit has frequently affirmed pretrial detention of even apparently non-violent drug dealers, whose crimes Congress also listed among those meriting a presumption of detention in § 3142(e)(3)(A). *See, e.g.*, *United States v. Hinton*, 113 F. App'x 76 (6th Cir. 2004) (detention of drug-trafficking defendant); *United States v. Ortiz*, 71 F. App'x 542 (6th Cir. 2003) (detention of defendant accused of conspiracy to distribute and possess cocaine); *United States v. Miller*, 39 F. App'x 278 (6th Cir. 2002) (detention of defendant accused of conspiracy to possess with intent to distribute marijuana). Drug crimes are of course dangerous to the community—but often not in the same direct and violent way as the attempted shooting of a political candidate.

consider the strength of the evidence of the underlying crime only insofar as it relates to the detention question, not to a defendant's guilt or innocence. *Stone,* 608 F.3d at 948–50. As the Sixth Circuit has explained, the weight-of-the-evidence factor "goes to the weight of the evidence of dangerousness, not the weight of the evidence of the defendant's guilt." *Id.* at 948.

The evidence of continuing dangerousness here is quite weighty indeed. Brown's online writing at least contemplated political violence. *See* Article (DN 27) Ex. B at 3, 6, 9. One of his social-media posts mentioned the mayoral candidate and violence. *See* DN 28-2. His electronic messages called for "all hands" against the same candidate, apparently to aid a preferred competitor. Text Messages (DN 30-1) at 4. And he researched the candidate's location and family. *See* Search Records (DN 30-2) at 594–610; Motion to Revoke Release (DN 28) at 3 (citing *id.* at 117–19, 234–45, 248–52, 357-60, 634–52). The defendant's past statements and mindset are relevant considerations amidst the weight of the evidence. *See Stone*, 608 F.3d at 948–950. Considered in isolation, as the defense urges, perhaps this amounts to mere political speech, which is of course often overheated though not actually dangerous.

But the evidence of Brown's dangerousness stretches from speech to conduct. The record indicates that he purchased two different weapons before the Valentine's Day shooting. He practiced aiming and shooting the first weapon. He traveled at night to the candidate's house. He researched the loading and repair of that gun from his phone outside the candidate's house. Rather than returning home, Brown searched the internet for tips on unjamming the gun and for a nearby gun store. *Id.* at 66–69. From his home, he continued searching for gun stores. Rideshare Data; Search Records at 60–61, 64–65. Again, defense counsel urges the Court to view this conduct in isolation—and treat it as lawful activity.

But still more evidence follows: the next morning he visited a pawn shop and bought a handgun less than an hour before the shooting. Pawn Shop Surveillance Video (DN 27) Ex. E; ATF Form 2 (DN 27) Ex. F. The shots fired in the office endangered not only the candidate, but also several others nearby. *See* Hearing 1 Tr. at 82–83. And after the shooting, police found Brown, armed with the second gun, only blocks away. Arrest Evidence (DN 24) Ex. H at 1–5. The first gun, as the government notes, remains unaccounted for, which could provide Brown with access to a weapon despite the lack of any firearms in the house where he has been staying, making his release more dangerous under § 3142(g)(4). *See* Hearing 1 Tr. at 122:22–123:9; Hearing 2 Tr. at 26–28.

To be clear, the Court is not judging Brown's guilt or innocence for past acts, and considers this evidence only in terms of future danger. Viewed through that narrow lens, the record contains ample evidence of continuing dangerousness. As the Sixth Circuit recognized in *Stone*, a "defendant['s] … demonstrated interest in

11

committing actual, physical violence against" officers of the government, as well as "a lack of concern about the likelihood of killing civilians, through the use of … firearms," cut strongly in favor of detention. *Stone*, 608 F.3d at 948. The Supreme Court has likewise recognized that when "clear and convincing evidence [indicates] that an arrestee presents an identified and articulable threat to an individual or the community … a court may disable the arrestee from executing that threat." *United States v. Salerno*, 481 U.S. 739, 750–51 (1987). And the Sixth Circuit has upheld detention orders based in part on a defendant's "access to firearms." *United States v. Ramsey*, No. 97-5144, 1997 WL 135443, at *1 (6th Cir. Mar. 24, 1997).[4]

The flaw in the reasoning of the defense, absorbed by the decision below, is to consider these facts as independent rather than interlinked. *See* Hearing 1 Tr. at 138–42. But Congress didn't instruct judges to consider this evidence piece by isolated piece, or to tally individual statutory subfactors for and against a defendant's detention. Rather, it asked us to assess all the evidence of danger, consider the factors set forth in § 3142(g), and then reach a conclusion regarding future danger. *See Stone*, 608 F.3d at 953–54 ("[v]iewing all of the [§ 3142(g)] factors together"). If courts adopted the contrary position of the defense—if we "think that if a particular fact does not itself prove the ultimate proposition," then that "fact may be tossed aside and the next … evaluated as if the first did not exist"—then we become "prone to making mistakes in judging evidence." *Al-Adahi v. Obama*, 613 F.3d 1102, 1105 (D.C. Cir. 2010).

