IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal Case No. 3:22-CR-33-BJB |
| | ) | |
| QUINTEZ O. BROWN | ) | |

**SENTENCING MEMORANDUM**

*ELECTRONICALLY FILED*

The United States of America, by counsel, files its memorandum in support of sentencing in this action. The United States may present two witnesses at the sentencing. Additionally, several victims in the case may deliver their victim impact statements to the Court at sentencing.

The United States agrees with the Guidelines calculations in the Presentence Report, which produce a total offense level of 30 and a Criminal History Category of I on Count One. This results in a sentencing range of 97 months to 121 months. Additionally, Count Two has a mandatory minimum sentence of 120 months that must be served consecutive to any other sentence. It is the position of the United States a sentence of 97 months as to Count One, to be served consecutively to the mandatory sentence of 120 months for Count Two, is the appropriate sentence in this matter.

**I.  OFFENSE CONDUCT**

The defendant has pled guilty to interfering with the federally protected right to campaign for elected office, in violation of 18 U.S.C. § 245(b)(1)(A) (Count One), and the unlawful use and discharge of a firearm in connection with a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A) (Count Two).

In early 2022, the defendant was a student at the University of Louisville running an

1

independent campaign for Louisville Metro Council. Among other things, the defendant was opposed to the West End Tax Increment Financing (TIF), which he believed would cause gentrification in the West End. *See* Ex. 1 (Gentrification Is Violence Instagram Post). Craig Greenberg, who in early 2022 was running for the Democratic nomination for mayor of Louisville, helped write the legislation for the West End TIF.

In January and February of 2022, the defendant expressed anger online about the current political climate and particularly about Greenberg. On January 10, 2022, the defendant published an article on Medium.com entitled "A Revolutionary Love Letter." In the article, the defendant announced, "[o]ur situation is one of political warfare," and "[v]oting and petitioning will not be sufficient for our liberation." Ex. 2 (Medium Article) at 3, 9. On January 24, 2022, the defendant reposted an image on social media of Greenberg engulfed in flames and perched as a "devil" on another person's shoulder. Ex. 3 (Greenberg in Flames Instagram Post). On February 8, 2022, Greenberg received important political endorsements from members of the Louisville Metro Council. The defendant reposted an article about these endorsements, adding the caption, "dollar democracy?" Ex. 4 (Dollar Democracy Twitter Post). This post implied that Greenberg had paid for the endorsements.

In late January of 2022, the defendant also became active in a local chapter of the Lion of Judah Armed Forces. The Lion of Judah Armed Forces is a Black nationalist militia group that has coopted Jewish symbols and terminology in support of the idea that Black people are the real Jewish people. Greenberg is Jewish. On February 8, 2022, the defendant messaged the head of the local chapter of the Lion of Judah Armed Forces and said they needed to plan an event in late May 2022. *See* Ex. 5 (Signal Chat One) at 4. The defendant said by then they would know who the Democratic candidate was and whether it would be "[a]ll hands on deck for [the defendant's

2

preferred candidate] or all hands against Greenberg." *Id*. Later that day, in a group chat with the defendant and several other members of the local chapter of the Lion of Judah Armed Forces, the leader of the local chapter said that he was planning on meeting with Greenberg on February 15. *See* Ex. 6 (Signal Chat Two) at 24. The leader said that he thought Greenberg would try to "buy" them and that the defendant's preferred candidate did not have the money to compete with Greenberg. *Id.* at 25-26. The defendant's girlfriend said that the defendant had been hanging out with a new group but stopped hanging out with the group shortly before February 14, 2022, because the group had "opposing views" and things were not "working out." Exhibit 7 (Interview of Girlfriend) at 1.

The defendant's friends and family describe him as being opposed to guns. But on January 12, 2022, two days after the defendant's Medium article was published calling for "political warfare", the defendant obtained a 9mm pistol from a gun store. *See* Ex. 8 (River City Firearms Receipt). On January 22, 2022, the defendant took his new gun to the shooting range, where he practiced loading, shooting, and aiming the firearm. *See* Ex. 9 (Image from Shooting Range Surveillance). On February 10, 2022, the defendant began using the internet to research Greenberg, including Greenberg's location. *See* Ex. 10 (Internet Search History) at 35. Greenberg's campaign office address was not easily available online, but the defendant learned the campaign's suite number and searched with various search terms to reveal the precise location of the office. *See id*. at 32-35. The defendant also researched Greenberg's family, including attempting to find information about the theatrical production in which Greenberg's teenage son was involved. *Id.* at 15-17.

