UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

UNITED STATES OF AMERICA

v.                                                                                                   No. 3:22-cr-33-BJB

QUINTEZ O. BROWN

OPINION & ORDER

  Quintez Brown admitted that he "walked into Craig Greenberg's campaign office and knowingly shot at [him] multiple times" because "Greenberg was campaigning as a candidate for mayor of Louisville." Plea Agreement (DN 164) ¶ 3. After years of motions practice and trial preparation, Brown pled guilty to interfering with a federally protected activity (the mayoral election) and discharging a firearm during a crime of violence (the attempted shooting). *See* 18 U.S.C. §§ 245(b)(1)(A), 924(c)(1)(A). The second offense carried a mandatory minimum of 10 (consecutive) years' imprisonment. And the parties' written plea agreement called for a total sentence between 180 and 217 months under Federal Rule of Criminal Procedure 11(c)(1)(C).

  Despite the binding plea agreement and the Defendant's waiver of appellate rights, the parties devoted more than four hours to Brown's sentencing. The hearing covered hundreds of pages of briefing and exhibits, multiple victim-impact and character-witness statements, extensive testimony from Brown's psychiatrist, and Brown's allocution. The Court ultimately imposed a sentence of 210 months for the offenses—which, as discussed during the hearing, easily could've ended multiple lives and thrown the City of Louisville into another period of civic unrest.

  After sentencing but before the Court entered a final judgment, Brown's lawyers filed a motion (DN 190) to "reopen" the sentencing and hold another hearing to correct a purported procedural error. The motion stemmed from the Court's decision, during the sentencing hearing, to sustain Brown's objection to the Guidelines range calculated in the presentence report. The Guidelines range for the crime of interfering with federally protected activities, 18 U.S.C. § 245(b)(1)(A), turns on the level assigned to the underlying offense, § 2H1.1(a)(1), which the Probation Office here determined to be attempted murder, PSR (DN 184) ¶ 20. This set the base offense level at 33, while Brown contended it should be only 10, *see* § 2H1.1(a)(3) (use or threat of force or property damage), because the plea agreement and colloquy excluded the enhancement for an "attempt to kill." As explained at the outset of the hearing, the approach taken by the Government and Probation Office (base offense

1

level 33, adjusted to 30, with a criminal history category of I) resulted in a Guidelines range of 97–120 months, plus the mandatory consecutive 120 months, for a range of 217–40 months. Hearing Tr. (DN 191) at 11:19–12:9. Neither side objected to this calculation, *id.* at 12:8–9 (THE COURT: Do you agree with that? DEFENSE COUNSEL: Yes, Judge.")—at least not apart from Brown's argument that attempted murder shouldn't be considered the underlying offense.

On that point, the Court ultimately sided with the defense—but only after hearing hours of testimony about the shooting attempt and considering the parties' competing characterizations of the scope of the plea deal. Although the record—"the multiple attempts, the multiple guns, the search history, and the manner of the shooting"—made it hard to see the conduct as "anything other than premeditated murder," the Court declined to increase the offense level based on an offense the parties had specifically agreed Brown would *not* plead guilty to. *See id.* at 134:11–17. Given that people "have to turn square corners with the Government," "the Government has to turn square corners" with the people as well. *Id.* at 134:21–23. And without a clear contraindication in the plea agreement, the Court declined to rest what was effectively a 23-level enhancement on disputed conduct omitted from the agreed statement of facts.

This is the moment when Brown now says the Court erred in a manner that warrants revisiting his sentence. Criminal Rule 35(a) allows a court to "correct a sentence that resulted from arithmetical, technical, or other clear error."[1] Brown hasn't identified any "arithmetical" or "technical" deficiencies in his sentence. He doesn't, for example, argue that the Court "improperly" calculated the Guidelines range. *Gall v. United States*, 552 U.S. 38, 51 (2007). Yet he characterizes the sentencing decision as "a clear error" in two respects. First, "the Guidelines were not calculated." Reply (DN 195) at 1. Second, "a quantity of and reason for a variance … were not stated." *Id.*[2]

---

[1] Brown hasn't moved under 18 U.S.C. § 3582(c)(2) to modify the sentence.

[2] Under *Gall v. United States*, 552 U.S. 38, 51 (2007), sentencing judges must calculate the Guidelines range, consider the § 3553(a) factors, and "adequately explain the chosen sentence—including an explanation for any deviation from the Guidelines range." Sentencing judges also "must adequately explain the chosen sentence to allow for meaningful appellate review and to promote the perception of fair sentencing." *United States v. Recla*, 560 F.3d 539, 547 (6th Cir. 2009). Brown points to no rule or caselaw, however, requiring judges who calculate a guidelines range and impose a sentence above or below it to go further and specifically "calculate" or announce a variance that represents the difference. The premise of *Gall*'s "adequate explanation" requirement is that a defendant, victim, public observer, or reviewing court could discern the basis for the judge's sentence when viewed against the backdrop of the guidelines range—in other words, the reason for any variance.