That risk is certainly present here. The evidence of dangerousness gets worse, not better, when considered as an unsegmented whole. Online researching and writing about political candidates, guns, and office locations may be innocent enough standing alone. But combining the three increases the likelihood of danger. Likewise, lawful gun ownership and target practice become riskier when combined with the evidence of planning and preparation mentioned above. And a missing gun may not *by itself* represent clear and convincing evidence of dangerousness—but it certainly adds to the record's overall weight and shades other facts in a darker light. "[A]lthough some events are independent (coin flips, for example), other events are dependent: 'the occurrence of one of them makes the occurrence of the other more or less likely.'" *See Al-Adahi*, 613 F.3d at 1105 (quoting JOHN ALLEN PAULOS, BEYOND NUMERACY at 189 (1991)).

---

[4] *See also United States v. Abboud*, 42 F. App'x 784, 784–85 (6th Cir. 2002) (upholding detention order in part because defendant kept guns in his home); *United States v. Portes*, 786 F.2d 758, 765 (7th Cir. 1985) (finding a defendant to be a danger based in part on access to firearm); *United States v. Tucker*, No. 19-555, 2020 WL 4436369, at *2 (D. Md. Aug. 3, 2020) (finding a defendant to pose a significant danger in part because he "had access to dangerous weapons").

Nothing about the record described above—the posting, the searching, the traveling, the shooting—suggests a series of random and unconnected actions. The law requires judges to assemble this puzzle, not just look at the pieces. Therefore the weight of the evidence of dangerousness (§ 3142(g)(2)), like the first and forth factors, leans strongly in favor of detention.

**4.** Against all this, Brown offered testimony—no doubt sincere—from various community members and leaders regarding his personal characteristics and history. § 3142(g)(3). These encompass his character, family ties, employment, mental and physical condition, and criminal history. *Id.* Brown's witnesses vouched for his intellect, empathy, and commitment to non-violence. But the first two qualities do not necessarily bear on his *dangerousness* to the community. And all three characteristics seem to have been affected, at least to some degree, by the recent changes these witnesses chalked up to a mental illness or breakdown. And (due in part to the pandemic) none of the witnesses reported more than de minimis interaction with Brown during the months since. These witnesses' testimony doesn't directly address (much less overcome) the clear and convincing evidence from 2021 and since that he could pose a danger to the community if released.

Brown also has lifelong ties to Louisville, no criminal record, and no record of drug or alcohol abuse. *See* Pretrial Report at 2–3. And his witnesses spoke to his past good behavior, affability, and leadership in the community. *See, e.g.*, Hearing 1 Tr. at 53:23–55:13; *id.* at 64:12–65:3. His grandmother (along with several other witnesses) offered to take custody of him if released. *Id.* at 36:2–14. Each of these facts leans in favor of release. *See* § 3142(g)(3). But they are of course not dispositive. *Stone*, 708 F.3d at 950 ("[C]ourts have never required a prior criminal record before ordering detention."). Particularly given the significant break in time and persona between Brown's earlier years and recent months. Brown's witnesses testified that Brown had deteriorated mentally and appeared to have changed since they last interacted with him. *See, e.g.*, Hearing 1 Tr. at 18:8–18 (Jones Testimony); *id.* at 40:6–12 (Russell Testimony).

The mental-health issues to which these witnesses ascribe Brown's change in character pose the most challenging part of the record and analysis in this case. The defense's argument rests heavily on the notion that mental illness contributed to his earlier actions, but is now under control (and therefore no longer dangerous) thanks to treatment and medication best administered out of custody. In support Brown submitted two letters from mental-health professionals: Dr. Singletary diagnosed Brown with bipolarism, anxiety, and PTSD, *see* DN 27 Ex. 5, and Dr. Chhibber diagnosed him with major depressive disorder, *see* DN 27 Ex. 4. Dr. Singletary also noted that Brown told her that he had "passive suicidal thoughts." DN 27 Ex. 5. Brown received nine days of inpatient treatment at a mental-health facility, returned home, and continued receiving outpatient care. *See* Hearing 1 Tr. at 25:6–24.

According to Brown, his mental-health struggles are at worst irrelevant to detention or even affirmatively support release because "[a]t the time of the alleged events, Mr. Brown was … not receiving mental health care" but "[n]ow, he is." Response (DN 34) at 2.