On the evening of February 13, 2022, records show that the defendant took a Lyft to Greenberg's neighborhood. *See* Ex. 11 (Lyft Records) at 2. That evening, Greenberg saw

3

someone who resembled the defendant walking down the street towards Greenberg's home. *See* Ex. 16 (Greenberg declaration). The defendant's search history that evening contains searches for "cartridge loaded backwards" and "bullet backwards in m&p shield." Ex. 10 (Internet Search History) at 8-10. Based on these searches, it appears the defendant brought his gun with him to Greenberg's neighborhood and the gun jammed. The defendant then tried to search the internet for a gun store near the University of Louisville, where he lived. *See id*. at 7-8. The defendant then ordered a Lyft home. *See* Ex. 11 (Lyft Records) at 2.

In the early hours of the next morning, February 14, 2022, the defendant performed searches for "greenberg butchertown." Ex. 10 (Internet Search History) at 4. The defendant also performed searches related to the location of a Republican candidate for mayor of Louisville. *See id*. at 2-3. Later that morning, just after 8am, the defendant exchanged routine "good morning" text messages with his mother and his girlfriend. *See* Ex. 12 (Texts with Mom); Ex. 13 (Texts with Girlfriend). The defendant told his girlfriend that he would be the "Equalizer," referencing a movie in which Denzel Washington plays a former Marine who kills numerous criminals. *See* Ex. 13 (Texts with Girlfriend) at 4; Wikipedia Page on *The Equalizer* (https://en.wikipedia.org/wiki/The_Equalizer_(film)) (last visited December 26, 2024).

Around 9:15am, about an hour after his texts with his mom and his girlfriend, the defendant bought a Glock 9mm pistol at a Louisville pawn shop. *See* Ex. 14 (Stewart Pawn Shop Records) at 4. Shortly thereafter, the defendant walked into Craig Greenberg's campaign office at Butchertown Market, and went to the conference room where Greenberg was having a meeting with four staffers. *See* Ex. 15 (LMPD Summary); Ex. 16 (Greenberg declaration). The defendant took direct aim at Greenberg and shot at him multiple times. *See* Ex. 16 (Greenberg declaration). Two bullets hit the desk at which Greenberg was sitting. *See* Ex. 17 (Photo of Greenberg Sitting

4

at Desk on Another Day); Ex. 18 (Photos of Desk). The wall immediately behind where Greenberg was sitting had multiple bullet holes. *See* Ex. 19 (Photos of Wall). Bullets that hit the wall went into the event planning office next door. *See* Ex. 20 (Photos of Event Planning Business). After the shooting, the defendant ran out of the building, took off his distinctively-colored jacket, and tried to get away from the scene of the crime. *See* Ex. 16 (LMPD Summary). Officers located and arrested the defendant on a dead-end street less than half a mile away from the shooting. *See id*. Officers located ammunition in the defendant's pocket and a gun in his backpack. *See id.* at 15. Before officers located the defendant, the defendant tried to order a Lyft to take him away from the area. *See* Ex. 11 (Lyft Records) at 2. Shell casings recovered at the scene of the shooting matched the gun that Brown was carrying at the time of his arrest.

## II. GUIDELINES CALCULATION

The United States concurs with the Guidelines offense level calculation in the Presentence Report, which sets forth a total offense level of 30. This calculation is correctly based on a base offense level of 33 due to a cross-reference to § 2A2.1 and a three-point reduction for acceptance of responsibility.

### A. Attempted Murder Cross-Reference

The cross-reference to USSG § 2A2.1 in the Presentence Report was correctly applied because the defendant's offense constitutes attempted murder under the relevant legal standard.[1]

The applicable guideline for violations of 18 U.S.C. § 245(b)(1)(A) is § 2H1.1 (Offenses Involving Individual Rights). Under § 2H1.1(a)(1), the base offense level is "the offense level

---

[1] In the defendant's objections to the PSR, he asserts that the Base Offense Level under 2H1.1 should be 10, because the attempted murder cross-reference should not apply. For the reasons stated in this section, the cross-reference is appropriate, and the defendant's objection should be overruled.