Brown's first argument is flatly inconsistent with what happened next during the hearing. Granting the objection, the Court immediately acknowledged, "obviously, doesn't change the (C) plea range [and] doesn't change the statutory mandatory minimum sentence, but … would change the sentencing guidelines." Hearing Tr. at 135:11–13. At the outset of the hearing, the Court had recounted the Guidelines range of 217–40 months as calculated in the presentence report. *Id.* at 12:1–9. After expressly citing—and rejecting—the base offense level of 33 on which that calculation rested, the Court noted that Brown's successful objection made it "a seven after the acceptance of responsibility." *Id.* at 135:14.

Both defense counsel immediately agreed, with Mr. Eggert noting that the range became "ten and a half" years. *Id.* at 135:16–18. His answer actually represented the upper end of a range between 10 and 10.5 years, as the Court and prosecutor then clarified. *Id.* at 136:2–6.

Asked "what range would that give us?," *id.* at 136:2–3, the Government responded with the correct answer: "zero to six" for the interference count (the sole offense that required a calculation) plus a mandatory 120-month sentence for discharging a firearm during a crime of violence. *Id.* at 136:4. The Court then reaffirmed that it was granting the objection and "calculate[d] that guidelines range." *Id.* at 136:11–12.[3] "That" range, as the transcript makes clear, was the one just articulated by the Government and defense: 10 years for count two plus 0–6 months for count one—in other words, 120–126 months. Brown did not object to that calculation at the time.

And his reconsideration motion offers little more—only the sparest of objections, lacking any substantive argument whatever on this point. It merely asserts that "the Court did not calculate the Guidelines range, nor explain any variance from that range." Motion at 1. The dialogue just recounted is entirely absent. Had it been addressed, of course, it would've belied Brown's claim that the Court simply didn't calculate the range at all. Sustaining Brown's objection changed the Guidelines range from 217–240 months to 120–126 months—which should've been clear to anyone representing Brown or observing the trial.

The second argument—that the Court failed to explain its upward variance—fares no better. Reading on to the next lines in the hearing transcript—where the Court discusses the parties' agreed range of 180 to 217 months—supplies the reasons that justified Brown's sentence. Hearing Tr. at 136:12–16; *see also* Plea Agreement ¶ 11. The Court accepted the parties' C-plea agreement and explained why,

---

[3] Indeed, the Court gave Brown the benefit of the doubt and declined to consider potential cross references for second-degree murder and aggravated assault, which could've led to a higher offense level. Hearing Tr. (DN 191) at 136:4–15.

3

notwithstanding the attempted-murder ruling—"we are still in a situation in which a serious sentence … is appropriate." *Id.* at 136:13–15. And the ultimate sentence of 210 months was consistent with that view.

Under Rule 11(c)(1)(C), the parties' agreement "binds the court once the court accepts the plea agreement," which it did here. Given that agreement to a sentence between 180 and 217 months, it should've come to no surprise that Brown's sentence sat above his recalculated Guidelines range. Any other outcome would have violated Rule 11(c)(1)(C).

Yet the motion to reopen implies that the Court erred by varying "upward" from the Guidelines by 7 years—and by doing so "without an explanation or even an acknowledgement that he was doing so." Reply at 1. A sentence 7 years shorter, of course, wasn't even available unless the Court rejected the C plea—an outcome that no one advocated at the time and that Brown hasn't urged since.

Even assuming the plea deal hadn't set the floor at 180 months, however, it's puzzling how anyone in the courtroom would've missed, or misunderstood, the reasons for Brown's lengthy sentence. After acknowledging that the Guidelines range didn't "bind or determine" Brown's sentence, *id.* at 10:14–16, and hearing lengthy argument from both sides,[4] the Court analyzed the sentencing factors enacted by Congress in 18 U.S.C. § 3553(a). It did so in a discussion spanning four transcript pages before imposing a sentence below the upper bound of the plea agreement and below the Government's request, *see id.* at 136:16–140:22.[5]

The Court addressed why the nature and circumstances of this offense, *see* § 3553(a)(1), were particularly chilling:

---

[4] Counsel for Brown and the Government offered lengthy arguments based on the § 3553(a) sentencing factors, *see id.* at 108:12–113:6 (United States); 117:24–123:5 (Brown). Much of the Government's argument rested on the sworn, in-person testimony of an FBI agent that Brown supported a political opponent of now-Mayor Greenberg, posted social media content likening Greenberg to a devil, advocated "political warfare" rather than participation, searched online for the locations of Greenberg's children, bought two guns, photographed himself at an Indiana firing range, traveled to Greenberg's house the night before the shooting, jammed his gun by loading a bullet backwards, visited a pawn shop and the campaign headquarters the next day, and fired six shots at Greenberg in his office before campaign staff forced him out of the room. *See* Hearing Tr. at 14:7–41:4 (direct examination of Special Agent Riley Konzen).

[5] No party directly based any sentencing argument in a particular policy statement, § 3553(a)(5), or any request for restitution, § 3553(a)(7).