Both sides concede that caselaw in this area is sparse. In rejecting a Due Process challenge to the Bail Reform Act, the Supreme Court offered as an example of detention without conviction that "the government may detain mentally unstable individuals who present a danger to the public." *Salerno*, 481 U.S. at 748–49. Other district courts have held that a defendant's mental illness, considered alongside other characteristics, may support detention. *See, e.g.*, *United States v. Tolbert*, No. 3:09-cr-56, 2017 WL 6003075, at *6 (E.D. Tenn. Dec. 4, 2017); *United States v. Fitzhugh*, No. 16-mj-30364, 2016 WL 4727480, at *5 (E.D. Mich. Sept. 12, 2016) (defendant's mental illness and suicidal ideation militated in favor of pretrial detention). Brown's own witnesses speculated that his mental breakdowns may have caused his alleged conduct. *See, e.g.*, Hearing 1 Tr. I at 18:8–18 (Jones Testimony); *id.* at 40:6–12 (Russell Testimony).

Although Brown received mental-health treatment after being released from state custody, *id.* at 25:12–26:5, no mental-health expert or evidence indicated that treatment has lessened his future dangerousness. The physician letters he did introduce stated only that he began receiving medication to stabilize his mood, but that even after receiving those medications he needed inpatient hospitalization and more intense treatment "for his safety and stabilization of psychiatric mood symptoms." Def's Ex. 5 at 1. A second letter describing his discharge reported that his mood and affect improved during his inpatient stay, and instructed him to participate in telehealth outpatient program for the next month. Def's Ex. 4 at 1. No mental-health evidence before the Court specifically addresses his ongoing risk of flight or community danger in home confinement.

As to his need for ongoing treatment, the Court has no reason to doubt counsel's representations that release rather than custody is best for Brown's mental health. That is a consideration of undeniable importance, but not one that Congress prioritized above flight and safety risks. *See United States v. Platt*, No. 18-cr-195, 2018 WL 4698616, at *4 (D. Colo. Oct. 1, 2018) (need for treatment was secondary to Congress's primary concern with risk of future dangerousness). And the record indicates the facility is well aware of Brown's mental-health issues and providing him with his medications. Hearing 1 Tr. at 119:10–19; Def's Response (DN 34) at 3.

So the Court has before it testimony about dangerous changes in behavior attributed to Brown's mental-health challenges, but only inferential evidence and lawyers' assertions that treatment has and would continue to mitigate those deleterious effects. Hearing 1 Tr. at 93–95; *id.* at 103. This evidence of Brown's

14

recent instability leans in favor of detention, § 3142(g)(3)(A), the evidence regarding his ongoing treatment is inconclusive at best, and his past nonviolence, affability, and community connections would favor release. *Id.* And Brown certainly enjoys the continuing support of many loving and committed friends, family members, and mentors. His personal history and characteristics under § 3142(g)(3)(A), therefore, sit in equipoise.

\*\*\*

Viewing the record as a whole in the light of the factors set forth by Congress, the Court finds that clear and convincing evidence indicates release would jeopardize the safety of the victims and the community. The charged offenses are serious, involving a "crime of violence" and "a … firearm" § 3142(g)(1). The weight of the evidence of future dangerousness is substantial, including Brown's potential access to the missing gun. § 3142(g)(2). Brown's mental health remains an extremely important and serious consideration—one that causes his overall personal history and characteristics to point in different directions, § 3142(g)(3). And the evidence of the seriousness of the risk to the victims and others stands practically unquestioned. § 3142(g)(4). This evidence strongly supports pretrial detention under the law, especially given Congress's finding that pretrial detention is presumptively warranted for the § 924(c) charge. § 3142(e)(3).

The conditions of confinement proposed by Brown and adopted by the Magistrate Judge include home confinement, electronic monitoring, and two third-party custodians—his grandmother, at whose house Brown would stay, and a former professor, who committed to visiting Brown at that house at least once per week. Those commitments to vouch for Brown's compliance are undoubtedly sincere, selfless, and a service the Court applauds. But none of these steps can reasonably ensure Brown does not leave the house, avoid detection by law enforcement, access the missing gun or another weapon, and again attempt to complete the crime he is accused of. As defense counsel acknowledged, no condition of confinement is foolproof; what the law requires is reasonable assurance. Hearing Tr. 2 at 27:6–18. Regrettably, the facts underlying this detention determination show that level of assurance is unattainable here, given the repeated efforts to access and harm a particular victim and endanger the lives of others in the process.

## Conclusion

The serious crimes of which Brown is accused were deemed by Congress to militate in favor of pretrial detention. The United States has shown by clear and convincing evidence that the proposed conditions on release cannot reasonably assure the safety of the community. And the government has also shown by a preponderance that Brown poses a flight risk. Because the record at this stage demonstrates this continuing risk, which conditions of confinement cannot reasonably address, the

defendant must remain in pretrial detention. 18 U.S.C. § 3142(e)(1). The Court therefore grants the United States' motion to revoke the release order (DN 28) and orders Brown to remain in custody pending trial.

Benjamin Beaton, District Judge
United States District Court

May 3, 2022