5

from the offense guideline applicable to any underlying offense[.]"[2] Section 2A2.1 is the guideline that "applies to the offenses of assault with intent to commit murder and attempted murder." USSG § 2A2.1, note "Background." A base offense level of 33 applies "if the object of the offense would have constituted first degree murder." USSG § 2A2.1(a)(1). First degree murder includes, among other things, any "willful, deliberate, malicious, and premeditated killing." 18 U.S.C. § 1111.[3] Thus, for the § 2A2.1 cross-reference for attempted first degree murder to apply, the Court must find by a preponderance of the evidence that the defendant acted with premeditation and had a specific intent to kill. *See United States v. Morgan*, 687 F.3d 688, 697 (6th Cir. 2012).

While the district court must find by a preponderance that the defendant had a specific intent to kill, in some cases the "facts presented 'inevitably lead to [such] a finding.'" *United States v. Howell*, 17 F.4th 673, 690 (6th Cir. 2021) (quoting *Morgan*, 687 F.3d at 697). Specific intent to kill can be "inferred from a defendant firing a gun aimed at an individual" or "from a defendant firing a gun at a group of individuals." *United States v. Bradford*, 822 F. App'x 335, 339 (6th Cir. 2020) (citing *United States v. James* 575 F. App'x 588, 597-97 (6th Cir. 2014) and *United States v. Rios*, 830 F.3d 403, 442 (6th Cir. 2016)). The Sixth Circuit has upheld a district court's finding of "intent to kill based solely on the fact that the defendant shot in the victim's direction such that the bullet could have struck him." *United States v. Caston*, 851 Fed. App'x 557, 564 (6th Cir. 2021).

---

[2] USSG §2H1.1(a) states to "apply the greatest" of "the offense level from the offense guideline applicable to any underlying offense" or an offense level of 6, 10, or 12, depending on whether the offense involved "the use or threat of force," "property damage or the threat of property damage," or "involved two or more participants." Here, the attempted murder offense level of 33 is greater than the offense level of 10 that would otherwise be applicable without the cross-reference (because the instant offense involved both property damage and the use of force but did not involve two or more participants).

[3] 18 U.S.C. §1111(b) states that any murder which is not first-degree murder is murder in the second degree. Attempted second degree murder carries a base offense level of 27 under §2A2.1(a)(2).

Premeditation is intertwined with the element of specific intent to kill. In *United States v. Frost*, the defendant challenged the district court's finding of premeditation where the evidence showed that the defendant's encounter with the victim "was unanticipated and quite heated." *Frost*, 521 Fed. App'x 484, 492 (6th Cir. 2013) (internal quotation marks omitted). The Sixth Circuit rejected this argument, finding that premeditation did not require any specific amount of time or planning, but only sufficient time to form "'the intent to kill,' and 'be fully conscious of that intent.'" *Id.* (quoting *United States v. Garcia-Meza*, 403 F.3d 364, 371 (6th Cir. 2005).

In this case, as part of the factual basis at the change-of-plea hearing, the defendant acknowledged he "knowingly shot at Craig Greenberg multiples times with a Glock." DN 164 (Plea Agreement) at 2. This is consistent with statements given by Greenberg and other victims that Brown aimed and shot directly at Greenberg. This is sufficient to establish that the defendant acted with the specific intent to kill Greenberg. *See Braxton v. United States*, 500 U.S. 344, 349 (1991) ("A stipulation by Braxton that he shot 'at a marshal,' without any qualification about his intent, would suffice to establish a substantial step towards the crime, and perhaps the necessary intent."); *Bradford*, 822 Fed. App'x at 339-40 (district court did not err in applying cross-reference for attempted first degree murder based on testimony the defendant fired a gun toward group of people from around fifty feet away, even though no one was hit); *Caston*, 851 Fed. App'x at 563-65 (6th Cir. 2021) (district court did not err in finding intent to kill based on hearsay evidence that the defendant fired a gun through the window of a car, hitting the victim in the leg); *United States v. Miller*, 73 F.4th 427, 429-31 (6th Cir. 2023) (district court did not err in finding intent to kill

7

based on evidence defendant fired gun at victim from a few feet away and hit the victim in the shoulder, despite defendant's claim she had not meant to hit the victim).