>   Obviously, the threat of civil and political violence in this country is nothing to be underestimated right now. I think we heard that in very different ways from both sides today. And with all due respect, I agree with the prosecutor that this crime is different, because not only did it have a great effect on the victims who were there that day, even if they weren't physically hurt, certainly they were emotionally harmed, and it is only a miracle, in all likelihood, as one victim said, that no one was actually hurt and possibly killed.
>
>   Not only did that act of violence harm their families, their friends, the other people who worked there, but it also represented a threat to the [whole] way that people in our communities come together to work out our policies, our disagreements in an orderly way by voting rather than fighting and by debating rather than killing or shooting, and I don't think any of us should underestimate how precious [is] the trust and the civility that allows us to live together.
>
>   Certainly, we can all go back to 2020, 2021, and think about how this community, in particular, was teetering and had existential questions about whether we, in fact, could live together, and I am grateful for the victims, I am grateful for Mr. Brown, I am grateful for the community that we're not here dealing with a much worse outcome for the families, for the victims, and for the political process.

Hearing Tr. at 136:19–137:17.

   The intense risk of political and community violence, therefore, set this case apart from the class of "harmless" failed shootings cited by defense counsel, who argued that the sentence was excessive since he "didn't hurt anybody." *Id.* at 122:12–123:5. The sentence didn't create an "unwarranted sentencing disparit[y]," *see* § 3553(a)(6), in part because—as both sides noted—no one knew of another case quite like this one. Hearing Tr. at 127:3–128:11. Brown's own distinctive history and characteristics, *see* § 3553(a)(1), contributed to this. The Court considered the hearing remarks of Professor Russell and Dr. Jones, as well as letters submitted by many friends and family members who helped the Court "understand the full person we're dealing with today." *Id.* at 137:24–138:6. The sentence was one that accounted for Brown's youth and the growth he'd experienced since the case began.

   It also accounted for "the kinds of sentence and sentencing range" applicable here, *see* § 3553(a)(3)–(4), by rejecting the notion, offered by a witness, that Brown had been "forgotten in this circumstance." Hearing Tr. at 138:19–20. In deciding Brown's sentence, the Court considered Brown's life after incarceration. And the Court dispelled any perception that it would overlook Brown's potential: It thanked Brown's supporters for their involvement in his sentencing, considered how its

5

sentence would "relat[e] to the rest of [Brown's] life," and contemplated "how we can go forward" after this tragedy. *Id.* at 138:21–25. The Court also arrived at a partially non-custodial sentence. After imposing a five-year term of supervised release, the Court expressed its hope that Brown's rehabilitation would prime him for early termination of supervision. *Id.* at 140:12–16. "[E]ducational or vocational training, medical care, [and] other correctional treatment" while incarcerated, § 3553(a)(2)(D), the Court recognized, gave reason for optimism when considered alongside Brown's youth, talents, and community support, Hearing Tr. 138:7–18; *id.* at 139:1–7. The Court granted defense counsel's request for a recommendation that the Bureau of Prisons evaluate Brown for mental-health treatment while in custody; it also imposed mental-health treatment and drug-testing requirements as part of his conditions of supervised release. *See id.* at 140:17–18; *id.* at 141:10–15. Although Brown's offenses were deadly serious, his sentence accounted for "the amount of life and understanding and healing that may be ahead" for him. *Id.* at 138:9–11.

In the end, the appropriate sentence was one that reflected the seriousness of this offense, promoted respect for the law, and provided just punishment. § 3553(a)(2)(A). "[G]iven the nature of the offense[,] the extreme risk, and the good fortune that we weren't looking at a potential life sentence and death on the part of the victims here, a very serious sentence toward the end—toward the upper end of the agreed range [was] appropriate." Hearing Tr. at 139:12–16. As Brown himself noted, "what [he] did tore us apart." *Id.* at 131:19. Or at least threatened to, given the miraculous nature of one jammed gun (the night before at Greenberg's home) and six consecutive missed shots from point-blank range. *Id.* at 99:6–13.

This sentencing was one of the most extensive and difficult such hearings known to most of the people in the packed courtroom. Why it should happen again— with all the pain and uncertainty that would entail for the victims, the community, and family and friends on both sides—is hard to perceive on a personal level. And harder still to understand as a legal matter. As his teachers attested on the witness stand, Brown revealed many remarkable qualities before his tragic fall from star scholarship student to incarcerated felon; many no doubt persist today and, we trust, more will develop as he continues to mature and grow. Yet his premeditation, attempted violence, disruption of civic trust, and threat to the democratic process all support a serious sentence toward the top end of the plea agreement's range. Nothing about the way the parties argued or the Court articulated the Guidelines range would change the plea agreement or the Court's sentencing discretion and decision under the law. This was a serious crime that merited a serious sentence—of 210 months— for all the reasons laid out for Brown, the victims, and their family and friends at the hearing.

## ORDER

The Court denies Brown's motion to reopen his sentencing hearing (DN 190) and his subsequent motion for a hearing on that request (DN 197).

Case 3:22-cr-00033-BJB-CHL   Document 199   Filed 05/22/25   Page 7 of 7 PageID #: 2431