Moreover, application of the § 2A2.1 cross-reference to attempted first-degree murder is supported by overwhelming evidence of the defendant's intent and premeditation prior to the shooting, including: the defendant's purchase of his first gun the month before the shooting (despite his public opposition to firearms); his writings advocating political "revolution"; his fixation on Greenberg as an obstacle to his political goals; the fact that he researched Greenberg's location; the fact that he went to Greenberg's home with a gun the night before the shooting; the fact that when the gun apparently jammed, the defendant went home and purchased a new gun the next morning; the fact that he told his girlfriend the morning of the shooting that he would be the "Equalizer"; and the fact that he went into Greenberg's campaign office and shot directly at Greenberg multiple times.

Specific intent involves the state of a person's mind. Because direct proof is rarely available to establish state of mind, intent must be inferred from what someone does. A person ordinarily intends all the natural and probable consequences of their actions. *United States v. Cooper*, 577 F.2d 1079, 1083 (6th Cir. 1978). When you point a gun at someone and fire multiple shots at close range, the natural and probable consequence of that action is that you will kill them, absent medical or other intervention. Here, the evidence – including eyewitness testimony and the bullet holes directly behind where Greenberg was sitting – suggests that it was a miracle that

Greenberg was not killed or seriously injured. The same evidence supports the inference that the defendant intended to commit murder.

For these reasons, the cross-reference to § 2A2.1 is correct and the appropriate base offense level is 33 under § 2A2.1(a)(1). After a three-point reduction for acceptance of responsibility pursuant to § 3E1.1(a) and (b), the defendant's total offense level is 30.

### B. Departure Under § 5H1.3 or §5K2.13

While the defendant has not raised this specific issue in his objections to the Presentence Report, the United States anticipates that the defendant may seek a departure based on USSG § 5H1.3 and/or § 5K2.13, as the defendant claims he was suffering from bipolar disorder at the time of the offense.[4] Such a departure would be unwarranted in this case.

Section 5H1.3 provides that "[m]ental and emotional conditions may be relevant in determining whether a departure is warranted." USSG § 5H1.3. Specifically, § 5H1.3 states that such conditions may justify a downward departure "to accomplish a specific treatment purpose" or "may be relevant in determining the conditions of probation or supervised release." *Id.*

Section 5K2.13 provides that "[a] downward departure may be warranted if (1) the defendant committed the offense while suffering from a significantly reduced mental capacity; and (2) the significantly reduced mental capacity contributed substantially to the commission of the offense." USSG § 5K2.13. The commentary defines "significantly reduced mental capacity" as "a significantly impaired ability to (A) understand the wrongfulness of the behavior comprising

---

[4] The government has argued in previous filings (see DN 150) that Dr. Agharkar's opinion was not relevant to the defendant's ability to understand the nature, quality, or wrongfulness of his actions or his ability to form the specific intent to commit the offense.

9

the offense or to exercise the power of reason; or (B) control behavior that the defendant knows is wrongful." *Id.*, note 1. Section 5K2.13 includes the following limitation:

> However, the court may not depart below the applicable guideline range if (1) the significantly reduced mental capacity was caused by the voluntary use of drugs or other intoxicants; (2) the facts and circumstances of the defendant's offense indicate a need to protect the public because the offense involved actual violence or a serious threat of violence; (3) the defendant's criminal history indicates a need to incarcerate the defendant to protect the public; or (4) the defendant has been convicted of an offense under chapter 71, 109A, 110, or 117, of title 18, United States Code.

*Id.*

The United States does not dispute that, like many people who commit acts of violence, the defendant appears to suffer from mental health issues. As referenced in the Presentence Report, a Bureau of Prisons psychologist who evaluated the defendant diagnosed the defendant with depressive disorder, cannabis use disorder, and narcissistic personality traits. An expert witness retained by the defendant has also diagnosed him with bipolar disorder. The defendant's mental conditions, however, are not unusual or severe enough to distinguish his case from the heartland of cases covered by the Guidelines so as to warrant a departure under USSG § 5H1.3. The Sixth Circuit has repeatedly upheld the determinations of sentencing courts not to depart downward on the basis that the defendant suffered from bipolar disorder. *See, e.g. United States v. Tolbert*, 459 F.App'x 541, 547-48 (6th Cir. 2012); *United States v. Allen*, 665 Fed.App'x. 531, 538 (6th Cir. 2007); *United States v. Sake*, 191 Fed.App'x. 401, 404 (6th Cir. 2006).[5]

The defendant's reasoning for shooting at Greenberg was not delusional or incoherent. Rather, the defendant's actions were consistent with his long-held political views. The defendant has admitted that he acted "because Craig Greenberg was campaigning as a candidate for mayor

---

[5] The Sixth Circuit has also held that depression (including suicidal ideation) is not a condition that is "ordinarily a relevant ground for imposing a lower sentence" under USSG 5H1.3, albeit interpreting an earlier version of the provision. *United States v. Borho*, 485 F.3d 904, 913 (6th Cir. 2007); *United States v. Harpst*, 949 F.2d 860, 863-64 (6th Cir. 1991).

of Louisville." DN 164 (Plea Agreement) at 3. However perverse, the defendant's attempt to assassinate a candidate with whom he had intense political disagreements was rationally connected to his political goals. Other would-be political assassins have similar motives. The defendant's behavior following the shooting also indicates that he was a rational actor who was in control of and aware of the wrongfulness of his actions, as he attempted to escape from the scene of the crime. Apart from the opinion of an expert retained by the defense team based largely on the defendant's self-serving statements, there is no evidence that his mental health conditions or reduced mental capacity contributed substantially to the shooting.

Moreover, *if* the defendant's offense was caused by his mental health issues, he could be at risk of engaging in future dangerous behavior if his mental health issues are not adequately treated. As such, the defendant's mental health issues should not be a basis for a variance or a departure. *See United States v. Hunter*, 842 Fed. App'x 999, 1006 (6th Cir. 2021) (finding the "potential of future dangerous behavior linked to mental disability" was a valid consideration in denying a motion for a downward variance).

Finally, the Sixth Circuit has held that Section 5K2.13 does not apply if "the facts and circumstances of the offense indicate a need to protect the public because the offense involved actual violence or a serious threat of violence." USSG § 5K2.13(2). "Section '5K2.13(2) expressly provides that a court may not depart downward when the offense involved actual violence or a serious threat of violence.'" *United States v. Loos*, 66 F.4th 620, 623 (6th Cir. 2023) (quoting *United States v. Lovejoy*, 42 F. App'x 741, 742 (6th Cir. 2002) (per curiam)). In *Loos*, the defendant argued that § 5K2.13(2) required "the district court to determine whether the offender remains a threat to the public in 'the present' or even in 'the future when [his] sentence is completed.'" 66 F.4th at 624 (citing appellant's brief). The Sixth Circuit rejected this approach,

11

holding that the Guidelines required looking at the nature of the offense itself, not at the offender. *Id*. Here, the facts and circumstances of this offense clearly involved actual violence and therefore indicate a need to protect the public.

For these reasons, the Court should not grant a downward departure under § 5H1.3 or § 5K2.13.

### III.  CRIMINAL HISTORY

The defendant has a criminal history score of zero and a Criminal History Category of I.

### IV.  SENTENCING FACTORS

This Court must ultimately affix a sentence which is sufficient, but not greater than necessary, to comply with the purposes set forth in 18 U.S.C. § 3553(a)(2). Title 18, United States Code, Section 3553(a) guides the Court regarding factors to consider when imposing a sentence. That section directs courts to consider the following:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed:

　(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

　(B) to afford adequate deterrence to criminal conduct;

　(C) to protect the public from further crimes of the defendant; and

　(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for--

　(A) the applicable category of offense committed by the applicable category of defendant as set forth in the Guidelines
　. . .

(5) any pertinent policy statement--
　. . .

12

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

### A. Nature and Circumstances of the Offense and the Need for the Sentence Imposed to Reflect the Seriousness of the Offense

The nature and circumstances of the offense and the need for the sentence imposed to reflect the seriousness of the offense justify a sentence of 217 months of imprisonment. The defendant walked into Greenberg's campaign office during a meeting and shot at Greenberg multiple times. According to witnesses in the room, the defendant took direct aim at Greenberg, barely missing him. If the defendant's aim had been slightly better, he would have killed Greenberg and deprived a family of their husband and father. It is blind luck that the defendant is not being sentenced for first-degree murder, which would carry a Guidelines sentence of life imprisonment.

The defendant had no prior connection to Greenberg and no basis for personal animosity towards him. Rather, the defendant targeted Greenberg because Greenberg was exercising his constitutional right to run for office and the defendant was opposed to Greenberg's candidacy. Political violence, including the attempted assassination of candidates for office, hurts not only the immediate victim but threatens our constitutional order. In the United States, elections are decided by the will of the people, not by the violent whim of a single individual. The defendant had the right to oppose Greenberg's candidacy by voting, protesting, or by campaigning for office himself. He had no right to decide the mayoral election by shooting its leading candidate.

The defendant's actions put people other than Greenberg at risk, including the four people Greenberg was meeting with, as well as others in the building. The bullets aimed at Greenberg went through a wall and into another office space. While no one was physically harmed, the

shooting caused damage to the building and caused the landlord of the building to lose tenants. Moreover, the defendant's crime had a lasting psychological impact on the individuals in the room and others in the building who evacuated. The Court will have the opportunity to hear from some of those victims about the impact of the defendant's crime.

### B. The Need for the Sentence Imposed to Protect the Public from Further Crimes of the Defendant

The need for the sentence imposed to protect the public from further crimes of the defendant justifies a sentence of 217 months of imprisonment. The defendant's actions, including researching Greenberg's family and going to Greenberg's home, are incredibly disturbing. They demonstrate a willingness to engage in violence due to strongly-held political beliefs, and show the defendant's planning and premeditation in engaging in those violent acts. Even if the defendant's behavior was significantly impacted by his mental health issues, this does not alleviate the risk the defendant may engage in violent acts in the future. As such, the sentence of 217 months, which incapacitates the defendant in the near-term and provides the opportunity for long-term rehabilitation treatment, is appropriate. *See United States v. Hunter*, 842 Fed. App'x at 1006.

### C. The History and Characteristics of the Defendant and the Need to Provide the Defendant with Appropriate Medical Care

The history and characteristics of the defendant and the need to provide the defendant with appropriate medical care justify a sentence of 217 months. The defendant was first diagnosed with potential mental health issues in the year prior to the shooting after he went missing. The defendant has been alternately diagnosed with Major Depressive Disorder and Bipolar Disorder. The defendant has been on different medications at times. A sentence of 217 months would enable personnel at a Bureau of Prisons facility to observe the defendant over an extended period of time,

including making observations on how he is responding to medications and what steps can be taken prior to and upon release to reduce the defendant's dangerousness to himself and others.

### D. The Need for the Sentence Imposed to Provide Adequate Deterrence for Criminal Conduct

We live in a time in which people are extremely polarized in their political views. There are people who believe their political beliefs are worth killing and/or dying for. In 2024, there were two assassination attempts on a candidate for the presidency. More recently, the CEO of United Healthcare was assassinated, seemingly due to the assassin's political views. As described above, this political violence undermines our entire system of democratic elections. A sentence of 217 months is needed to provide adequate deterrence for politically-motivated violence.

### VI. CONCLUSION

For the reasons set forth herein, the United States respectfully requests that the Court apply the Sentencing Guidelines, follow the statutory directives set out in 18 U.S.C. § 3553(a), and follow the government's recommendation, by imposing a sentence of 217 months of imprisonment.

Respectfully submitted,

| | |
|---|---|
| MICHAEL A. BENNETT | COREY R. AMUNDSON |
| United States Attorney | Chief, Public Integrity Section |
| Western District of Kentucky | Criminal Division, U.S. Department of Justice |
| | |
| */s/ Amanda E. Gregory*_____ | */s/ Alexander Gottfried* |
| By: Amanda Gregory | By: Alexander Gottfried |
| Assistant United States Attorney | Trial Attorney |
| 717 West Broadway | 1301 New York Ave. NW |
| Louisville, KY 40202 | Washington, DC 20530 |
| Tel. 502-582-5016 | Tel. 202-615-1286 |
| amanda.gregory@usdoj.gov | alexander.gottfried@usdoj.gov |

**CERTIFICATE OF SERVICE**

I hereby certify that on January 17, 2025, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system, which will send a notice of electronic filing to defense counsel.

    s/ *Amanda E. Gregory*
    Amanda E. Gregory
    Assistant U.S. Attorney